UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JHISAIAH MYERS, on behalf of himself
and all others similarly situated,

*Plaintiff*,

v.

COUNTY OF NASSAU, NASSAU
COUNTY CIVIL SERVICE
COMMISSION, and NASSAU COUNTY
POLICE DEPARTMENT,

*Defendants*.

Docket No. 22-cv-7023

**CLASS ACTION COMPLAINT**

***JURY TRIAL DEMANDED***

Plaintiff Jhisaiah Myers, on behalf of himself and a class of similarly situated individuals, by and through his attorneys, the Law Offices of Frederick K. Brewington, Newman Ferrara LLP, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, alleges, upon information and belief, as follows:

**PRELIMINARY STATEMENT**

1.    This case is brought to remedy longstanding, invidious racial discrimination by Defendants in the hiring of police officers in Nassau County.

2.    As demonstrated below, hiring data obtained through Freedom of Information Law requests, the individual experiences of applicants such as the named Plaintiff, and other publicly available information demonstrate that Defendants unfairly, improperly, and unlawfully eliminate qualified non-white applicants from consideration for employment as police officers.

3.    Plaintiff Jhisaiah Myers grew up and continues to live in Freeport in Nassau County.  He currently serves as an active duty member of the New York City Police Department. Because he has long sought to serve the community he calls home, in late 2017, Officer Myers

applied to become a Nassau County police officer, a job for which he is plainly qualified. Officer Myers passed the written exam, performed well on the physical agility test, and—as evidenced by his current work—has a background that strongly reflects his respect for the law.

4.      Officer Myers' qualifications, however, could not overcome the pervasive discrimination in the Nassau County police officer hiring process.  Despite his impressive background, Defendants claimed that Officer Myers' "motor vehicle record"—which consisted of nothing more than minor accidents and timely paid, decade-old traffic tickets for minor non-moving violations—amounted to "disrespect for the process of law" that purportedly rendered him unfit for the job.

5.      This is obviously pretext.  As an initial matter, around the same time that Defendants disqualified Officer Myers from becoming a Nassau County police officer, the NYPD, which traditionally has high standards for selecting applicants, considered his record and qualifications and offered him a position as an NYPD officer.

6.      What is more, in approximately the same time period, Defendants hired white applicants who have far more troubling records.  In 2016, for example, the Nassau County Police Department ("NCPD" or "Police Department") welcomed into its ranks an individual who, while serving as a police officer with another department, allegedly threw a pregnant woman to the ground on her abdomen during a traffic stop.  Similarly, in 2020, the NCPD hired an individual who, while serving as a police officer with another department, allegedly stood around and did nothing while his friend beat another man unconscious.  The reason for Officer Myers' different treatment by Defendants is not his motor vehicle record or a purported disrespect for the law.  It is that those officers are white, and Officer Myers is Black.

7.      Officer Myers is not an isolated example.  Hiring data obtained from Defendants through FOIL requests shows that non-white applicants have been disqualified from the hiring process at an alarming rate that significantly exceeds the rejection rate for white applicants.  This problem is spread pervasively throughout the process and routinely transforms applicant pools that initially mirror the County's diverse demographics into recruit classes that are unjustifiably and disproportionately white.  The end result is that, for the most recently completed hiring cycle, which concluded in 2019, Defendants hired 6.9% of white applicants, but merely 3.7% of Hispanic applicants, and just 1.8% of Black applicants.

8.      These discriminatory hiring figures result in large part from a highly subjective, post-written examination screening process (the "post-exam process").  This post-exam process affords Defendants the latitude to discriminatorily weed out otherwise qualified non-white applicants who make it through the written exam and into the processing pipeline.

9.      The numbers speak for themselves: Defendants hired white applicants who began the post-exam process 1.61 times more often than similar Hispanic applicants, and a staggering 2.84 times more often than similar Black applicants.  As demonstrated below, this is a shocking and statistically significant difference that cannot be attributed to non-discriminatory factors.

10.     None of this is news to Defendants.  More than 40 years ago, the United States Department of Justice commenced an action to enjoin the use of discriminatory hiring practices by Defendants.[1]  The DOJ's complaint focused largely on what then appeared to be the greatest impediment to diversity—the written examination.  It alleged that, through the exam and other means, Defendants had "pursued and continue to pursue policies and practices that discriminate

---

[1] Specifically, the DOJ sued the County, the Commissioner of Police, and the Civil Service Commissioners. *See U.S.* v. *Nassau Cnty. Police Dep't*, 77-cv-01881 (E.D.N.Y. Sept. 21, 1977).

against blacks, Spanish-surnamed individuals, and women with respect to employment opportunities within the police department." It further alleged that "[u]nless restrained by order of this Court, defendants . . . will continue to pursue" their discriminatory policies and practices.

11.     The DOJ's lawsuit resulted in the issuance of a consent decree by the United States District Court for the Eastern District of New York that should have remedied the historical pattern of discrimination in Defendants' hiring of police officers. The consent decree mandated that Defendants "adopt[], and . . . seek in good faith to achieve, the objective of employing blacks, Hispanics and females in all sworn ranks and non-sworn positions" within the Police Department. And Defendants expressly recognized that nondiscriminatory selection "should result in the appointment of blacks, Hispanics and females as Police Officers in the NCPD at levels which approximate their proportions in the pool of qualified applicants."

12.     The consent decree imposed a strict reporting regimen to track Defendants' hiring practices. The decree required that Defendants collect detailed demographic data, including "the total number of persons who passed and who failed, respectively, any selection qualification or criterion for the position of police officer used by the County." In other words, it required that Defendants create the necessary tools to identify and remediate components of the hiring process that stood in the way of achieving the diversity mandated by the Consent Decree.

13.     Despite having more than 40 years to achieve an integrated police force, however, Defendants have failed to diversify the ranks of Nassau County police officers. In fact, the numbers show that Defendants continue to implement their discriminatory tactics in the post-exam process, allowing these more subjective steps to weed out qualified non-white applicants who manage to pass the difficult written exam.

14. Defendants' conduct in this regard is well known. On May 27, 2021, Long Island daily *Newsday* published a detailed report on the lack of diversity in the Nassau and Suffolk County Police Departments. *Newsday* reported that in the six years following Nassau County's 2012 hiring exam, the NCPD hired only 36 Black officers out of 2,508 Black applicants, and that as of March 2021, only 103 of the NCPD's approximately 2,400 police officers were Black, which is *fewer* than the total number of Black police officers employed by the NCPD in 1991.

15. *Newsday* reported that throughout the hiring process—including the post-exam process—Defendants disqualified Black applicants at a significantly higher rate than white applicants. As *Newsday* correctly explained, "[t]he rates at which minority candidates were eliminated in subjective tests after passing written tests defy reasonable explanation."

