**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

Jhisaiah Myers, on behalf of himself and all others
similarly situated,

Plaintiff,

- against -

County of Nassau, Nassau County Civil Service
Commission, and Nassau County Police Department,

Defendants.

Case No. 22-CV-7023

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT, STRIKE CLASS ACTION ALLEGATIONS
AND DENY CLASS CERTIFICATION**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000

THE LAW OFFICES OF FREDERICK K. BREWINGTON
556 Peninsula Blvd.
Hempstead, NY 11550
516-489-6959

NEWMAN FERRARA LLP
1250 Broadway, 27th Floor
New York, NY 10001
212-619-5400

*Attorneys for Plaintiff and the Class*

Dated: November 13, 2023

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

I.    Officer Myers Was Disqualified Under Nassau County's Discriminatory Hiring Process Despite Being Highly Qualified............................................................................. 3

II.    Defendants Employ Discriminatory Hiring Practices That Result in a Police Department Where Non-Whites Are Significantly Underrepresented. .................................. 6

    A.    Nassau County Police Department Is Disproportionately White, Resulting from an Application Process That Discriminates Against Black Applicants at Every Stage. ..................................................................................................... 6

    B.    The Highly Discretionary Post-Exam Process Allows Defendants to Discriminate Against Non-White Applicants. ....................................................... 7

III.    Defendants Have a History of Discriminatory Hiring Practices....................................... 8

LEGAL STANDARD ...................................................................................................... 9

I.    Rule 12(b)(1) ................................................................................................................... 9

II.    Rule 12(b)(6) ................................................................................................................. 10

III.    Rule 23(c)(1)(a) ............................................................................................................ 10

ARGUMENT ............................................................................................................... 11

I.    The Complaint Clearly Establishes That Plaintiff Has Standing to Bring the Claims Asserted........................................................................................................................ 11

II.    Plaintiff Adequately Pleads Discriminatory Intent in Support of His Claims for Violations of the Equal Protection Clause.......................................................................... 13

    A.    The Statistical Evidence Alleged Is Plainly Sufficient to Support an Inference of Discriminatory Motivation. .............................................................. 15

    B.    Plaintiff Also Raises an Inference of Discriminatory Intent by Identifying Similarly Situated Comparators Who Were Provided Preferential Treatment..... 19

    C.    Comments from Key Decisionmakers in Nassau County Provide Further Evidence of Discriminatory Intent....................................................................... 20

III.    Plaintiff Adequately Pleads Municipal Liability Under Monell....................................... 21

    A.    Nassau County Adopted a De Facto Policy or Custom of Discrimination........... 21

        1.    Plaintiff's Averred Statistics, Combined with the Discretionary Nature of the Post-Exam Process, Are Sufficient to Plead Defendants Acted Pursuant to a De Facto Policy or Custom.................................... 22

        2.    The DOJ Lawsuit and Ensuing Consent Decree Are "Government Reports" Showing That Defendants Have a De Facto Custom or Policy of Discrimination. ........................................................................ 24

    B.    The CSC's Disqualification Constituted County Action. ..................................... 25

i

C.      The County Did Not Adequately Train Its Commissioners and Background
Investigators. .................................................................................................... 26

IV.    Plaintiff Adequately Alleges Disparate Treatment and Disparate Impact Under the
NYSHRL's More Lenient Pleading Standard. ................................................... 27

A.      Plaintiff Adequately Alleges Disparate Treatment in Violation of the
NYSHRL. ......................................................................................................... 28

B.      Plaintiff Adequately Alleges Disparate Impact in Violation of the NYSHRL. .... 28

1.      The Subjective Post-Exam Process Is One Employment Practice. .......... 29

2.      Plaintiff Alleges That Disparities Exist in the Hiring Rates of Non-
White and White Applicants to the NCPD. .............................................. 31

3.      Plaintiff Alleges a Disparity Substantial Enough to Raise an Inference
of Causation. ........................................................................................... 31

V.     Defendants' Motion to Strike Plaintiff's Class Allegations Should Be Dismissed. ......... 32

CONCLUSION .................................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdu-Brisson* v. *Delta Air Lines, Inc.*,
239 F.3d 456 (2d Cir. 2001)........................................................21

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)........................................................10

*Bernstein* v. *Cengage Learning, Inc.*,
2020 WL 5819862 (S.D.N.Y. Sept. 29, 2020)........................................................34

*Borgese* v. *Baby Brezza Ents. LLC*,
2021 WL 634722 (S.D.N.Y. Feb. 18, 2021)........................................................35

*Boyle* v. *City of Philadelphia*,
2018 WL 994218 (E.D. Pa. Feb. 20, 2018) ........................................................23

*Brown* v. *City of New York*,
2017 WL 1102677 (E.D.N.Y. Mar. 23, 2017) ................................................ *passim*

*Burgis* v. *N.Y.C. Dep't of Sanitation*,
798 F.3d 63 (2d Cir. 2014)........................................................15, 18

*Calibuso* v. *Bank of America Corp.*,
893 F. Supp. 2d 374 (E.D.N.Y. 2012) ........................................................34

*Camacho* v. *City of New York*,
2020 WL 4014902 (S.D.N.Y. July 16, 2020) ........................................................34

*Campo* v. *City of New York*,
2022 WL 970730 (E.D.N.Y. Mar. 31, 2022)........................................................25

*Carter* v. *HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016)........................................................9

*Chavez* v. *City of Chicago*,
2022 WL 6974625 (N.D. Ill. Oct. 11, 2022)........................................................25

*Chen-Oster* v. *Goldman, Sachs & Co.*,
877 F. Supp. 2d 113 (S.D.N.Y. 2012)........................................................11

*Chin* v. *Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012)........................................................30

*Cincotta* v. *Hempstead Union Free Sch. Dist.*,
313 F. Supp. 3d 386 (E.D.N.Y. 2018) ...................................................26

*United States* v. *City of New York*,
637 F. Supp. 2d 77 (E.D.N.Y. 2009) ....................................................33

*Cortec Indus., Inc.* v. *Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) ..................................................................10

*Davis* v. *State of Connecticut Dep't of Corr.*,
169 F. Supp. 3d 311 (D. Conn. 2016) ..................................................13

*Dunnigan* v. *Metro. Life Ins. Co.*,
214 F.R.D. 125 (S.D.N.Y. 2003) .........................................................34

*Gadson* v. *Long Island Jewish Hosp.*,
2007 WL 879654 (E.D.N.Y. Mar. 21, 2007) ......................................10

*Ganny* v. *FJC Sec. Servs., Inc.*,
2016 WL 4939312 (E.D.N.Y. Sept. 14, 2016) ....................................14

*Gaston* v. *Ruiz*,
2018 WL 3336448 (E.D.N.Y. July 6, 2018) ........................................24

*Gerardi* v. *Huntington Union Free Sch. Dist.*,
124 F. Supp. 3d 206 (E.D.N.Y. 2015) .................................................26

*Gibson* v. *Cnty. of Suffolk*,
2022 WL 1063017 (E.D.N.Y. Feb. 18, 2022)....................................1, 15

*Gittens-Bridges* v. *City of New York*,
2020 WL 3100213 (S.D.N.Y. June 11, 2020) .....................................32

*Glob. Network Commc'ns* v. *City of New York*,
458 F.3d 150 (2d Cir. 2006)..................................................................4

*Goldberg* v. *Merrill Lynch, Pierce Fenner & Smith, Inc.*,
1998 WL 321446 (S.D.N.Y. June 18, 1998) .......................................35

*Hazelwood Sch. Dist.* v. *United States*,
433 U.S. 299 (1977).............................................................................16

*Ingram* v. *Madison Square Garden Ctr., Inc.*,
709 F.2d 807 (2d Cir. 1983).................................................................23

*Jackson* v. *Nassau Cnty.*,
552 F. Supp. 3d 350 (E.D.N.Y. 2021) .................................................21

*John* v. *Whole Foods Mkt. Grp., Inc.*,
858 F.3d 732 (2d Cir. 2017)................................................................9

*Johnson* v. *Long Island Univ.*,
58 F. Supp. 3d 211 (E.D.N.Y. 2014) ...................................................14

*EEOC* v. *Joint Apprenticeship Comm.*,
186 F.3d 110 (2d Cir. 1999)...............................................................32

*Kassman* v. *KPMG LLP*,
925 F. Supp. 2d 453 (S.D.N.Y. 2013)..................................................34

*Kucharczyk* v. *Westchester Cnty.*,
95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015) ...........................................24

*Littlejohn* v. *City of New York*,
795 F.3d 297 (2d Cir. 2015)...............................................................14

*Local 3621, EMS Officers Union* v. *City of New York*,
2022 WL 17175798 (S.D.N.Y. Nov. 22, 2022) ...............................31, 34

*M.O.C.H.A. Soc'y, Inc.* v. *City of Buffalo*,
689 F.3d 263 (2d Cir. 2012)...............................................................31

*Malave* v. *Potter*,
320 F.3d 321 (2d Cir. 2003)..........................................................15, 31

*Mandala* v. *NTT Data, Inc.*,
975 F.3d 202 (2d Cir. 2020)..........................................................16, 19

*Martinez* v. *City of Stamford*,
2023 WL 3162131 (2d Cir. May 1, 2023) .......................................17, 18

*Miranda* v. *S. Country Cent. Sch. Dist.*,
461 F. Supp. 3d 17 (E.D.N.Y. 2020) ...................................................29

*Monell* v. *Department of Social Services of the City of New York*,
436 U.S. 658 (1978).........................................................................21