16. None of this is by accident. For years, Defendants have utilized discriminatory hiring practices that exclude non-white applicants from the ranks of Nassau County police forces. In addition to denying the community a police force that more clearly reflects the demographics of the County, this important "path to the middle class" has for far too long been virtually closed to non-white applicants. Upon information and belief, this is a result of Defendants' intentional efforts to exclude non-white officers from the NCPD.

17. Despite Defendants' awareness of these problems, they have taken no meaningful action. To the contrary, the tone from the very top of the NCPD is one that accepts and promotes discrimination. Rather than treating Defendants' legal obligation to promote diversity as an important priority, current NCPD Commissioner Patrick Ryder has referred to the consent decree as a "farce" and described it as a "game that gets played in the numbers." Similarly, after learning of the troubling police officer hiring statistics, Ryder indicated that he "liked" the system that produced these discriminatory results. This is no surprise, coming from an official

who unjustifiably blamed the lack of diversity on "broken homes" and, as alleged in sworn testimony in a recent deposition, referred to a Black female ex-police officer as a "f*cking [n-word]."

18.     Defendants have, in sum, discriminated against Officer Myers and similarly situated applicants in violation of 42 U.S.C. § 1983 ("Section 1983") and the New York State Human Rights Law, N.Y. Exec. L. §§ 290 *et seq.* ("NYSHRL"). This discrimination has been allowed to continue for far too long and must come to an end. This court should provide Officer Myers, and others like him, with the relief to which they are entitled under the law—including an equitable, transparent, and fair police officer hiring process.

## JURISDICTION

19.     The Court has jurisdiction over the subject matter of this civil action arising under the United States Constitution pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

20.     This Court is requested to exercise pendent jurisdiction over Plaintiffs' NYSHRL claims pursuant to 28 U.S.C. § 1367 because they arise from a common nucleus of operative facts with the federal claim and are so related to the federal claim as to form part of the same case or controversy under Article III of the United States Constitution.

## VENUE

21.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants conduct business and can be found in this District and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

22.     Plaintiff JHISAIAH MYERS is a 36-year old Black male who has successfully worked as an NYPD police officer since 2021. Officer Myers resides in the County of Nassau, State of New York. The proposed class includes all non-white applicants to become police

officers in Nassau County who were disqualified from consideration by Defendants during the post-exam process (the "Class").

23.    Defendant COUNTY OF NASSAU is a municipality of the State of New York.  It funds, oversees, maintains, manages, supervises, and/or controls several departments, agencies, and employees, including the Nassau County Civil Service Commission ("Civil Service"), the Police Department, and the Police Commissioner, and was and is the employer of members of the Police Department.  The County is an employer within the definition of the New York State Executive Law and employs over 15 employees.

24.    Defendant NASSAU COUNTY CIVIL SERVICE COMMISSION is a municipal civil service commission that operates pursuant to the New York State Constitution, New York State Civil Service Law, and the Nassau County Rule Book.  Civil Service administers the entry-level police officer examination and is responsible for coordinating all phases of the qualifying process for law enforcement positions.

25.    Defendant NASSAU COUNTY POLICE DEPARTMENT is an agency of the County of Nassau and operates under the direction and on behalf of the County of Nassau.  The Police Department is an employer within the definition of the New York State Executive Law and employs over 15 employees.

## FACTUAL ALLEGATIONS

### Background

26.    Officer Myers, a 36-year old Black man, is a patrol officer in the 25th precinct of the NYPD, covering the northern part of East Harlem.

27.    Officer Myers moved to Freeport when he was three years old, and he has lived there for more than 30 years.  He attended St. Pius V School for his elementary education (1st to

6th Grades), John W. Dodd Middle School for middle school (7th to 8th Grades), and graduated from Freeport High School in 2005.

28.     Officer Myers' community involvement began early in his youth.  Growing up, Officer Myers attended the Faith Baptist Church of Hempstead, New York, and, like many in his family, sang in the church choir.  He also participated in the Boy Scouts.

29.     In high school, Officer Myers played second base for the varsity baseball team and was a member of the varsity wrestling team.

30.     After graduating high school, Officer Myers initially worked as a direct care provider with the United Cerebral Palsy Association of Nassau County, Inc.

31.     In 2008, Officer Myers began work as a medical coordinator for AHRC Nassau, a non-profit that supports individuals with disabilities.  In this role, Officer Myers was responsible for working with individuals—from ages seven through 82—to ensure their hygienic and medical needs were met.  He also managed field trips, as well as medical services for individuals billed through Medicare and Medicaid.

32.     In 2009, Officer Myers took on another job—working as a youth support counselor for MercyFirst in Syosset, a non-profit human and social services agency that serves children and families in need.  He mentored young people aged nine to 21 with various psychiatric disorders to help them overcome trauma, assisted with their daily living skills (including hygiene and cleanliness), and provided recreational therapy (e.g., fishing and sporting events).

33.     Officer Myers thereafter decided to return to school.  From 2011 through 2012, he attended Sanford-Brown Institute, a trade school in Melville, New York.  An honor roll student,

Officer Myers graduated with a 3.14 GPA, and an associate's degree in business administration. All this while continuing to work at both AHRC Nassau and MercyFirst in Syosset.

34.     After graduating, Officer Myers continued to work as a medical coordinator at AHRC Nassau. Among other things, he also took up work in 2016 as a direct support professional with Adults & Children with Learning & Developmental Disabilities, Inc. ("ACLD"), where he played a similar role.

35.     In short, Officer Myers has been a valued and dedicated member of the Nassau, New York community for more than 30 years.

<u>Discrimination Against Officer Myers</u>

36.     Officer Myers' interest in law enforcement began well before his application to become a Nassau County police officer. He dreamed of being a cop since he was a little kid. Then, as a high school student in 2003, Officer Myers took a course on law that required him to work on, among other things, a mock argument. He expressed so much interest in this course that his teacher encouraged him to consider law enforcement.

37.     Officer Myers' childhood dream turned into a concrete desire in 2014. Prompted by a conversation with a detective, who similarly encouraged that Officer Myers consider a career in law enforcement, Officer Myers began to apply for such roles so he could continue to serve those most in need in his community—as he had already done for many years.

*Application to Become a Nassau County Police Officer*

38.     In late 2017, Officer Myers registered for the written examination that commences the hiring process for aspiring Nassau County police recruits. While continuing his work as a medical coordinator assisting individuals with disabilities, Officer Myers began to prepare for the application process, purchasing study guides from National Learning Corporation to help inform his studies, and working out to remain physically fit.

39.     In early 2018, Officer Myers took a written civil service exam alongside many other applicants at the Nassau Coliseum. The pool of fellow applicants was substantially diverse, with many non-white applicants sitting alongside Officer Myers to take the exam. He achieved a sufficiently high score to be added to the corresponding list of passing candidates eligible to be selected by Defendants to continue the hiring process (the "eligibility list").