*Murphy* v. *Potter*,
2008 WL 2433615 (E.D.N.Y. June 12, 2008) ......................................34

*Nicosia* v. *Amazon, Inc.*,
834 F.3d 220 (2d Cir. 2016).................................................................4

*PFT of America, Inc.* v. *Tradewell, Inc.*,
1999 WL 179358 (S.D.N.Y. Mar. 31, 1999) .........................................35

*Reynolds* v. *Lifewatch, Inc.*,
    136 F. Supp. 3d 503 (S.D.N.Y. 2015)...................................................33

*Ricciuti* v. *N.Y.C. Transit Auth.*,
    941 F.2d 119 (2d Cir. 1991)...........................................................27

*Richardson* v. *City of New York*,
    2021 WL 1910689 (S.D.N.Y. May 12, 2021) ...........................11, 12, 30

*Rookard* v. *Health and Hosps. Corp.*,
    710 F.2d 41 (2d Cir. 1983)............................................................26

*Russell* v. *Forster & Garbus, LLP*,
    2020 WL 1244804 (E.D.N.Y. Mar. 16, 2020) .......................................34

*Salahuddin* v. *City of Mount Vernon, N.Y.*,
    2022 WL 564002 (S.D.N.Y. Feb. 24, 2022).................................18, 26

*Schallop* v. *New York State Dep't of L.*,
    20 F. Supp. 2d 384 (N.D.N.Y. 1998) ..............................................30

*Smith* v. *City of Jackson, Miss.*,
    544 U.S. 228 (2005)...........................................................30, 31

*Sorlucco* v. *N.Y.C. Police Dep't*,
    971 F.2d 864 (2d Cir. 1992)....................................................22, 23

*Starks* v. *MTA*,
    2022 WL 814668 (S.D.N.Y. Mar. 17, 2022) ......................................14

*Sutter* v. *Dibello*,
    2021 WL 930459 (E.D.N.Y. Mar. 10, 2021) .................................15, 19

*Syeed* v. *Bloomberg L.P.*,
    568 F. Supp. 3d 314 (S.D.N.Y. 2021)..............................................28

*Talarico* v. *Port Auth. of N.Y. & N.J.*,
    367 F. Supp. 3d 161 (S.D.N.Y. 2019).........................................10, 33

*Teasdale* v. *N.Y.C. Fire Dep't*,
    574 F. App'x. 50 (2d Cir. 2014) ...................................................14

*Triano* v. *Town of Harrison, N.Y.*,
    895 F. Supp. 2d 526 .................................................................24

*United States* v. *Vazquez*,
    145 F.3d 74 (2d Cir. 1998)............................................................9

*Vega* v. *Hempstead Union Free Sch. Dist.*,
    801 F.3d 72 (2d Cir. 2015)...................................................................14

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011)...............................................................30, 35

*White* v. *City of New York*,
    206 F. Supp.3d 920 (E.D.N.Y. 2016) .....................................................24

## Statutes

42 U.S.C. § 1983................................................................... *passim*

42 U.S.C. § 2000e–2(k)(1)(B)(i)...............................................................29

Civil Rights Act of 1964 Title VII................................................ *passim*

N.Y. Civ. Serv. Law. § 50(1) (McKinney 2023) ........................................26

NYSHRL....................................................................................28, 29

## Other Authorities

Rule 12(b)(1)............................................................................9

Rule 12(b)(6)...........................................................................10

Rule 23(c)(1)(a) .......................................................................10

Plaintiff Jhisaiah Myers submits this memorandum of law in opposition to the motion ("Motion" or "Mot.") of defendants County of Nassau ("County"), Nassau County Civil Service Commission ("CSC"), and Nassau County Police Department ("NCPD" or "Department") (collectively, "Defendants") to dismiss the complaint ("Complaint"), strike the class allegations, and deny class certification.

<u>**PRELIMINARY STATEMENT**</u>

The Motion filed by Defendants should be denied in its entirety. This action seeks to remedy pervasive racial discrimination against non-white applicants in the hiring of police officers in Nassau County. Plaintiff has standing to assert the claims set forth in the Complaint, and the Complaint easily satisfies the applicable pleading standards based on extensive statistical evidence and other allegations of racial bias. There is no proper basis for dismissal of the Complaint, and all of the arguments made by Defendants are meritless.

*First*, Plaintiff has standing to assert the claims set forth in the Complaint. In fact, Defendants concede that Plaintiff has standing to challenge the background investigation phase of the hiring process, and the law clearly supports Plaintiff's challenge to the balance of the post-written examination hiring process based on the well-pleaded allegations of unlawful discrimination enabled by vague and discretionary standards applied throughout the process, resulting in both intentional discrimination and a discriminatory disparate impact.

*Second*, Count One of the Complaint properly pleads intentional discrimination in violation of the Equal Protection Clause. Plaintiff easily meets the pleading standard of alleging facts that give "plausible support to a minimal inference of discriminatory motivation." *Brown* v. *City of New York*, 2017 WL 1102677, at *3 (E.D.N.Y. Mar. 23, 2017); *see also Gibson* v. *Cnty. of Suffolk*, 2022 WL 1063017, at *13 (E.D.N.Y. Feb. 18, 2022) (statistical and non-statistical evidence "give

rise to an inference of discrimination"). For example, as further described below, the Complaint alleges that although Black individuals comprise approximately 13% of the Nassau County population, only approximately 4% of the Nassau County Police force is Black. Compl. ¶ 88. The Complaint further alleges that in the most recently completed hiring cycle, Nassau County hired approximately 7% of white applicants to the NCPD, but less than 2% of Black applicants. *Id.* ¶ 7. In the highly subjective post-examination phase of the hiring process, Nassau County hired white applicants approximately three times more than Black applicants. *Id.* ¶ 9. And in the extremely subjective background check phase of the application process, the failure rate for white applicants was 19.5%, while the failure rate for Black applicants was a staggering 51.3%. *Id.* ¶ 102. The Complaint also alleges specific facts concerning more favorable treatment of white applicants, demonstrating that the subjective hiring process was applied in an intentionally discriminatory manner. *Id.* ¶¶ 57–66. These allegations easily exceed the bar for raising a minimal inference of discrimination.

*Third*, Plaintiff properly pleads that the County can be held liable under 42 U.S.C. § 1983 by presenting overwhelming evidence that the County had a municipal policy of discrimination in hiring its police officers. The Complaint establishes that discrimination was so "persistent and widespread that it constitutes a de facto custom" by setting forth (i) evidence of statistical disparities in hiring rates combined with allegations of a subjective, bias-laden hiring process; and (ii) a "governmental report documenting constitutional deficiencies" in the form of a continuing Consent Decree that was expressly issued to remedy discrimination in the NCPD's hiring practices. The Complaint also adequately pleads that the County is subject to municipal liability based on allegations that it failed to properly train those who oversee the hiring process and allegations that Plaintiff and others were disqualified by the County's "final decisionmakers."

*Fourth*, the Complaint easily satisfies the pleading requirements for claims under the New York State Human Rights Law, which has a more lenient pleading standard than § 1983. Accordingly, the claims in the Complaint of disparate treatment (Count Two) and disparate impact (Count Three) under that statute are more than adequately pled.

*Finally*, it is well established that motions to strike class allegations at this stage of a case are fatally premature. Plaintiff's class allegations are properly pled and a determination of whether the Rule 23 requirements are satisfied requires the development and evaluation of a complete factual record.

For all of these reasons, Defendants' Motion should be denied.

## STATEMENT OF FACTS

### I. Officer Myers Was Disqualified Under Nassau County's Discriminatory Hiring Process Despite Being Highly Qualified.

Plaintiff Jhisaiah Myers is a life-long resident of Nassau County who presently is an active duty member of the New York City Police Department ("NYPD"). Officer Myers graduated from Freeport High School in 2005 and worked after graduation as a direct care provider with the United Cerebral Palsy Association of Nassau County. Compl. ¶ 30. He subsequently took on jobs supporting individuals with disabilities and mentoring young people in need of psychiatric and recreational assistance. *Id.* ¶¶ 31–32. Officer Myers thereafter decided to return to school, attending the Sanford-Brown Institute from 2011 through 2012. *Id.* ¶ 33. After graduating, Officer Myers continued to work with a local non-profit that supports individuals with disabilities. *Id.* ¶ 34.

Officer Myers' interest in law enforcement began well before his application to become a Nassau County police officer. *Id.* ¶ 36. He dreamed of being a cop from an early age and took a high school law course that resulted in his teacher encouraging him to consider a career in law

3

enforcement. *Id.* Officer Myers' childhood dream turned into a concrete desire in 2014 after speaking with a police detective who encouraged Officer Myers to apply for such roles. *Id.* ¶ 37.

In 2017, Officer Myers applied to become a Nassau County Police officer by registering for the written examination. *Id*. ¶ 38. Officer Myers passed the written exam in 2018. *Id.* ¶ 39. In May 2019, Civil Service delivered Officer Myers a letter informing him that he had been selected to continue with the hiring process. *Id.* ¶ 40. The next step was to take the Physical Agility Test, which Officer Myers passed. *Id.* In March 2020, the NCPD informed Officer Myers that it would begin conducting his background investigation, which is the next step in the hiring process. *Id.* ¶ 41. Officer Myers met with the NCPD Investigator and discussed answers he had previously provided to a mandatory questionnaire regarding his background. *Id.* ¶ 42. Officer Myers disclosed that eight to nine years earlier, he received traffic tickets on three occasions for non-moving violations that he timely paid. ¶¶ 42–43. Officer Myers discussed with the NCPD Investigator the context for these traffic tickets, including that almost all resulted from just two traffic stops, that he had not received additional tickets since August 2012, and that he timely paid each of the tickets he received. *Id.* ¶ 43. Officer Myers' record was otherwise pristine.[1] *Id.* ¶ 44.