40.     In May 2019, over a year later, the Civil Service delivered Officer Myers a letter informing him that he had been selected to continue with the hiring process. The next step was to take a so-called "physical agility test." Officer Myers took and passed this test, finishing third out of 25 participants in the timed 1.5-mile run.

41.     In March 2020, the Police Department's Applicant Investigation Unit informed Officer Myers that it would begin conducting his background check, which is the next step in the hiring process. Officer Myers was assigned a white investigator (the "NCPD Investigator"). Officer Myers met with the NCPD Investigator and discussed the answers he had previously provided to a mandatory questionnaire regarding his background and history.

42.     Despite the apparent lack of significance, Officer Myers dutifully disclosed that, some eight to nine years earlier, he received traffic tickets on three occasions for non-moving violations: (a) a ticket for tinted windows on July 12, 2011; (b) seven tickets arising from a single traffic stop on May 2, 2012—each for a minor infraction, such as having a non-conforming license plate cover; and (c) five tickets arising from a single traffic stop on August 6, 2012—each again for a minor infraction, such as having a non-conforming license plate cover (which Officer Myers had previously adjusted following the last traffic stop in an effort to avoid further tickets).

43.     Officer Myers discussed with the NCPD Investigator the context for these traffic tickets, including that almost all resulted from just two traffic stops, that he had not received additional tickets since August 2012, and that he timely paid each of the tickets he received.  She asked him to be "very detailed" in his explanation.

44.     Officer Myers' record was otherwise pristine.  He had no arrests or convictions; no gang affiliation; no use of recreational drugs, including marijuana; no other negative interactions with law enforcement officers; only minor car accidents for which he was not at fault; and had never been terminated from a job.

45.     Officer Myers was, in short, fully qualified to serve as a Nassau County police officer, and he had no reason to think that distant, minor, timely paid non-moving violations would cause his disqualification.

*Disqualification by Defendants*

46.     On August 6, 2020, the Civil Service informed Officer Myers that he had been disqualified, purportedly for "disrespect for the process of law and order as evidenced by [his] motor vehicle record."

47.     The Civil Service's decision surprised Officer Myers.  As explained above, he had no arrests, no convictions, and no moving violations on his record, nor did he have any problematic employment history, medical, or psychological problems.

48.     Officer Myers tried to solicit further information regarding his disqualification from the Police Department, but he was referred to the Civil Service, which similarly failed to offer any additional details.

49.     Officer Myers also reached out to a member of the Nassau County Legislature for assistance, but the County Legislator informed him that they also could not provide any assistance.

*Appeal of Defendants' Disqualification*

50.     With no real understanding of why he was disqualified, and facing an informational stonewall, Officer Myers engaged an attorney to help with his appeal.

51.     Officer Myers did not hear from his attorney for many months, and he presumed that his appeal remained under review.  It was only in June 2021 that the attorney informed Officer Myers that the Civil Service had rejected his appeal.

52.     As Officer Myers would learn, the Civil Service had summarily rejected his appeal.  It did not solicit any additional information; bring him in for a meeting to discuss his qualifications; or otherwise attempt to further explore or explain the basis for his disqualification.

*Continued Pursuit of Employment as a Nassau County Police Officer*

53.     In August 2021, still determined to serve his community, Officer Myers again reached out to the County Legislator.  The County Legislator connected Officer Myers with a representative of the Nassau County Guardians, who said they would look into the matter.

54.     In September 2021, the Nassau County Guardians representative told Officer Myers that they had spoken with the Freeport Police Department.  This department is a smaller, local force that draws recruits from a list of eligible candidates generated by Defendants through their hiring process.[2]

55.     As a resident of Freeport, Myers hoped to work for the Freeport Police Department, in particular, and the force indicated to the Nassau County Guardians representative that it would have hired Officer Myers had he been added to the list of approved hires.

56.     Officer Myers thereafter sent a second appeal letter to the Civil Service in October 2021.  The Civil Service responded that it "conducted a thorough review of all the

---

[2] Defendants administer the hiring process to determine eligibility for police officers to be hired by both the NCPD and other local police forces, such as the Freeport Police Department.

materials submitted in connection with [his] disqualification" but "determined that [his] appeal process ha[d] been completed as of our letter dated October 29, 2020" and that "[his] time to appeal ha[d] expired."

*Comparison to Defendants' Treatment of White Applicants*

57.     Defendants' treatment of Officer Myers stands in stark contrast to their treatment of white applicants with far more significant background issues that were uncovered—or should have been uncovered—during their background investigations.

58.     In 2016, the NCPD hired a former NYPD officer, who on information and belief is a white male ("Officer A"). Officer A's record reflects serious concerns.[3]

59.     In July 2014, a 29-year-old Black male filed a complaint with the New York City Civilian Complaint Review Board alleging that Officer A engaged in four kinds of misconduct (referred to as "FADO," or "Force, Abuse of Authority, Discourtesy, and Offensive Language").

60.     The complaint accused Officer A of engaging in acts of (a) "Discourtesy: Word"; (b) "Abuse of Authority: Threat of force (verbal or physical)"; (c) "Discourtesy: Action"; and (d) "Abuse of Authority: Retaliatory summons." All but (c) were "Substantiated (Command Discipline)," meaning that "[t]he alleged conduct occurred and it violated the rules."

61.     In March 2015, according to a lawsuit filed against Officer A, he and another officer stopped a Black social worker, then seven months pregnant, on her commute to work. Officer A allegedly pulled the woman from the driver's seat, threw her to the ground, and called her a "fat bastard." Officer A resigned within months, and the lawsuit settled.

62.     In 2020, the NCPD hired a former NYPD officer, who on information and belief is a white male ("Officer B"). Officer B's record also reflects serious concerns.

---

[3] In addition to these serious concerns, Officer A's record also reflects three traffic accidents.

63.     In April 2016, surveillance video allegedly captured Officer B, then off-duty, standing by as his friend beat another man unconscious.  According to a lawsuit filed by the victim, just before the assault, Officer B flashed his badge and said, "I'm with the NYPD.  You're not going anywhere."  The NYPD fired Officer B in June 2017.

64.     The comparison is stark.  All three individuals were hired by the NYPD.  Only the two white officers, however, were hired by the NCPD, despite well-publicized allegations of their involvement in egregious misconduct.

65.     Indeed, both of these officers completed (or should have completed) the same hiring process to which Defendants subjected Officer Myers, and through the process Defendants learned (or should have learned) of the very concerning facts described above.

66.     There is no credible, non-nondiscriminatory explanation for how Officer Myers was treated compared to the two applicants who were not disqualified based on exponentially more serious issues.

*Application to the NYPD*

67.     Understanding the competitiveness of the process of seeking employment as a Nassau County police officer, and committed to his goal of joining law enforcement, Officer Myers simultaneously pursued employment with the NYPD.

68.     Officer Myers underwent a similar hiring process, including an extensive background check process similar to the background check undertaken as part of the Nassau County hiring process.