Nevertheless, Defendants disqualified Officer Myers on August 6, 2020, informing him that his "motor vehicle record" amounted to "disrespect for the process of law" that purportedly rendered him unfit for the job. *Id.* ¶ 46. Officer Myers appealed his disqualification to the CSC,

---

[1] Defendants are wrong that Officer Myers' application is integral to the complaint and therefore incorporated by reference. *See* Mot. at 1–2, n.1. A "necessary prerequisite" to finding a document integral to a complaint "is that the plaintiff rely on the terms and effect of the document in drafting the complaint." *Nicosia* v. *Amazon, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). Here, the application is not quoted in the Complaint, but rather described at a high level to explain the broader application process. *See Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (complaint's reference to a guilty plea could not open the door to the content of the testimony proffered in exchange for the plea in the context of a motion to dismiss).

which summarily rejected the appeal. *Id.* ¶ 52. Officer Myers sent a second appeal letter to the CSC in October 2021. *Id.* ¶ 56. The CSC responded that it "conducted a thorough review" of his application but "determined that [his] appeal process ha[d] been completed as of our letter dated October 29, 2020" and that "[his] time to appeal ha[d] expired." *Id.*

During approximately the same time period, Defendants hired white applicants with far more troubling records than Officer Myers. In 2016, the NCPD hired a former NYPD officer who is white. *Id.* ¶ 58. According to a lawsuit filed against this officer, in March 2015 he stopped a Black social worker, then seven months pregnant, on her commute to work and allegedly pulled the woman from the driver's seat, threw her to the ground, and called her a "fat bastard." *Id.* ¶ 61. This officer resigned from the NYPD within months, and the lawsuit against him was settled. *Id.* In 2020, the NCPD hired another former NYPD officer who is white. *Id.* ¶ 62. In April 2016, surveillance video allegedly captured this officer, then off-duty, standing by as his friend beat another man unconscious. *Id.* ¶ 63. According to a lawsuit filed by the victim, just before the assault, the officer flashed his badge and said, "I'm with the NYPD. You're not going anywhere." *Id.* The NYPD fired this officer in June 2017. *Id.* Both of these officers successfully completed the same hiring process to which Defendants subjected Officer Myers, even though Defendants learned (or should have learned) of the concerning facts described above. *Id.* ¶ 65.

Simultaneous with his application to the NCPD, Officer Myers pursued employment with the NYPD. *Id.* ¶ 67. Officer Myers underwent a similar hiring process with the NYPD, including an extensive background check process in which he had a conversation about his prior traffic tickets with the officer conducting the investigation. *Id.* ¶¶ 68–69. On December 29, 2020, just months after he was disqualified from the NCPD process, Officer Myers was admitted to the NYPD Police Academy. *Id.* ¶ 70. Today, Officer Myers patrols the 25th precinct of New York,

commuting each day to protect and serve a community for which he cares greatly but in which he does not reside. *Id.* ¶ 71. Officer Myers is proud to be an NYPD officer, successfully works a difficult beat, and has received positive feedback on his performance. *Id.* ¶ 73. Officer Myers nevertheless continues to desire serving as a police officer in his home County of Nassau. *Id.*

II.     **Defendants Employ Discriminatory Hiring Practices That Result in a Police Department Where Non-Whites Are Significantly Underrepresented.**

   A.     **Nassau County Police Department Is Disproportionately White, Resulting from an Application Process That Discriminates Against Black Applicants at Every Stage.**

Officer Myers' experience is all too common for non-white applicants to the NCPD. Hiring data obtained from Defendants through FOIL requests shows that non-white applicants have been disqualified from the hiring process at an alarming and statistically significant rate that far exceeds the rejection rate for white applicants. For the most recently completed hiring cycle, which concluded in 2019, Defendants hired 6.9% of white applicants, but just 1.8% of Black applicants. *Id*. ¶ 7. These discriminatory hiring figures result in large part from a highly subjective, post-written examination screening process (the "Post-Exam Process"). *Id.* ¶ 104. For example, approximately 24.2% of white applicants who began the Post-Exam Process were hired as NCPD officers, compared to just 8.5% of Black applicants. *Id.* ¶ 100. In the Background Investigation phase—the part of the Post-Exam Process in which Officer Myers was disqualified and which presents numerous opportunities for discretion (and discrimination)—white applicants were disqualified 19.5% of the time compared to 51.3% of the time for Black applicants. *Id.* ¶ 101(b).

**B.    The Highly Discretionary Post-Exam Process Allows Defendants to Discriminate Against Non-White Applicants.**

After candidates complete an application and appear for a written examination, those who achieve a sufficiently high score are added to an "eligibility list," which reflects candidates who may be selected to participate in the Post-Exam Process. *Id.* ¶ 92(a). The first step of the Post-Exam Process is a Physical Agility Test, which includes push-ups, sit-ups, and a timed 1.5-mile run and is administered by a Civil Service employee. *Id.* ¶ 92(b). Applicants who pass the Physical Agility Test proceed to the Background Investigation, in which applicants meet with investigators to discuss applicants' answers to a questionnaire they fill out prior to this stage. *Id.* ¶ 92(e). The questionnaire discloses, *inter alia*, employment, criminal, driving, and financial history. *Id.* The Background Investigation reports ultimately make their way to the CSC, which reviews the reports and either disqualifies an applicant or permits them to continue with the hiring process. *Id.* ¶ 92(g). Applicants who pass the Background Investigation then undergo additional tests, including a Polygraph, Psychological Evaluation, and Medical Examination. *Id.* ¶ 92(h). If an applicant is successful at all stages of the hiring process, they are added to a list of eligible hires for an upcoming recruit class. *Id.* Applicants can appeal their disqualifications to the CSC. *Id.* ¶ 50.

The discretionary nature of the assessments in the Post-Exam Process enables Defendants to discriminatorily disqualify applicants who are qualified to work as NCPD officers. For example, the lack of objective criteria in the Physical Agility Test creates room for discretion as to what qualifies as a proper push-up or sit-up, which allows bias to impact scoring. *Id.* ¶ 93(a). The Background Investigation similarly extends opportunities for discriminatory decisionmaking, as investigators are given considerable leeway in investigatory tactics, tend to be more dilatory with applicants of color, and have no standard for what constitutes "disrespect for the process of

law and order." *Id.* ¶ 93(b)–(e). And the Psychological Examination and Polygraph are conducted pursuant to either subjective criteria or—perhaps most notably—no criteria at all. *Id.* ¶ 93(g).

## III. Defendants Have a History of Discriminatory Hiring Practices.

Officer Myers' disqualification is part of Defendants' long-standing pattern of invidious discrimination against non-white applicants in the hiring of police officers. In 1977, the Department of Justice ("DOJ") filed an action alleging that the County had "pursued and continue[d] to pursue policies and practices that discriminate against blacks [and] Spanish-surnamed individuals . . . with respect to employment opportunities within the police department," in violation of Title VII of the Civil Rights Act of 1964 and the Fourteenth Amendment. *Id.* ¶ 76. In 1982, the Court issued a Consent Decree resolving the litigation, in which the County represented that it "realizes that certain of its selection criteria for hire into and promotion within the Nassau County Police Department . . . may give rise to an inference that discrimination has occurred" and agreed to "fill Police Officer appointments in the NCPD by fair and nondiscriminatory selection from amongst qualified candidates." *Id.* ¶¶ 77, 81. However, as the above-reference data shows, little (if any) improvements have been made.

Although Defendants make the unsupportable assertion that they were not aware of Plaintiff's race, *see* Mot. at 4, the Complaint expressly alleges that Defendants track the races of applicants, *see* Compl. ¶¶ 94–110, and that Officer Myers met with Defendants' agents, *see id.* ¶¶ 40–43. In addition, Plaintiff's application, which was reviewed by the CSC Commissioners, includes three photos of Plaintiff. *See* Defs.' Exhibit A at 85, 87, 133. Moreover, Defendants supply information on the race of applicants to the DOJ pursuant to the Consent Decree. *See* Compl. ¶¶ 84–85. These unsupportable assertions are a distraction from what NCPD's leadership has said publicly about its hiring process and its perspective on the paucity of Black officers. Current NCPD Commissioner Patrick Ryder has stated that he "like[s]" the current hiring system

and referred to the consent decree as a "farce" and a "game that gets played in the numbers." *Id.* ¶ 17. Commissioner Ryder also blamed the lack of diversity in the NCPD on the dog-whistle of "broken homes" and, as alleged in sworn testimony in a recent deposition, referred to a Black female ex-police officer as a "f\*cking [nword]." *Id.*

***

While non-white applicants are deprived of good, well-paying jobs with the NCPD, they are not the only ones who suffer at the hand of the NCPD's discriminatory hiring process. The NCPD hiring process deprives all people of Nassau County of potential officers, like Officer Myers, who are uniquely situated to serve its diverse community and foster an environment of public safety. Officer Myers, who has spent the past two years as an exemplary member of the NYPD, seeks the opportunity before this Court to finally hold Defendants to account.

## LEGAL STANDARD

## I.      Rule 12(b)(1)

To establish standing to support the Court's constitutional jurisdiction, a plaintiff need only allege that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *John* v. *Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quotations and citations omitted). The court need only determine whether the complaint alleges "facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (cleaned up). At the pleading stage, the court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *United States* v. *Vazquez*, 145 F.3d 74, 81 (2d Cir. 1998) (quotations and citations omitted).