69.     Officer Myers had virtually the same conversation with the NYPD investigator, an Asian-American officer, as he had with the NCPD Investigator, informing him that all his traffic tickets were timely paid, that they resulted from three stops, and that they were for non-moving violations.

*Offer of Employment by the NYPD*

70.     On December 29, 2020, just months after he was disqualified from consideration for the position of Nassau County police officer, Officer Myers was admitted to the NYPD Police Academy as a recruit.  He ultimately graduated from the Academy on June 2, 2021.

71.     Today, Officer Myers patrols the 25th precinct of the NYPD, commuting each day to protect and serve a community for which he cares greatly but in which he does not reside.

72.     Officer Myers is proud to be an NYPD officer, and he takes the difficult circumstances in stride.  Officer Myers works a difficult beat, confronting all too much domestic violence, homelessness, and drug abuse.  But despite the difficulties, Officer Myers is fulfilled by his job, and he has received positive feedback on his performance.

73.     Officer Myers nevertheless continues to desire employment as a police officer in his home County of Nassau and his hometown of Freeport.  But, due to Defendants' discrimination, he was robbed of the opportunity to serve the community in which he grew up.

74.     Officer Myers worries that 20 years from now, the next young Black man in his situation will still face the same barriers to becoming a Nassau County police officer, a concern that the following facts show is all too well-founded.

<u>Defendants' History of Discriminatory Hiring Practices</u>

75.     Officer Myers' disqualification is part of Defendants' long-standing pattern of discriminating against non-white applicants in the hiring of police officers.

*The Consent Decree*

76.     On September 21, 1977, the DOJ filed an action alleging that the County[4] had "pursued and continue[d] to pursue policies and practices that discriminate against blacks,

---

[4]  This term is defined in the Consent Decree as encompassing the other named defendants in that action, and the references to "County" in this section mirror that definition.

Spanish-surnamed individuals and women with respect to employment opportunities within the police department," in violation of, among other things, Title VII of the Civil Rights Act of 1964 and the Fourteenth Amendment. The action focused on what then appeared to be the principal barriers to diversity—including, in large part, the discriminatory written examination.

77.     On April 21, 1982, the Court entered a Consent Decree resolving the litigation, in which the County represented that it "realizes that certain of its selection criteria for hire into and promotion within the Nassau County Police Department . . . , certain of its personnel practices within the NCPD, and the existence of a substantial disproportion between the percentages of blacks, Hispanics and females in the NCPD as compared [their] percentages . . . within the relevant labor market, may give rise to an inference that discrimination has occurred."

78.     "The major purpose of th[e] Decree [was] two-fold: to ensure that blacks, Hispanics and females are considered for employment by Nassau County in the NCPD on an equal basis with white males, and that the present effects of the County's alleged prior discriminatory employment practices against blacks, Hispanics and females be corrected."

79.     The County agreed to "adopt[]" and "seek in good faith to achieve, the objective of employing blacks, Hispanics and females in all sworn ranks and non-sworn positions within the NCPD in numbers which roughly approximate their respective interest in and ability to qualify for such employment under non-discriminatory selection procedures and criteria."

80.     Specifically, the Consent Decree mandated that the County "shall seek to develop and to utilize qualifications and selection criteria for hire, assignment, transfer and promotion within the NCPD which have no discriminatory impact or which have been validated in accordance with Title VII, and with the Uniform Guidelines on Employee Selection Procedures issued pursuant thereto . . . or successor guidelines."

81.     The County agreed that it "hereafter shall fill Police Officer appointments in the NCPD by fair and nondiscriminatory selection from amongst qualified candidates." And the Consent Decree was clear: "It is the expectation of the parties that such nondiscriminatory selection should result in the appointment of blacks, Hispanics and females as Police Officers in the NCPD at levels which approximate their proportions in the pool of qualified applicants."

82.     The Consent Decree also mandated that the County "immediately adopt and implement an active and continuing recruitment program directed toward increasing substantially the numbers of qualified black, Hispanic and female applicants for the rank of Police Officer in the NCPD in accordance with the purpose and objectives of th[e] Decree."

83.     Although the Consent Decree prescribed quite specific relief to remedy certain problems that had been identified with the hiring process, it did not separately address the racial discrimination inherent in the post-exam process—the focus of the instant action—nor did it tailor relief to address those particularly acute discriminatory practices.

84.     Importantly, the Consent Decree did not rely on blind faith to guarantee the County's compliance. It instead provided that the County "shall submit to the United States, within twenty (20) days after every four-month period of time following the entry of this Decree, a report which contains" a substantial amount of information that would allow the DOJ—and the County—to track the progress being made. The information was to include:

(a)     The total number of personnel (sworn and non-sworn, full and part-time) employed by the NCPD as of the end of that four-month period, with a numerical breakdown by rank (if sworn), job (if non-sworn), race, national origin, and sex;

(b)     The total number of persons who applied for the position of police officer during that four-month period, with a numerical breakdown by race, national origin, and sex, the

total number of persons who passed and who failed, respectively, any selection criterion for the position of police officer used by the County during that four-month period, with a numerical breakdown by race, national origin, and sex for each selection qualification or criterion;

(c)     The name, race, national origin, sex, and date of hire of each person hired as a police officer recruit in the NCPD's Training Academy during that four-month period; and

(d)     The name, race, national origin, sex, and date of appointment of each person who graduated from the NCPD's Training Academy and was appointed a police officer during that four-month period.

85.     The Consent Decree required that the County "retain during the life of this Decree, and . . . make available to the United States for inspection and copying upon written request, all documents, records, or other memoranda pertaining to the recruitment, selection, hire, assignment, transfer, promotion, demotion, discipline and termination of all personnel in the NCPD." And, to ensure compliance, it required the designation of "one official . . . who shall be responsible for coordinating and overseeing the County's compliance with this Decree."

86.     The Consent Decree provided that the County "shall be entitled to such dissolution of th[e] Decree, if it has complied with th[e] Decree in all material respects."

*Defendants' Abject Failure to Comply with the Consent Decree*

87.     Defendants have utterly failed to comply with their obligations under the Consent Decree, with hiring figures today even more discriminatorily disproportionate than in 1977.

88.     There is a substantial disproportion between the percentages of non-whites in the NCPD as compared to their percentages within the Nassau County population. Around the time of the DOJ's lawsuit, the NCPD was over 95% white, as compared to a population in the County

that was approximately 91% white.  By contrast, according to recent Census data,[5] non-Hispanic whites today make up approximately 57% of the County's population as compared to approximately 87% of the NCPD's officers.  Meanwhile, Blacks comprise approximately 13% of the County's population but only approximately 4% of the NCPD.