## II.     Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  To satisfy the plausibility standard, plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  In considering a motion under 12(b)(6), "a court must read the complaint liberally, assume that the allegations in the complaint are true, and draw all reasonable inferences in the plaintiff's favor." *Gadson* v. *Long Island Jewish Hosp.*, 2007 WL 879654, at *1 (E.D.N.Y. Mar. 21, 2007).  A court must only consider whether the plaintiff is "entitled to offer evidence to support the claims," and not whether the plaintiff will ultimately succeed.  *Id.* (citations and quotations omitted).  Courts may not properly consider materials outside of the pleadings, unless the motion is converted to a summary judgment motion. *See Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991) (citing Fed. R. Civ. P. 12(b)(6)).

## III.    Rule 23(c)(1)(a)

Rule 23(c)(1)(A) allows courts to "decide whether to certify a class action '[a]t an early practicable time' after a putative class action is brought." *Talarico* v. *Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 166 (S.D.N.Y. 2019) (quoting Rule 23(c)(1)(A)).  Nevertheless, "[m]otions to strike are generally looked upon with disfavor [and] a motion to strike class allegations . . . is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Chen-Oster* v. *Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (citations and quotations omitted).

**I.  The Complaint Clearly Establishes That Plaintiff Has Standing to Bring the Claims Asserted.**

Defendants argue that Plaintiff lacks standing to challenge any portion of the Post-Exam Process other than the 2018 Background Investigation.  That argument, however, is based on a misunderstanding of the law and facts in this case.  A plaintiff has class standing if "he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicat[e]s the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Richardson* v. *City of New York*, 2021 WL 1910689, at *5 (S.D.N.Y. May 12, 2021) (citations and quotations omitted).  At the motion to dismiss stage, "the presence of class standing 'is assessed based on allegations rather than evidence'" for the simple reason that, at this stage, there is no "evidence" yet.  *Id.* (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig*, 299 F. Supp. 3d 430, 459 (S.D.N.Y. 2018)).

As an initial matter, and as Defendants concede, Plaintiff indisputably has standing to challenge, at the very least, the Background Investigation portion of the Post-Exam Process.  *See* Mot. at 9 ("Plaintiff lacks standing to challenge any portion of the process **other than the 2018 Background investigation**." (emphasis added)).  Plaintiff most obviously has standing to bring claims respecting the Background Investigation because that is the particular stage of the hiring process in which he was disqualified.

Plaintiff also has standing with respect to his claims challenging the entire Post-Exam Process.  The Complaint alleges that the *entire* highly subjective, Post-Exam Process is tainted by discrimination as Defendants use their discretion to impose more stringent requirements for non-white applicants, *see, e.g.*, Compl. ¶¶ 7–9, 92–110, and the Background Investigation is a

component of that process. Plaintiff was directly harmed based on discrimination in the Post-Exam Process. Plaintiff further alleges that the class members experience discrimination during the Post-Exam Process through the same mechanism: decisionmaker bias purposely enabled by unconstrained discretion. *See id.* ¶ 93. The stark and dire statistics alleged by Plaintiff, *see id.* ¶¶ 95–110, clearly reflect conduct by Defendants that implicate the "same set of concerns" and show that Plaintiff was subjected to a highly discriminatory hiring process that harmed him at every step, even if he managed to pass some steps.

*Richardson*, 2021 WL 1910689, is instructive. In *Richardson*, the court held that the plaintiff, a rejected applicant for an FDNY civilian position, had class standing for all Black applicants who had initially passed the City's Administrative Service test and who possessed all other posted requirements for FDNY civilian positions, but who otherwise were rejected. *Id.* at *3, *5. Reviewing plaintiff's allegations under the Second Circuit's class standing test, the court found that plaintiff's allegations that she had "'applied and was rejected for one or more Civilian Positions at FDNY for which she was qualified' and that her rejection was racially motived" left "no doubt that [plaintiff's] pleadings describe[d] injuries felt and conduct faced by members of Plaintiff['s] envisioned class[]." *Id.* at *5. Furthermore, the court concluded that defendant's "challenges [to] the factual underpinnings" of plaintiff's class allegations were more appropriate at class certification. *Id.* As the court in *Richardson* emphasized, class standing is "assessed based on allegations rather than evidence." *Id.* Here, Plaintiff has alleged that the practice being challenged is not any particular step of the Post-Exam Process, but rather the discriminatory discretion exercised by Defendants in making decisions throughout the entire Post-Exam Process.

Defendants reliance on *Davis* v. *State of Connecticut Department of Correction*, 169 F. Supp. 3d 311 (D. Conn. 2016), is misplaced. In *Davis*, the court held that the plaintiff, who failed

one segment of the Connecticut Department of Correction's four-part physical fitness exam for correctional officer applicants, did not have standing to bring a class action on behalf of plaintiffs who had failed the three other parts of the fitness exam. 169 F. Supp. 3d at 318. In so holding, the court concluded that the other three parts of the exam did not raise the "same set of concerns." *Id.* Here, the challenged conduct raises exactly the same set of concerns. In *Davis*, there was no allegation of a common practice impacting each of the fitness exam parts that resulted in the same injury. Here, Plaintiff has alleged that the discriminatory exercise of discretion is a common practice impacting all stages of the Post-Exam process that results in the same injury. Moreover, *Davis*'s procedural posture differs considerably from the present case. In *Davis*, the court already had the benefit of findings of fact from an earlier, related class action that challenged the physical fitness test and resulted in the court granting plaintiff's motion for summary judgment with respect to some, but not all, parts of the physical exam. *See Davis*, 169 F. Supp. at 314–15 (citing *Easterling* v. *State of Conn., Dep't of Corr.*, 783 F. Supp. 2d 323 (D. Conn. 2011).[2]

## II. Plaintiff Adequately Pleads Discriminatory Intent in Support of His Claims for Violations of the Equal Protection Clause.

In Count One, Plaintiff states a claim for intentional race discrimination in violation of the Equal Protection clause by alleging that Nassau County intentionally discriminated against him on

---

[2] Defendants also argue that Plaintiff lacks standing to challenge "any aspect of the 2012 Exam" because Plaintiff took the 2018 Exam. Mot. at 8–10. This argument misunderstands Plaintiff's claims. Plaintiff is not challenging any particular exam but is challenging pervasive, ongoing, and longstanding racial discrimination in the hiring of NCPD officers as a result of a subjective and discretionary Post-Exam Process. *See* Compl. ¶ 22 ("The proposed class includes all non-white applicants to become police officers in Nassau County who were disqualified from consideration by Defendants during the post-exam process."). The racially discriminatory Post-Exam Process in connection with both the 2012 exam and the 2018 exam are relevant and provide proof of Plaintiff's claims. Moreover, the Complaint alleges that the Post-Exam Process has not been meaningfully updated since 2012; thus the 2012 and 2018 exams raise the same set of concerns. *See* Compl. ¶ 105.

the basis of race when it disqualified him from the police officer hiring process.  *See* Compl. ¶ 144; *Littlejohn* v. *City of New York*, 795 F.3d 297, 320 (2d Cir. 2015).  Defendants argue that Plaintiff's § 1983 Equal Protection claim should be dismissed because he fails to plausibly allege that Defendants acted with the requisite discriminatory intent.  The position asserted by Defendants is unsupportable.

A plaintiff alleging employment discrimination on the basis of race must adequately plead that (1) he suffered an adverse employment action; and (2) his race was a motivating factor in the decision to take the adverse action.  *See Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85–86 (2d Cir. 2015).[3]  In order to adequately plead that race was a motivating factor, a plaintiff must allege facts that "'give plausible support to a minimal inference of discriminatory motivation.'"  *Ganny* v. *FJC Sec. Servs., Inc.*, 2016 WL 4939312, at *1 (E.D.N.Y. Sept. 14, 2016) (quoting *Littlejohn*, 795 F.3d at 311).

There is no dispute that Defendants took adverse action against Officer Myers by failing to hire him.  *See Johnson* v. *Long Island Univ.*, 58 F. Supp. 3d 211, 222 (E.D.N.Y. 2014) (failure to hire constitutes an "adverse action").  And Plaintiff adequately alleges facts that give plausible support to a minimal inference of discriminatory motivation by pointing to (1) a discretionary hiring process with statistical evidence of discrimination; and (2) comparative evidence of the different treatment of white applicants.  Each of these, on its own, is sufficient to plead discriminatory motivation.  *See Brown*, 2017 WL 1102677, at *5; *Sutter* v. *Dibello*, 2021 WL 930459, at *21 (E.D.N.Y. Mar. 10, 2021).  But even if these pieces of evidence were not enough

---

[3]     Defendants' analysis of Plaintiff's § 1983 Equal Protection claim under a disparate impact theory, *see* Defs.' Mot. at 14–19, is in error.  The Equal Protection clause protects against intentional discrimination, and § 1983 claims are therefore evaluated under the Title VII disparate *treatment* rather than disparate *impact* framework.  *See Starks* v. *MTA*, 2022 WL 814668, at *6 (S.D.N.Y. Mar. 17, 2022); *Teasdale* v. *N.Y.C Fire Dep't*, 574 F. App'x. 50, 52 (2d Cir. 2014).

standing alone, when combined with the discriminatory comments on the part of key stakeholders of Defendants, they "create[e] a mosaic of intentional discrimination by identifying bits and pieces of evidence, statistical and non-statistical, that together give rise to an inference of discrimination." *Gibson*, 2022 WL 1063017, at *13 (denying motion to dismiss § 1983 discrimination claim because plaintiff presented a plausible claim that he was demoted at least in part due to his race).