89.    As *Gothamist* reported learning from FOIL requests, the breakdown of the NCPD as of 2020 was as follows:

|  | White | Hispanic | Black | Asian | Other |
|---|---|---|---|---|---|
| Police Officer | 1464 | 141 | 73 | 20 | 7 |
| Detective | 268 | 34 | 18 | 3 | |
| Sergeant | 150 | 4 | 4 | 1 | 1 |
| Detective Sergeant | 52 | 2 | 4 | | 1 |
| Lieutenant | 72 | 3 | 1 | 1 | |
| Detective Lieutenant | 20 | 1 | | | |
| Captain | 2 | | | | |
| Detective Captain | 1 | | | | |
| Deputy Inspector | 13 | | | | |
| Inspector | 13 | | | | |
| Chief | 11 | | 3 | | |
| | 87% | 8% | 4% | 1% | 0% |

*Gothamist's* source: Nassau County Police Department demographics by rank in 2020.  Obtained through a freedom of information request.

90.    Nor is there evidence that Defendants are moving in the right direction.  As of October 2021, for example, only 108 of the NCPD's approximately 2,500 police officers were Black, which is still *fewer* than the total number of Black police officers in 1991.

---

[5] *Quick Facts: Nassau County, New York*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/nassaucountyn ewyork (accessed Nov. 15, 2022).

91.     In short, the NCPD—for a long time—has not appropriately represented the community that it serves, and it continues to trend in the wrong direction.

*Defendants' Hiring Process for Police Officers*

92.     The continuing lack of diversity among Nassau County police officers results from a discriminatory hiring process, which on information and belief entails these steps:



(a)     Written Examination.  Candidates must first complete an application and appear for a written examination, administered by the Civil Service, to be considered for employment as a police officer.  Candidates that achieve a sufficiently high score on the exam, referred to as "passers," are added to the resulting "eligibility list."  The list reflects candidates who may—but not necessarily will—be called in for further processing with their candidacy.

(b)     Physical Agility Test.  Applicants selected by the Civil Service for further processing—which is done largely in order of the scores on the written exam, in a process called "canvassing"—continue with a "physical agility test."  The test includes push-ups, sit-ups, and a timed 1.5-mile run.  A Civil Service employee, in his or her sole discretion, determines whether an applicant properly meets odd and complicated fitness standards.

(c)     For example, Defendants' onerous push-up requirements are as follows:

The objective is to perform the required number of push-ups correctly. This is a maximum effort test with no time limit. You will begin the test in the up position with your hands approximately shoulder width apart. Your back must be kept straight at all times. You may stop to rest in the up position only. If your knees or torso touch the floor, it will result in that repetition not being counted. Failure of your sternum to touch the testing block will result in that repetition not being counted. Failure of your elbows to fully extend will result in that repetition not

being counted. The counter will inform you when you have obtained the required number of push-ups.

        (d)      The County's similarly complex sit-up requirements are as follows:

The objective is to perform the required number of sit-ups correctly within a one-minute time limit. You will begin in a down position with your back on a bench. Your legs will be placed in a bent-leg position with your fingers interlocked behind your head. You may stop to rest in the up position only. Your elbows must pass your knees on each repetition. If you lie down on the bench, the test is terminated. Your failure to sit fully upright will result in that repetition not being counted. Failure of your fingers to remain interlocked behind your head will result in that repetition not being counted. Failure of your hips to remain down on the bench will result in that repetition not being counted. Failure of your shoulder blades to touch the bench in the down position will result in that repetition not being counted.

        (e)      <u>Background Investigation</u>.  Applicants that pass the physical agility test proceed to a background investigation, which is based in part on a questionnaire each fills out prior to this stage disclosing, *inter alia*, employment, criminal, driving, and financial history.

        (f)      With the questionnaire in hand, the NCPD's Applicant Investigation Unit meets with the applicant and their references.  An assigned investigator discusses with the applicant matters they deem relevant, and then drafts a background report summarizing the candidate.  The investigator has discretion on what to include in each investigative report—and how and in what language to frame the issues—and there is no timeframe by which it must be completed.

        (g)      The background reports ultimately make their way to the Civil Service Commissioners, who review the reports and either disqualify an applicant or permit them to continue with the hiring process.  The analysis is driven by highly subjective determinations—

for example, whether an applicant's background reflects "a record of disrespect for the requirements and processes of law"[6]—unbounded by objective, non-discriminatory guideposts.

      (h)    <u>Post-Investigation Steps</u>.  When an applicant proceeds beyond the background investigation, they then undergo a battery of additional tests, including: (a) a polygraph; (b) a psychological evaluation; and (c) a medical examination.

      (i)    *Polygraph*.  Failing a polygraph examination is not *per se* disqualifying. Rather, examiners use the polygraph to solicit disqualifying information.  Examiners have discretion to determine how forcefully to press a candidate to admit to disqualifying behavior.

      (j)    *Psychological and Medical Examination.*  The psychological evaluation and medical examination, too, involve individualized—and therefore inherently discretionary—determinations as to the fitness of a candidate to serve as a police officer.

      (k)    For the medical examination, a list of conditions provided to the examining physician is "only to be considered potentially disqualifying," and a delegate employed by the Civil Service must determine, "based upon their medical judgment, whether the existence of such condition renders the candidate unable to perform the essential functions of an entry-level police officer."

      (l)    The psychological evaluation is similarly conducted pursuant to subjective criteria, with psychologists and psychiatrists, also employed by the Civil Service, using exams such as the Minnesota Multiphasic Personality Inventory, which presents test takers with hundreds of statements that require true-or-false responses, such as "I cry easily" and "I have a good appetite."

---

[6]  To date, Plaintiff has not found any clear written guideline, policy, procedure, or rule that defines this term and/or sets parameters.

(m)    Selection for Academy.  If an applicant is successful at all stages of the hiring process, they are added to a list of eligible hires, and they may be selected to enter the police academy as a member of an upcoming recruit class.

93.    The discretionary nature of the assessments outlined above allows bias to enter the hiring process and serves to disqualify applicants who are in fact physically and mentally fit to work as NCPD police officers.  For example, on information and belief:

(a)    There is room for discretion in deciding what qualifies as a proper push-up or sit-up for purposes of the physical agility test, allowing bias to impact scoring;

(b)    The background check investigation process affords investigators considerable discretion in deciding how thoroughly to investigate a candidate and how to frame identified issues, and investigators are much tougher and dilatory with applicants of color;

(c)    The background check reports provided to the Civil Service are highly subjective and slanted, with Black and Hispanic candidates' reports using coded critical language in disproportionate numbers as compared to reports for white candidates;

(d)    The background check reports contain information (e.g., a candidate's name and address) that can suggest a candidate's racial or ethnic background, allowing bias to enter the process;

(e)    The discretionary nature of the process—in particular, the determination of what constitutes "disrespect for the process of law and order"—allows for discrimination, for example, with the decision to overlook prior thefts of a white applicant as mere youthful indiscretions, or to overlook the egregious misconduct of individuals, compared to the treatment of Officer Myers' traffic record;

(f)     The dearth of non-white Civil Service Commissioners compounds the differential treatment of applicants based on race;

(g)     "[M]any candidates are psychologically disqualified for no valid reason," as acknowledged by a contracted psychologist who coaches police candidates on how to pass the psychological screening;

(h)     Personality tests can be "culturally loaded," and responses by people of color may be "outliers"; for instance, a Black man could be considered paranoid for disclosing past concerns about being followed by police when he had not done anything wrong, because statistics show Black men are policed differently than white men;

(i)     The use of unnecessary or unduly restrictive hiring criteria benefits those with familial or other connections to existing police officers, who are disproportionately white, by allowing them to more readily navigate the convoluted process—for example, using a polygraph to press applicants, but not disclosing to all the open secret that only admissions elicited during the polygraph are disqualifying, or relying on unintuitive and unnecessarily strict fitness criteria; and

(j)     The disqualification of applicants based on criteria that disproportionately affect non-white communities, for example, marijuana use, high blood pressure, or unpaid parking tickets, discriminates against non-white applicants.