### A. The Statistical Evidence Alleged Is Plainly Sufficient to Support an Inference of Discriminatory Motivation.

Plaintiff alleges statistical evidence that is plainly sufficient to survive a motion to dismiss. "'Statistics alone may be sufficient' to demonstrate discriminatory intent on a motion to dismiss." *Brown*, 2017 WL 1102677, at *4 (quoting *Burgis* v. *N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2014)). Statistics are sufficient "if they show a pattern or practice that cannot be explained except on the basis of intentional discrimination." *Burgis*, 798 F.3d at 69. To do so, "the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely." *Id.*

Plaintiff alleges a statistically significant disparity greater than two standard deviations in the hiring rates between white and non-white applicants to the NCPD, which "courts generally consider . . . sufficient to warrant an inference of discrimination." *Malave* v. *Potter*, 320 F.3d 321, 327 (2d Cir. 2003). Specifically, Plaintiff alleges that the share of Black applicants (as well as all non-white applicants) hired in the Post-Exam Process is lower than the share of white applicants hired by "more than three standard deviations." Compl. ¶ 103.[4] Plaintiff's statistics plainly show

---

[4]     Defendants' arguments concerning 2012 examination data should be rejected. "Proof that an employer engaged in racial discrimination [in an earlier period] might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decisionmaking process had undergone little change." *Hazelwood Sch. Dist.* v. *United States*, 433 U.S. 299, 309 n.15 (1977). It is reasonable to consider the 2012 data where, as Plaintiff has alleged, there have been no material changes to the hiring process since then. *See* Compl. ¶¶ 105–10.

that white applicants are more likely to succeed at every single step of the Post-Exam Process: 23.6% of white applicants who took the Physical Agility Test failed, compared to 50.6% of Black applicants; 19.5% of white applicants who underwent a Background Investigation were disqualified at this stage, compared to 51.3% of Black applicants; and 2.6% of white applicants who completed a Psychological Examination failed, compared to 8.2% of Black applicants. *See id.* ¶ 101.

Further, Plaintiff's statistics reflect what the Second Circuit calls the "relevant comparison," which is "between the racial composition of the at-issue jobs [i.e., passing candidates] and the racial composition of the qualified population in the relevant labor market [i.e., those applicants who made it to Post-Exam Process]." *Mandala* v. *NTT Data, Inc.*, 975 F.3d 202, 210 (2d Cir. 2020). Defendants attack this comparison by arguing that Plaintiff improperly identifies the County's general population as the comparator group. *See* Mot. at 17. That is incorrect. Neither of the two relevant comparisons Plaintiff identifies—(1) the racial composition of applicants who began the Post-Exam Process and those who were ultimately hired, *see* Compl. ¶ 100; and (2) the racial composition of applicants who began the Background Investigation process and those who passed the Background Investigation, *see* Compl. ¶ 101(b)—includes general population statistics. Rather, Plaintiff adequately pleads an inference of discrimination based on statistically significant differences in the hiring rates of white and non-white applicants in the Post-Exam Process.

---

Moreover, although the current hiring cycle is ongoing, the preliminary data available is similarly suggestive of discrimination. *See id.* Defendants cannot fault Plaintiff for not including data not yet available due to the ongoing nature of the hiring process. Not only would it be perverse to require plaintiffs to wait the entire cycle, sometimes lasting as long as six years, for the full data set to be complete before bringing a claim, but such a practice would also necessarily prevent certain plaintiffs from bringing claims due to statute of limitations issues.

*Brown* v. *City of New York* is instructive. There, the court found that plaintiff stated a claim for employment discrimination based on statistical evidence that Black applicants were disqualified from a hiring process at a higher rate than white applicants and allegations that the screening process was "subjective" and "particularly susceptible to contamination with implicit bias." *Brown*, 2017 WL 1102677, at \*4–5. Here, too, Plaintiff alleges that rates of hiring by race differ by statistically significant amounts, *see* Compl. ¶ 103, and that the hiring process is riddled with the same opportunities for bias that plagued the process in *Brown*, *see* Compl. ¶ 93. Indeed, just like *Brown*, Plaintiff's statistics "lack no needed context" and "suggest an unambiguous difference in outcomes for black and white [police officer] candidates." *Brown*, 2017 WL 1102677, at \*5.

Plaintiff's statistics are highly probative of discriminatory intent, and Defendants offer no persuasive argument to the contrary. The one case they do cite, *Martinez* v. *City of Stamford*, 2023 WL 3162131, at \*2 (2d Cir. May 1, 2023), is readily distinguishable. As a preliminary matter, *Martinez* was decided on summary judgment, not a motion to dismiss. Regardless, the statistics deemed insufficient in *Martinez* are of a different kind than the statistics alleged by Plaintiff. In *Martinez*, the plaintiff only alleged that "the lack of Hispanic officers in leadership positions at the time he sought a promotion" allowed a reasonable juror to infer discriminatory intent. *Id.* at \*2. Here, by contrast, Plaintiff alleges particular disqualification rates for white, Black, and Hispanic applicants at various stages of the application process for the 2012 *and* 2018 exam periods. *See* Compl. ¶¶ 95–110. Defendants further rely on *Martinez* for the proposition that "numbers alone" cannot "serve as evidence of intentional discrimination." Mot. at 13. While raw numbers may not be enough to state a claim for intentional discrimination, "*statistics* alone may be sufficient to demonstrate discriminatory intent on a motion to dismiss." *Brown*, 2017 WL 1102677, at \*4

(citing *Burgis*, 798 F.3d at 69) (emphasis added). Plaintiff here alleges detailed statistics, not raw numbers: Plaintiff provides *both* the "raw percentages of White, Black, and Hispanic individuals at each [part of the hiring process]" *and* "the number of individuals at each level." *Burgis*, 798 F.3d at 70. *See* Compl. ¶¶ 95–110.

Defendants also argue that Plaintiff "ignores an obvious and plausible nondiscriminatory explanation for his disqualification": his motor vehicle record. Mot. at 14.[5] This argument misses the mark. Plaintiff's motor vehicle record is not a plausible explanation for his disqualification where similarly situated white applicants were not disqualified for far more egregious behavior,[6] *see* Section II.B., *infra*, and the statistical evidence shows that 19.5% of white applicants who went through a Background Investigation were disqualified at that stage compared to 51.3% of Black applicants, *see* Compl. ¶ 101(b). Defendants also argue that Plaintiff's averred statistics are flawed because "those with a criminal record, poor prior employment performance, or financial distress or improprieties are not within the 'pool of qualified job applicants' and would have to be excluded from any comparator group to which otherwise qualified candidates belong." Mot. at 18. While it is possible that some of the non-white applicants were disqualified at the Background Investigation stage for valid reasons, "such figures are not always available, particularly before discovery," so courts often "allow plaintiffs to rely on other statistics that do not conform to the

---

[5] Defendants' repeated references to Article 78 cases, *see* Mot. at 2 n.2, 11 n.5, 27, are distractions, and Article 78 caselaw has no bearing on the Equal Protection analysis at issue here. *See Salahuddin* v. *City of Mount Vernon, N.Y.*, 2022 WL 564002, at *4 (S.D.N.Y. Feb. 24, 2022) (where "Court cannot say that the alleged deprivations were 'random and unauthorized,' Plaintiff's failure to avail himself of an Article 78 proceeding does not preclude this action"). Further the Article 78 cases cited by Defendants included no allegations of racial discrimination.

[6] It is telling that Defendants consider decades-old, timely-paid non-moving violations to be "thumb[ing] [one's] nose at the law," Mot. at 14, but not abusing one's role in law enforcement to inflict or allow violence on citizens. *Compare* Compl. ¶¶ 42–43, *with* Compl. ¶¶ 57–66.

*preferred* methodology so long as they are probative of whether the challenged policy has a disparate impact on the qualified labor pool in question." *Mandala*, 975 F.3d at 210. That is the case here.

## B. Plaintiff Also Raises an Inference of Discriminatory Intent by Identifying Similarly Situated Comparators Who Were Provided Preferential Treatment.

A "plaintiff can raise an inference of discrimination by demonstrating the disparate treatment of at least one similarly situated employee outside his protected group and sufficient facts from which it may reasonably be inferred that the plaintiff's and comparator's circumstances bear a reasonably close resemblance." *Sutter* v. *Dibello*, 2021 WL 930459, at *21 (E.D.N.Y. Mar. 10, 2021). Courts have held that "employees may be similarly situated in all material respects when the plaintiff and the putative comparator were subject to the same workplace standards." *Id.* Here, Plaintiff raises an inference of discrimination by pointing to two current NCPD officers who went through "the same workplace standards" (*i.e.*, the Background Investigation) as Plaintiff, and who were subject to preferential treatment compared to Plaintiff. *See* Compl. ¶¶ 57–66. Specifically, Plaintiff describes two former NYPD officers, one who resigned after allegedly throwing to the ground a Black woman who was seven months pregnant during a routine traffic stop, and another who was fired for his involvement in a physical altercation when off-duty. *See id.* ¶¶ 61, 63. Both of these individuals went through the Background Investigation where far more significant issues than Plaintiff's were excused. *Id.* ¶ 57. Moreover, at least one of these comparators had three traffic infractions when applying to the NCPD. *See id.* ¶ 58 n.3. That two white men who had previously been forced to leave a police department for misconduct passed Defendants' Background Investigation, but a Black man who was pulled over for non-moving

vehicular infractions almost 10 years earlier did not, is a clear indication of the discriminatory animus entrenched in the NCPD hiring process.[7]

### C. Comments from Key Decisionmakers in Nassau County Provide Further Evidence of Discriminatory Intent.

Plaintiff's statistical and comparative allegations are further supported by allegations of the NCPD Commissioner's comments reflecting racial animus. After being presented with a newspaper's findings on the lack of non-white NCPD officers, Commissioner Ryder attributed the issue to the purported presence of "broken homes" or to a lack of parental support in non-white communities. Compl. ¶ 121. Commissioner Ryder also tried to explain the lack of diversity in the NCPD by invoking other racial stereotypes, asking "[w]hat's the percentage of Asians that are in the doctor world? What is the percentage of lawyers that are Jewish." *Id.* ¶ 122. Commissioner Ryder has also, according to sworn deposition testimony, referred to a then-police officer with the NCPD, who is Black, as a "'(expletive) N-word.'" *Id.* ¶ 125. The Second Circuit has held that while "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination," "when other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Commissioner Ryder's statements are far more egregious than the comments at issue in *Abdu-Brisson*, an age discrimination case where the court determined that the employer's comments that older pilots were "contaminated" and "Bad Apples" raised an inference of discriminatory intent. 239 F.3d at 468.