94.     Data produced by the Civil Service to counsel in response to Freedom of Information Law requests is consistent with the existence of such pervasive discrimination.

*The 2012 Hiring Exam*

95.     Hiring data from the 2012 written exam (PO Exam No. 2000), first administered on December 9, 2012, reflects a dramatic and racially discriminatory shift in demographics from

the applicant pool to the recruit pool. Set forth below is a graphic display showing the shrinking percentage of non-white applicants throughout Defendants' hiring process.[7]

**DEMOGRAPHIC BREAKDOWN ACROSS THE HIRING PROCESS**



96.      The process began with 20,352 applicants registered to take the exam: 11,374 (55.9%) white, 3,389 (16.7%) Hispanic, 2,508 (12.3%) Black, 718 (3.5%) Asian or Pacific Islander, 44 (0.2%) Native, and 2,319 (11.4%) other or unknown.[8]  The white, Black, and Hispanic representation roughly approximated County demographics.

97.      After the exam was taken, the Civil Service added a total of 11,969 applicants to the corresponding eligibility list: 7,221 (60.3%) white, 1,865 (15.6%) Hispanic, 1,289 (10.8%) Black, and 1,594 (13.3%) other or unknown.

---

[7] The data upon which the "Eligibility List" column was based includes API candidates in the "Other" category.

[8] The Consent Decree obligates Defendants to track the "numerical breakdown by race, national origin, and sex, [of] the total number of persons who passed and who failed, respectively, any selection criterion for the position of police officer used by the County during" the relevant period.  The provision of FOIL data that identifies a population of individuals of "unknown" race or national origin demonstrates that Defendants have abdicated this responsibility.

98.     Over the course of the next five years, 5,478 applicants were invited from the list to commence the post-exam process, including 3,232 white applicants, 849 Hispanic applicants, and 518 Black applicants.

99.     The relative success rates of those applicants called for further processing tells a bleak story.  It is this portion of the hiring process, the post-exam process, which is the focus of the instant action.

100.    Approximately 24.2% of white applicants who began the post-exam process were hired as Nassau County police officers, compared to a mere 15% of Hispanic and just 8.5% of Black applicants.



101.    This dwindling number of non-white candidates flows from discriminatory results during the post-exam process:

        (a)    Physical Agility Test: 23.6% of the white applicants who took the agility test failed, compared to 33.7% of Hispanic and 50.6% of Black applicants;

        (b)    Background Check: 19.5% of white applicants who underwent a background check were disqualified at this stage, compared to 24.7% of Hispanic and 51.3% of Black applicants; and

(c)    Psychological Examination: 2.6% of white applicants who completed a psychological evaluation failed, compared to 1.8% of Hispanic and 8.2% of Black applicants.

102.    The following graph offers a stark visual comparison of the relevant failure rates throughout various stages of the hiring process:



103.    The differences in post-exam outcomes for Blacks and other non-whites versus white candidates are not the result of chance.  Starting with the population of applicants that pass the written exam and begin the post-exam process, rates of hiring by race differ by statistically significant amounts—that is, by amounts that are too large to reasonably be the result of random variation.  In particular, the share of Black applicants hired is lower than the share of white applicants hired by more than three standard deviations.  Similarly, the share of all non-white applicants hired is lower than the share of white applicants hired by more than three standard deviations.  The observed differences in the rates that minorities and whites are hired exceed standard levels of statistical significance and are extremely unlikely to occur by chance.

104.    Overall, 1,131 recruits were hired from the eligibility list for the 2012 exam: 782 (69.1%) white; 127 (11.2%) Hispanic; 44 (3.9%) Black; 23 (2.0%) API; 2 (0.1%) Native; and

153 (13.5%) "other or unknown."  Defendants' flawed hiring process, in other words, led to the

hiring of roughly 6.9% of the total number of white applicants, compared to 3.7% of Hispanic

applicants and 1.8% of Black applicants.  White applicants were almost *2 times as likely to be*

*hired as Hispanic applicants* and almost *4 times as likely to be hired as Black applicants*.



*2018 Hiring Exam*

105.    Although the current hiring cycle is ongoing, the preliminary data available for

the 2018 written exam (PO Exam No. 2018) shows that racial discrimination in the hiring of

Nassau County police officers has continued.

106.    The process began with 17,179 applicants registered to take the exam: 11,150

(64.9%) white; 3,116 (18.1%) Hispanic; 1,235 (7.2%) Black; 683 (4.0%) API; 46 (0.3%) Native;

and 949 (5.5%) other, unknown, or preferred not to answer.

107.    After the exam was taken, the Civil Service added 9,113 applicants to the

corresponding eligibility list: 6,163 (67.6%) white; 1,551 (17%) Hispanic; 574 (6.3%) Black;

318 (3.5%) API; 22 (.2%) Native; and 485 (5.3%) other, unknown, or preferred not to answer.

108.    Based on the most recent data, which was supplied by the Civil Service on

October 28, 2022, 4,714 of the applicants on the eligibility list had been invited for further

processing, and of those invited to continue, 664 had completed all steps. Not surprisingly, 475 (15.5% of) white applicants invited for further processing had made it through all of the steps, compared to 31 (9.4% of) Black and 89 (10.4% of) Hispanic applicants.

109.    The differences in the above-referenced outcomes for Blacks and other minorities versus white candidates in completing all steps are, again, not the result of mere chance. The share of all non-white applicants who complete all stages of the post-exam process is lower than the share of white applicants hired by more than three standard deviations.

110.    In short, based on the presently available data from the 2018 exam and subsequent hiring process, there is reason to believe that the abysmal hiring record following the 2012 exam will once again repeat itself this cycle.

*Defendants' Response to the Newsday Article is to*
*Maintain the Status Quo of Racial Discrimination*

111.    None of the levels of racial disparities in hiring is news to Defendants—not just because of the historical truths of the consent decree, but also because it has been the subject, including (but not only) very recently, of public discourse.