---

[7]     Defendants' sole response to Plaintiff's comparators is that these individuals "cannot be comparators for racial discrimination because there is no allegation that the CSC Commissioners knew their race or the race of any other applicant." Mot. at 13. This claim is absurd on its face. *See* Statement of Facts Section III, *supra*.

III.    **Plaintiff Adequately Pleads Municipal Liability Under *Monell*.**

*Monell* v. *Department of Social Services of the City of New York*, 436 U.S. 658, 690–91 (1978), provides that municipal defendants can be held liable for deprivation of constitutional rights under § 1983 where the execution of a government's policy or custom causes a constitutional violation.  To state a claim against a municipality in a § 1983 *Monell* claim, a plaintiff need only plead three elements: "(1) an official policy or custom that (2) caused the plaintiff to be subjected to (3) a denial of constitutional rights."  *Jackson* v. *Nassau Cnty.*, 552 F. Supp. 3d 350, 377 (E.D.N.Y. 2021).  As discussed in Section II, *supra*, Plaintiff has adequately pleaded the denial of his Equal Protection rights.

A "plaintiff can satisfy the municipal policy requirement by alleging: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decisionmaking authority; (3) a practice so persistent and widespread that it constitutes a *de facto* custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that policymakers exercised deliberate indifference to the rights of plaintiff."  *Id.* at 378 (citing *Ying Li* v. *City of New York*, 246 F. Supp. 3d 578, 636 (E.D.N.Y. 2017)).  Here, Plaintiff adequately pleads *Monell* liability by alleging that the County adopted a *de facto* policy or custom of discrimination, that the CSC's disqualification constituted County action because it is the County's "final decisionmaker" for police officer eligibility, and that the County failed to adequately train its Commissioners and investigators to impartially conduct Background Investigations.

A.    **Nassau County Adopted a *De Facto* Policy or Custom of Discrimination.**

Nassau County adopted a *de facto* policy or custom of using the Post-Exam Process to pretextually disqualify non-white applicants.  Where "discriminatory practices of city officials are persistent and widespread," they can "be so permanent and well settled as to constitute custom or

usage with the force of law, and thereby generate municipal liability." *Sorlucco* v. *N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992). Plaintiff adequately pleads that Defendants engaged in a persistent and widespread practice of discrimination by persisting in using a discretionary hiring process that had statistically significant disparities in hiring outcomes by race. *See* Compl. ¶¶ 93, 95–110. Defendants were repeatedly put on notice of this practice by virtue of the prior Consent Decree between the County and the Department of Justice. *See* Compl. ¶¶ 76–86.

> 1. *Plaintiff's Averred Statistics, Combined with the Discretionary Nature of the Post-Exam Process, Are Sufficient to Plead Defendants Acted Pursuant to a De Facto Policy or Custom.*

Plaintiff alleges that the subjective nature of the County's disqualification criteria allows Defendants to make decisions based on an applicant's race, and the alleged statistical evidence shows that the policy has its intended effect of excluding non-whites from the NCPD. *See* Compl. ¶¶ 93, 95–110. Case law makes clear that these allegations are sufficient to plead *Monell* liability based on the theory that "persistent and widespread" discriminatory practices can "generate municipal liability." *Sorlucco*, 971 F.2d at 870–71.

In *Boyle* v. *City of Philadelphia*, 2018 WL 994218, at *6 (E.D. Pa. Feb. 20, 2018), the court considered a reverse race discrimination challenge to fire department promotion criteria and "conclude[d] that [plaintiff] properly pleaded a custom or policy under *Monell*" based on allegations "regarding the design and scoring of the exam . . . when combined with the statistical data provided by plaintiffs." The plaintiff in *Boyle* had alleged "that the examination grading and promotion criteria was subjective, which enabled the Fire Department to make promotions based on the race of the applicant," and presented statistics supporting his allegations. *Id.* at *2, *6. Plaintiff's allegations here mirror those in *Boyle*. Courts in the Second Circuit have similarly held that plaintiffs can show *de facto* customs of discrimination based on statistics. In *Sorlucco*, for instance, the court upheld a jury finding of a custom of sex discrimination based on statistics

22

showing that the NYPD disproportionately terminated women and indirect evidence that "bias existed throughout the department." 971 F.2d at 872. Plaintiff here similarly alleges bias throughout the NCPD by pointing to recent discriminatory comments on the part of its Commissioner, *see* Compl. ¶¶ 120–31, and a history of discriminatory actions resulting in a Consent Decree, *see id.* ¶¶ 76–86. This evidence "br[ings] the cold numbers convincingly to light," and can be used to infer a custom of discrimination. *Sorlucco*, 971 F.2d at 872; *see also Ingram* v. *Madison Square Garden Ctr., Inc.*, 709 F.2d 807, 810–11 (2d Cir. 1983).

Defendants offer only the conclusory response that "Plaintiff fails to adequately allege a widespread pattern or practice because he is the only person identified in the Complaint who was allegedly injured by the Defendants' discriminatory hiring practices." Mot. at 21. That is not true. Each of the proposed class members who went through the Post-Exam Process was subjected to Defendants' bias-laden system, which is an injury in itself. Defendants also do not even try to rebut the well-established legal principle, supported by *Boyle*, *Sorlucco*, and *Madison Square Garden*, that statistics, combined with indirect evidence of discrimination, are plainly sufficient to plead municipal liability. In fact, none of the plaintiffs in the cases cited by Defendants alleged a widespread practice of discrimination through statistics, rendering irrelevant those courts' admonitions that plaintiffs must point to numerous alleged instances to support a widespread practice finding.[8]

---

[8] *See White* v. *City of New York*, 206 F. Supp. 3d 920, 938 (E.D.N.Y. 2016) (plaintiff alleged six examples of trans individuals subject to police misconduct, not statistics comparing the NYPD's treatment of trans individuals to other citizens); *Triano* v. *Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 537–39 (S.D.N.Y. 2012) (plaintiff alleged only "systematic flaws" in the police misconduct review process, not statistics on the extent of police misconduct); *Gaston* v. *Ruiz*, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018) (plaintiff did not allege statistics).

2.  *The DOJ Lawsuit and Ensuing Consent Decree Are "Government Reports" Showing That Defendants Have a De Facto Custom or Policy of Discrimination.*

The Consent Decree issued after the DOJ filed an action alleging that the County had "pursued and continue[d] to pursue policies and practices that discriminate against blacks . . . with respect to employment opportunities within the police department" provides further evidence that the County has a custom of discrimination.  *See* Compl. ¶ 76.  For purposes of pleading *Monell* liability, plaintiffs can "plead the existence of de facto customs or policies based on governmental reports documenting constitutional deficiencies . . . if such reports are sufficiently connected to the specific facts of the case."  *Campo* v. *City of New York*, 2022 WL 970730, at *12 (E.D.N.Y. Mar. 31, 2022); *see also Chavez* v. *City of Chicago*, 2022 WL 6974625, at *3–5 (N.D. Ill. Oct. 11, 2022) (denying motion to strike allegations in complaint citing several sources, including "provisions of a consent decree," and noting that such allegations "could support [Plaintiff's] claim for *Monell* liability").  In *Kucharczyk* v. *Westchester County*, 95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015), for example, the court determined that plaintiff adequately pleaded a custom of constitutional deprivations by pointing to a DOJ Report that the Westchester County Jail violated inmates' Eighth Amendment rights by failing to provide them with adequate medical care.  The DOJ lawsuit that led to the Consent Decree directed to NCPD similarly alleged that the County's employment practices denied Black individuals employment opportunities in the NCPD in violation of the Fourteenth Amendment.  *See* Compl. ¶ 76.  And the County itself represented in the Consent Decree that its selection criteria "may give rise to an inference that discrimination occurred."  *Id.* ¶ 77.

Defendants argue that the Consent Decree is not "sufficiently connected to the specific facts" alleged in the Complaint because the "Consent Decree" arose from a challenge to the *written* civil service exam . . . not the post-exam process."  Mot. at 22.  The contention that the Consent

Decree and this action are "not sufficiently connected" is belied by the language of the Consent Decree itself. The Consent Decree was entered into after the United States filed an action alleging that the County had "pursued and continue[d] to pursue policies and practices that discriminate against blacks [and] Spanish-surnamed individuals with respect to employment opportunities within the police department," with the "purpose . . . to ensure that Blacks [and] Hispanics . . . are considered for employment by Nassau county in the NCPD on an equal basis with white males and that the present effects of the County's alleged prior discriminatory employment practices against Blacks [and] Hispanics . . . be corrected." Compl. ¶¶ 76, 78. Notably, although the Consent Decree is subject to dissolution once the County is deemed to have complied in all material respects, *id.* ¶ 86, it remains in effect.