112.    On May 27, 2021, *Newsday* published an alarming report on the lack of diversity in the Nassau and Suffolk County Police Departments.

113.    That report described some of the statistical data set forth above, noting, for example, that of the 6,539 Black applicants who applied to become police officers in both counties from 2012–2019, only 67 were hired.

114.    *Newsday* reported that in the six years following Nassau County's 2012 hiring exam, the NCPD hired only 36 Black officers out of 2,508 Black applicants.

115.    Similarly, *Newsday* reported that at each stage of the hiring process, Nassau County disqualified Black applicants at a higher rate than white applicants.

116. *Newsday* aptly observed that Defendants' discriminatory process transformed a pool of passing applicants with a racial makeup roughly in line with the County's population into recruits with a white makeup 26 percentage points higher than the white share of the population, while cutting Black and Hispanic representations to about half of their population shares.

117. Defendants' response to *Newsday*'s compelling and thorough reporting reflects an overt decision to continue to discriminate on the basis of race, or at best, a deliberate indifference to the issues described by *Newsday*. Certainly what has been displayed by the County is a callous disregard for inequities that are supported by data well known to them.

118. For their part, Defendants created a police diversity task force that, after well over a year, has yet to announce any significant reforms sufficient to address the problems identified by *Newsday*'s reporting. Indeed, despite New York State Executive Order 203—which required that every in-state government unit with a police department develop a plan to improve the strategies, policies, and practices of law enforcement within their community—the County has resisted addressing issues of transparency and accountability in its Police Department.

119. Defendants continue to deflect blame onto non-white applicants, asserting that the problem is a lack of non-white applicants applying and/or appearing for the exam, an explanation that entirely lacks merit, given that the post-exam process shows plain discrimination.

120. By contrast, Defendants have continued to support the actions of those espousing racially biased views within the NCPD. None of this is more evident than in Defendants' continued support of Commissioner Patrick Ryder.

121. After being presented with *Newsday*'s findings, Commissioner Ryder, in a widely denounced interview, attributed the lack of non-white NCPD officers to the purported presence of "broken homes" or to a lack of parental support in their communities. Commissioner Ryder

stated that "[t]hese kids struggle in these communities because they don't have both parents around"; that he "can't fix the family home, but I can fix the kid"; and that "giving kids a little advantage in some of the minority communities is important too," because "[t]hey don't have mom and dad."

122.     Commissioner Ryder also invoked racial stereotypes to defend the NCPD's lack of diversity, stating, "[w]hen we look at diversity in the police department, you've got to go look at other employments around the country.  What's the percentage of Asians that are in the doctor world?  What is the percentage of lawyers that are Jewish?"

123.     Following these insensitive and uninformed comments by Commissioner Ryder, many members of the Nassau community called for the County to take actions that would hold Commissioner Ryder accountable for his statements and sought his resignation.  Nassau County refused to take any action that would hold him accountable, and he refused to resign.

124.     Furthermore, when asked how he would devise the perfect process for hiring police officers—and fully aware of the discriminatory results of the existing process—Commissioner Ryder responded, "I like the process that we do now."

125.     Unfortunately, Commissioner Ryder is alleged to have made even more troublesome statements in the past.  As reported by *Gothamist*, "[a] retired officer[] said in a sworn deposition taken October 25[, 2021,] that in 2015, when [the officer] was still on the force and Ryder was a sergeant, Ryder referred to a then-police officer Dolores Sharpe [a Black female] as an '(expletive) N-word.'"

126.     After news outlets reported on this deposition testimony, and after a coalition of civil rights and police organizations called for Commission Ryder to resign, the Nassau

legislature approved a $650,000 offer of judgment to Ms. Sharpe, who accepted the offer after years of litigating her federal race discrimination lawsuit.

127.     As *Gothamist* further explained, "[l]ater in the deposition, [the officer] was asked if he reported Commissioner Ryder's use of the slur to the department.  [The officer] answered that he did not.  'I was basically in fear that if I reported it, retribution would follow.'"

128.     Indeed, as *Gothamist* further explained, "Ryder, who was a sergeant at the time, would be promoted to assistant commissioner the following year.  He was named acting commissioner in 2017, and confirmed as commissioner in 2018."

129.     Nor is this problematic animus limited to individual actors.  As *Newsday* reported in 2018, as recently as a few years ago, the NCPD used a single-letter system to denote the races of its officers: B, H, I, W and Y, where "I" stands for Indian— for Native American officers— and "Y" for Asian-American officers.

130.     As the director of the New York Civil Liberties Union's Nassau chapter, who blew the whistle on this problematic practice, explained, using "'yellow' to describe Asian-Americans is 'obviously derogatory,'" and "[l]anguage is a real indicator of the culture of an institution."

131.     Discrimination in the hiring of Nassau County police officers has been allowed to remain pervasive for far too long—and it must come to an end.[9]

---

[9]  Commissioner Ryder was questioned on the record during police reform hearings on March 21, 2021.  During his presentation, Commissioner Ryder refused to acknowledge the problems with the fact that the NCPD's own data showed a 5.3:1.0 Black-to-white arrest disparity, which is concerning enough to require at least an examination to address the racial issues raised by these numbers.  Nor did Commissioner Ryder or the Nassau County Executive respond to written inquires made to them asking them to address this racial disparity.

## CLASS ACTION ALLEGATIONS

132.    This class action is brought pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking liability-phase injunctive and declaratory relief on behalf of a Class of all non-white applicants seeking to become Nassau County police officers who were disqualified for consideration by Defendants during the post-exam process in violation of § 1983 and the NYSHRL.  Plaintiffs reserve the right to amend the definition of the Class based on discovery or other factual or legal developments.

133.    Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) seeking monetary damages and other make-whole relief on behalf of a Class of all non-white applicants seeking to become Nassau County police officers who were disqualified for consideration by Defendants during the post-exam process in violation of § 1983 and the NYSHRL.  Plaintiffs reserve the right to amend the definition of the Class based on discovery or other factual or legal developments.

134.    Officer Myers is a member of the Class he seeks to represent.

135.    The members of the Class identified herein are so numerous that joinder of all members is impracticable.  According to the most recent data produced by Civil Service on the number of applicants disqualified in connection with the 2018 exam cycle, 249 non-white applicants had already been disqualified in the post-exam process.  On information and belief, this number is expected to grow significantly, based on, *inter alia*, the fact that over 500 non-white applicants were disqualified in the post-exam process at the end of the most recently completed hiring cycle that arose out of the 2012 exam.

136.    There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members, including:

(a)    Whether Defendants' hiring policies or practices for police officers in Nassau County discriminate against non-white police officer applicants;

(b)    Whether Defendants' hiring policies and practices for police officers in Nassau County violate § 1983 and/or the NYSHRL;

(c)    Whether Defendants, using as a pretext their hiring criteria, intentionally discriminate against non-white applicants seeking to become police officers in Nassau County;

(d)    Whether Defendants' hiring practices have a disparate impact on non-white applicants seeking to become police officers in Nassau County; and

(e)    Whether equitable remedies, injunctive relief, and other relief for the Class are warranted to address the discriminatory effects of Defendants' misconduct.