### B. The CSC's Disqualification Constituted County Action.

Plaintiff adequately pleads *Monell* liability for the separate reason that the CSC acted as the County's final decisionmaker for police officer eligibility. "Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Rookard* v. *Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) (officials with final "authority over personnel decisions" determined to be final decisionmakers for purposes of *Monell*); *Cincotta* v. *Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 410 (E.D.N.Y. 2018) (claim against school district based on allegedly discriminatory termination constituted county action because school board's vote was final). The CSC's disqualification of Plaintiff was similarly final, as it both disqualified Plaintiff and denied his appeal. *See* Compl. ¶¶ 46, 52.

Indeed, New York Civil Service Law § 50 makes the CSC expressly responsible for prescribing "[t]he merit and fitness of applicants for" competitive positions, including police officers. N.Y. Civ. Serv. Law. § 50(1) (McKinney 2023). Such clear delineation of responsibility

in state law is suitable grounds for a finding of final decisionmaking authority under *Monell*. *See Gerardi* v. *Huntington Union Free Sch. Dist.*, 124 F. Supp. 3d 206, 227–28 (E.D.N.Y. 2015) (determining that the board of education was the final decisionmaker for purposes of *Monell* because the board controlled the teacher hiring process under New York Education Law).

Defendants argue that the CSC was not the final decisionmaker because "Plaintiff twice appealed his disqualification, and he neglected to file an Article 78 action to challenge the decisions of the CSC." Mot. at 23. Defendants' argument is factually misleading and legally insufficient. As noted, Plaintiff's two appeals were to the CSC, the same "final decisionmaker" that already rejected his application. *See* Compl. ¶¶ 46, 52. And Defendants argument that the CSC cannot be the final decisionmaker for purposes of *Monell* because Plaintiff could have appealed the decision through an Article 78 proceeding is not supported by case law. *See Salahuddin*, 2022 WL 564002, at *4 (in challenge to suspension from the fire department, the court determined that the Fire Commissioner was a final decisionmaker for purpose of *Monell* even though the suspension could have been appealed through an Article 78 proceeding). By Defendants' logic, no county decisionmaker in New York could be considered a "final decisionmaker" for the purposes of *Monell*, as their decisions are always subject to review under Article 78. That is clearly incorrect.

### C. The County Did Not Adequately Train Its Commissioners and Background Investigators.

Plaintiff also adequately pleads municipal liability by pleading that Defendants "improper[ly] train[ed] and supervis[ed] . . . individuals involved in the hiring process." Compl. ¶ 147. The inference that a municipal policy existed may be drawn from "evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Ricciuti* v. *N.Y.C. Transit Auth.*, 941 F.2d

119, 123 (2d Cir. 1991). Here, Plaintiff alleges that the County acted with deliberate indifference because it knew its CSC would be making subjective decisions, *see* Compl. ¶¶ 92–93, its Commissioner had a history of discriminatory comments, *see id.* ¶¶ 120–31, and this dynamic led to disproportionate disqualification of non-white applicants, *see id.* ¶¶ 101–04. Indeed, Defendants' deliberate indifference to Plaintiff's constitutional rights is further evidenced by the Consent Decree Defendants should have been implementing. *See id.* ¶¶ 76–86. Defendants "knew or should have known of the need to adequately train and supervise" the CSC "involved in the selection process for the position of [police officer] so as to ensure that selection process was conducted in a non-discriminatory manner." *Brown*, 2017 WL 1102677, at *7. The facts alleged therefore plausibly establish the existence of a municipal policy based on deliberate indifference. *Id.*

## IV. Plaintiff Adequately Alleges Disparate Treatment and Disparate Impact Under the NYSHRL's More Lenient Pleading Standard.

Plaintiff sets forth more than sufficient factual allegations to plausibly support both his disparate treatment and disparate impact claims under the flexible pleading standards of the New York State Human Rights Law ("NYSHRL"). The pleading standard for discrimination claims under the NYSHRL matches the lenient standard under the NYCHRL, not, as Defendants suggest, Title VII.[9] Plaintiff states a claim for disparate treatment under the NYSHRL for the same reasons

---

[9] Prior to 2019, the pleading standard to state a discrimination claim under the NYSHRL was the same for Title VII. *See Syeed* v. *Bloomberg L.P.*, 568 F. Supp. 3d 314, 343 (S.D.N.Y. 2021) (citing *Awad* v. *City of New York*, 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014). However, following legislative amendment, New York federal courts have interpreted the standard required to state a claim under the NYSHRL for claims that accrue after October 11, 2019 as being closer to NYCHRL's more lenient standard. *See Bloomberg*, 568 F. Supp. 3d at 345 (analyzing NYSHRL claims under the NYCHRL standard for conduct occurring after October 11, 2019). Here, the cause of action under the NYSHRL accrued on August 6, 2020—the date the CSC informed Officer Myers that he had been disqualified from the hiring process. *See* Compl. ¶ 46.

he states a claim for disparate treatment under the Equal Protection clause. *See* Section II, *supra*. And he states a claim for disparate impact by isolating a practice of subjective determinations throughout the Post-Exam Process that causes statistically significant racial disparities in the hiring rates of applicants to the Department. Defendants' arguments, which incorrectly apply the more stringent Title VII pleading standards to these claims, are easily rejected.

A.    **Plaintiff Adequately Alleges Disparate Treatment in Violation of the NYSHRL.**

To plead a discrimination claim under the NYSHRL, a plaintiff "must allege only that she was treated less well at least in part because of a discriminatory intent." *Bloomberg*, 568 F. Supp. 3d at 322, 344. Plaintiff easily satisfies this burden because he states a claim for discrimination in violation of the Equal Protection clause, *see* Section II, *supra*, which has a more stringent pleading standard than the NYSHRL. *See Miranda* v. *S. Country Cent. Sch. Dist.*, 461 F. Supp. 3d 17, 30 (E.D.N.Y. 2020) ("For the same reasons the Court finds that plaintiff has pled a *prima facie* case of Title VII discrimination against the school district, the Court denies the motion to dismiss plaintiff's claims of discrimination under NYSHRL as to the school district.").

B.    **Plaintiff Adequately Alleges Disparate Impact in Violation of the NYSHRL.**

A plaintiff may state a disparate impact claim under the NYSHRL by "establish[ing] that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions" of the statute. *Bloomberg*, 568 F. Supp. 3d at 345 (citations omitted). To do so, a plaintiff must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin* v. *Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012). This analysis is the same as Title VII, "but the claims are construed more liberally." *Bloomberg*, 568 F. Supp. 3d at 345–46. Plaintiff satisfies each of these requirements.

1. *The Subjective Post-Exam Process Is One Employment Practice.*

Plaintiff adequately pleads an employment practice that causes a disparate impact on non-white applicants by alleging that the entire Post-Exam Process is infected by the same discretionary and biased decisionmaking. If "the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e–2(k)(1)(B)(i). "Whether a particular decisionmaking process is capable of separation for analysis largely turns on the details of the specific process and its implementation in a given case." *Chin*, 685 F.3d at 154. Relevant here, an entire process may be characterized as a single employment practice "[w]hen employment decisions are made based on variable, subjective criteria." *Schallop* v. *New York State Dep't of L.*, 20 F. Supp. 2d 384, 402 (N.D.N.Y. 1998); *see Chin*, 685 F.3d at 154 (the Chief's recommendation could not be separated from the rest of the promotion process because "the weight it carried in the process was both unclear and variable").

Consistent with the case law, Plaintiff pleads that the Post-Exam Process cannot be separated into its component parts since the process is replete with subjective and variable criteria that allow discrimination to seep into hiring decisions. *See* Section I, *supra*; Compl. ¶ 93. Although the specific components of the hiring process may differ, the consistent opportunities for discretion allow bias to pervade the entire Post-Exam Process. Together, the Post-Exam Process is a "group of policies or practices" that "results in a disparate impact." *See Bloomberg*, 568 F. Supp. 3d at 345; *see also Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 355 (2011) (stating that giving discretion to lower-level supervisors can be the basis of disparate impact liability "since an employer's undisciplined system of subjective decisionmaking can have precisely the same effects as a system pervaded by impermissible intentional discrimination"); *Richardson*, 2018 WL

4682224, at *3 (performance reviews that were inconsistently administered and insufficiently objective were a factor causing racial disparity in hiring).

The cases cited by Defendants are inapposite. In *Smith* v. *City of Jackson, Miss.*, 544 U.S. 228, 241 (2005), an age discrimination case, the court held that plaintiffs "have not identified any specific test, requirement, or practice within the pay plan that has an adverse impact on older workers." To begin, *Smith* is an Age Discrimination in Employment Act case where "the scope of disparate-impact liability is narrower than under Title VII" because of the textual differences. 544 U.S. at 240 (explaining that the amendment to Title VII contained in the Civil Rights Act of 1991 expanding employer disparate-impact liability did not apply to age discrimination). Moreover, unlike in *Smith*, Plaintiff "isolate[s] and identif[ies] the *specific* employment practices that are allegedly responsible for [the] observed statistical disparities." *See id.* at 241.