137.    The claims of Officer Myers are typical of the claims of the Class.

138.    Officer Myers will fairly and adequately represent and protect the interests of the members of the Class.

139.    Plaintiff has retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

140.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the Class as a whole.  The Class Members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices.

141.     Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The Class Members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices.

**COUNT ONE:**
**EQUAL PROTECTION VIOLATION, 14TH AMENDMENT, 42 U.S.C. § 1983**

142.     The allegations set forth above are incorporated here.

143.     All relevant actions taken by Defendants and those with delegated authority to act on their behalf were taken under color of law.

144.     Defendants have engaged in an intentional and systematic policy, pattern, and/or practice of discrimination against Plaintiff and the Class in violation of the Equal Protection Clause through the hiring process, including by, among other things:

(a)     Adopting subjective hiring criteria that allow for disproportionate disqualifications of non-white applicants on the basis of race and/or national origin; and

(b)     Applying the subjective hiring criteria in a manner that does, in fact, disqualify non-white applicants at a disproportionate rate on the basis of race and/or national origin.

145.     The injury sustained by Plaintiff and the Class resulted from a municipal policy or custom, including because, among other things:

(a)     Defendants adopted a *de facto* policy or custom of using their hiring criteria to pretextually disqualify non-white applicants;

(b)     The Civil Service, as a "final decision maker," rendered the decision disqualifying Plaintiff and the Class from the hiring process;

(c)     Defendants failed to train and/or supervise their agents and representatives to impartially conduct and evaluate the stages of the hiring process; and

(d)     Defendants failed to address discriminatory practices in their hiring process, despite being on notice of the data reflecting disproportionate hiring and disqualification on the basis of race through the consent decree and other public sources.

146.    These policies are intended to, and do have the effect of, denying Plaintiff and the Class equal opportunities to become police officers in Nassau County, as set forth in detail above.

147.    Similarly, Defendants' selection criteria, improper training and supervision of individuals involved in the hiring process, and willful indifference to the disparities in hiring results on the basis of race and/or national origin demonstrated by its own data constitutes a deliberate policy and practice of intentional discrimination.

148.    As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiff and the Class have suffered damages including, but not limited to, lost employment opportunities and lost past and future income, compensation, and benefits.

149.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by the Equal Protection Clause.

150.    Plaintiff and the Class request relief as hereinafter described.

## COUNT TWO:
## NYS HUMAN RIGHTS LAW, N.Y. EXECUTIVE LAW § 296
### (*Disparate Treatment*)

151.    The allegations set forth above are incorporated here.

152.     Plaintiff and the Class plead that Defendants are liable under the NYSHRL based on a disparate treatment theory of liability.

153.     Defendants discriminated against Plaintiff and the Class in the police officer hiring process based on their race and/or national origin.

154.     Plaintiff and the Class are members of a protected class pursuant to New York Executive Law § 296.

155.     Plaintiff and the Class were qualified to become police officers in Nassau County.

156.     Plaintiff and the Class were subjected to the adverse employment action of refusal to hire.

157.     The adverse employment action taken against Plaintiff and the Class occurred under circumstances giving rise to an inference of discrimination.

158.     The policies and procedures adopted and applied by Defendants were implemented and enforced with an intent to discriminate against non-white applicants because of their race and/or national origin and does so discriminate against them as described above.

159.     The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by the NYSHRL.

160.     Plaintiff and the Class request relief as hereinafter described.

## COUNT THREE:
## NYS HUMAN RIGHTS LAW, N.Y. EXECUTIVE LAW § 296
### (*Disparate Impact*)

161.     The allegations set forth above are incorporated here.

162.     Plaintiff and the Class plead, in the alternative, that Defendants are liable for discrimination under the NYSHRL based on a disparate impact theory of liability.

163.     Defendants' use of the existing hiring policies and procedures has had an adverse impact on non-white applicants to the Police Department.

164. As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiff and the Class have suffered damages including, but not limited to, lost employment opportunities and lost past and future income, compensation, and benefits.

165. The foregoing policies, pattern, and/or practices have had an unlawful disparate impact on non-white applicants in violation of the NYSHRL.

166. Plaintiff and the Class request relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, the following relief is requested:

- Certification of the case as a class action on behalf of the proposed Class;

- Designation of Plaintiff Myers as representative of the Class;

- Designation of Representative Plaintiff's counsel of record as Class Counsel;

- A declaratory judgment that the practices complained of herein are unlawful and violate the Equal Protection Clause and the NYSHRL;

- A declaratory judgment that Defendants' refusal to hire Plaintiff and Class Members for the positions for which they were each qualified was unjustified and based on race and/or national origin;

- A preliminary and permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs or Class Members based on their race and/or national origin or participation in this lawsuit;

- An order that Defendants institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of race

and/or national origin, and that they eradicate the effects of their past and present unlawful employment practices;

- An order requiring Defendants to develop and institute objective and validated standards for conducting the hiring process that do not have a disparate impact on applicants on the basis of race and/or national origin;

- An order appointing a monitor to ensure that Defendants comply with the injunction provisions of any decree ordered by the Court;

- An order retaining jurisdiction over this action to ensure that Defendants comply with such a decree;

- An order restoring Plaintiff and Class Members to their rightful positions on the eligibility list relating to the 2018 exam cycle;

- In the alternative, if such eligibility list is no longer in use, an order requiring that Defendants add Plaintiff and Class Members to the new eligibility list, or otherwise allow them to be considered for employment;

- Back pay (including interest and benefits) for Plaintiff and Class Members;

- All damages sustained as a result of Defendants' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

- Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

- Pre-judgment and post-judgment interest, as provided by law; and

- Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

167.    Jury trial is requested on all matters triable to a jury.

Dated: November 17, 2022

Respectfully submitted,

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP*

By: _____
Lorin L. Reisner
Liza M. Velazquez
Kamil R. Ammari
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
lreisner@paulweiss.com
lvelazquez@paulweiss.com
kammari@paulweiss.com

- and -

THE LAW OFFICES OF
   FREDERICK K. BREWINGTON

Frederick K. Brewington
556 Peninsula Blvd.
Hempstead, NY 11550
516-489-6959
fred@brewingtonlaw.com

- and -

NEWMAN FERRARA LLP

Randolph M. McLaughlin
Debra S. Cohen
Casey K. Pearlman
1250 Broadway, 27th Floor

---

* We acknowledge the essential contributions of beloved Paul, Weiss partner David W. Brown, who helped lead the legal team responsible for this matter before his untimely passing.

New York, NY 10001
216-619-5400
rmclaughlin@nfllp.com
dcohen@nfllp.com
cpearlman@nfllp.com

***Attorneys for Plaintiff and the Class***