*Local 3621, EMS Officers Union* v. *City of New York*, 2022 WL 17175798 (S.D.N.Y. Nov. 22, 2022), is similarly inapposite. In *Local 3621*, the court held that "plaintiffs may not point to the promotional process generally as the basis for their disparate impact" because it was not a sufficiently specific policy. *Id.* at *9. But *Local 3621* was decided on a motion to certify the class, rather than a motion to dismiss, and the parties had engaged in discovery for the purpose of filing and contesting the motion for class certification. *Id.* at *1. Further, the court held that the "overall promotion process" included "several distinct ways for a single employee potentially to suffer discrimination in that process—including as a result of standardized rules *or* subjective criteria." *Id.* at *9. Here, by contrast, Plaintiff does not allege multiple mechanisms for an applicant to suffer discrimination; he alleges just one: "[t]he discretionary nature of the assessments" in the Post-Exam Process that "allows bias to enter the hiring process." Compl. ¶ 93. In fact, Plaintiff does exactly what the court in *Local 3621* asked plaintiffs to do, which is "identify" the discretionary

components of the Post-Exam Process as "the[] specific employment practices" that are "responsible for any observed statistical disparities." *Local 3621*, 2022 WL 17175798, at *8.

2.   *Plaintiff Alleges That Disparities Exist in the Hiring Rates of Non-White and White Applicants to the NCPD.*

Plaintiff alleges a statistically significant disparity greater than two standard deviations in the hiring rates between white and non-white applicants to the NCPD, which "courts generally consider . . . sufficient to warrant an inference of discrimination." *Malave*, 320 F.3d at 327; *see* Compl. ¶ 103; *M.O.C.H.A. Soc'y, Inc.* v. *City of Buffalo*, 689 F.3d 263, 274 (2d Cir. 2012) (finding disparate impact where plaintiff provided evidence that the passing rate for African Americans who took examinations (42.6%) was only 57.3% of the passing rate for whites who took the same test (74.3%)). Plaintiff also supplements his statistical analysis of racial disparities with comparative evidence that similarly situated white applicants were subject to preferential treatment, *see* Compl. ¶¶ 57–66, which is more than sufficient to establish the plausibility of the claim. *See Gittens-Bridges* v. *City of New York*, 2020 WL 3100213, at *16 (S.D.N.Y. June 11, 2020) (holding that plaintiffs stated a claim under the disparate impact theory by pleading two examples of individuals denied opportunity to apply for a position now occupied by individuals younger and less qualified).

3.   *Plaintiff Alleges a Disparity Substantial Enough to Raise an Inference of Causation.*

The disparities in hiring rates between white and non-white applicants to the NCPD are so pronounced that they cannot be accounted for by chance, and the court can infer that Defendants' hiring practices caused such disparities. A "disparate impact plaintiff need not prove causation to a scientific degree of certainty," and instead may "establish a prima facie case of disparate impact discrimination by proffering statistical evidence which reveals a disparity substantial enough to raise an inference of causation." *EEOC* v. *Joint Apprenticeship Comm.*, 186 F.3d 110, 117 (2d

Cir. 1999). In *Joint Apprenticeship*, statistics reflecting, *inter alia*, that 89.2% of white applicants and 68.3% of Black applicants satisfied an employment requirement were considered so great that the court inferred that the employment requirement at issue caused such disparities. *Id.* at 120. Here, to take just one example, white applicants were almost three times as likely to be hired as Black applicants in the Post-Exam process. *See* Compl. ¶ 9. Plaintiff's statistical evidence, like that in *Joint Apprenticeship*, therefore "reflect[s] a disparity so great that it cannot be accounted for by chance." *Joint Apprenticeship*, 186 F.3d at 117. *See also United States* v. *City of New York*, 637 F. Supp. 2d 77, 93 (E.D.N.Y. 2009) (finding plaintiffs demonstrated disparate impact since the standard deviation presented "support[ed] a conclusion of a causal relationship between the observed disparities and the employment practices at issue").

## V.    Defendants' Motion to Strike Plaintiff's Class Allegations Should Be Dismissed.

Defendants' Motion to Strike Plaintiff's Class Allegations and Deny Class Certification is similarly meritless. Motions to strike are "disfavored because they require a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint and before the plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Talarico*, 367 F. Supp. 3d at 166 (citing *Kassman* v. *KPMG LLP*, 925 F. Supp. 2d 453, 462 (S.D.N.Y. 2013)). Like the defendants' motion to strike in *Talarico*, Defendants' arguments here "mirror the class certification inquiry and so are premature," as "the issues of numerosity, commonality, typicality, adequacy, and predominance" raised "are the same ones that would be decided in connection with determining the appropriateness of class certification under Rules 23(a) and 23(b)." *Talarico*, 367 F. Supp at 173; *see also Bernstein* v. *Cengage Learning, Inc.*, 2020 WL 5819862, at *6 (S.D.N.Y. Sept. 29, 2020) ("[A] determination whether the Rule 23 requirements are met is more properly deferred to the class certification stage, when a more complete factual record can aid the Court in making its

determination."). As a result, "motions to strike class allegations are often denied as premature." *Reynolds* v. *Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511 (S.D.N.Y. 2015).

Here, the parties have barely begun discovery and Defendants have produced only a small number of documents. Plaintiff has not yet been able to seek full discovery relevant to class certification issues. *See Calibuso* v. *Bank of America Corp.*, 893 F. Supp. 2d 374, 390 (E.D.N.Y. 2012) (motion to strike class claims at motion to dismiss stage denied as premature where class discovery had not occurred); *Kassman*, 925 F. Supp. 2d at 464–65 (same). The cases cited by Defendants confirm that a motion to strike class allegations and to deny class certification should not be granted where the parties have not engaged in class discovery. *See Camacho* v. *City of New York*, 2020 WL 4014902, at *1 (S.D.N.Y. July 16, 2020) (granting motion to strike class allegations only "[f]ollowing the exchange of targeted discovery"); *Russell* v. *Forster & Garbus, LLP*, 2020 WL 1244804, at *4 (E.D.N.Y. Mar. 16, 2020) (granting motion to strike class allegations *after* plaintiff was deposed); *Local 3621*, 2022 WL 17175798, at *1 (denying motion for class certification after "the parties engaged in discovery for the purpose of filing and contesting the present motion for class certification"); *Dunnigan* v. *Metro. Life Ins. Co.*, 214 F.R.D. 125, 133 (S.D.N.Y. 2003) (same); *Murphy* v. *Potter*, 2008 WL 2433615, at *11 (E.D.N.Y. June 12, 2008) (denying class certification at summary judgment after "the uncontroverted record clearly demonstrate[d] that the defendant ha[d] applied the [disputed] policy equally as to both male and female employees").

Moreover, the cases Defendants cite where class allegations were struck prior to discovery are wholly inapposite. In *Borgese* v. *Baby Brezza Enterprises LLC*, 2021 WL 634722, at *4 (S.D.N.Y. Feb. 18, 2021), the court struck plaintiff's class allegations in a products liability case because plaintiff could not meet the Rule 23(b)(3) predominance requirement since the complaint

did not indicate where other potential plaintiffs lived or where they may have suffered a resulting injury, preventing the court from determining which state laws applied. Those concerns are not remotely present here, where all claims will be adjudicated under federal or New York law.

Defendants then argue that courts have struck class allegations where plaintiffs did not identify other individuals allegedly injured; but the cases Defendants cite in this regard are also inapposite. In *PFT of America, Inc.* v. *Tradewell, Inc.*, 1999 WL 179358, at *1–2 (S.D.N.Y. Mar. 31, 1999), the court struck plaintiff's class allegations in a breach of contract case because plaintiff suspected that its contracting partner breached its contracts with other companies but failed to identify a single member of the purported class. In *Goldberg* v. *Merrill Lynch, Pierce Fenner & Smith, Inc.*, 1998 WL 321446, at *9 (S.D.N.Y. June 18, 1998), the plaintiff failed to allege any facts to support allegations as to purported members of a class. In both cases, plaintiffs cited no facts demonstrating that there were other members of the purported class. *See PFT of America, Inc.*, 1999 WL 179358, at *1; *Goldberg*, 1998 WL 321446, at *9.

That is not the case here where the Complaint alleges that Defendants hired white applicants who began the Post-Exam Process almost three times more often than similar Black applicants. *See* Compl. ¶ 9. Plaintiff's statistical evidence strongly demonstrates there are many members of the proposed class. The existence of the Consent Decree further demonstrates that Plaintiff's claims—addressed towards hiring practices that impact thousands of applicants—are well suited for class treatment. Without a full factual record, this Court cannot conduct the "rigorous analysis" that Rule 23 requires. *Dukes*, 564 U.S. at 351. Defendants' motion to strike the class action allegations and deny class certification must be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

Dated:  November 13, 2023

                                    Respectfully submitted,

                                    **PAUL, WEISS, RIFKIND,**
                                      **WHARTON & GARRISON LLP**

By: _Lorin L. Reisner_
Lorin L. Reisner
Liza M. Velazquez
Johan E. Tatoy
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
lreisner@paulweiss.com
lvelazquez@paulweiss.com
jtatoy@paulweiss.com

                - and -

**THE LAW OFFICES OF**
    **FREDERICK K. BREWINGTON**

Frederick K. Brewington
556 Peninsula Blvd.
Hempstead, NY 11550
516-489-6959
fred@brewingtonlaw.com

                - and -

**NEWMAN FERRARA LLP**

Randolph M. McLaughlin
1250 Broadway, 27th Floor
New York, NY 10001
212-619-5400
rmclaughlin@nfllp.com

***Attorneys for Plaintiff and the Class***