# EXHIBIT B

Case 2:22-cv-07023-OEM-LGD   Document 40-2   Filed 11/27/23   Page 2 of 19 PageID #: 519

# 6,539 Black people tried to become police officers on LI. Only 67 were hired.

projects.newsday.com/long-island/police-hiring/

By Jim Baumbach  Published: May 27, 2021                                    May 22, 2021



# WATCHDOG
# POLICING ON LI

**T**he path to winning appointment to Long Island's highly paid police forces has been more than three times tougher for Black would-be officers than for white applicants and twice as tough for Hispanic job seekers in recruitment by the Nassau and Suffolk County departments, a Newsday investigation has found.

With thousands more people seeking jobs than the number needed by the two forces, the investigation revealed that since 2012, each county's hiring process rejected minorities at rates that exceeded a federally established benchmark used to detect evidence of unlawful

discrimination.

Candidates for positions on the 2,400-member Nassau County Police Department and the 2,400-member Suffolk County Police Department compete on written exams and then undergo physical fitness tests, psychological screening, medical evaluations and background reviews.

Newsday's investigation found that at each of those hurdles one or both counties disqualified minority applicants in three rounds of hiring at rates higher than those of their white peers.

The disqualifications help explain how a pool of 2,508 Black applicants generated only 36 Black Nassau County cops in the six years after a 2012 hiring exam, as well as how 1,419 Black applicants for the Suffolk department produced only 16 Black cops in the four years after a 2015 test.

After new rounds of hiring, a total of **6,539** Blacks applied to the Nassau and Suffolk forces in the period studied by Newsday. The departments have hired **67**.

**Police hiring data reveals barriers to diversity**
A Newsday analysis found that minorities who took Nassau and Suffolk police department tests had harder paths to being hired. Faith Jessie reports. Credit: Newsday/Chris Ware, Jim Baumbach, Jeffrey Basinger

## Many Black Applicants, Few Black Officers

"To the vast majority of young African American men interested in a good government job such as this, these numbers say your chances of getting through this process are slim to none," said civil rights attorney Randolph McLaughlin, a professor at Pace University's School of Law, when informed about Newsday's findings.

"These numbers tell me there is bias operating in the system, and much more analysis needs to be done by professionals and experts to determine where the block is. You're not going to be able to get more minorities to get through this system unless you remove the blocks, and there are blocks here."

> These numbers tell me there is bias operating in the system.
>
> *Randolph McLaughlinprofessor at Pace University Law School and of counsel at Newman Ferrara LLP*

McLaughlin added: "Frankly, I think a lawsuit is ready, willing and able, given the numbers that I'm seeing here. It surprises me that someone hasn't sued again. And if there's a consent decree, then it may very well be they're violating it."

Newsday uncovered the racial and ethnic dynamics behind Long Island's police hiring by reviewing hundreds of civil service and police documents; interviewing officers, commissioners, civil service officials, testing experts and civil rights attorneys; and by analyzing the histories of 71,600 police candidates.

To conduct that analysis, Newsday calculated how frequently each county filtered out white, Black, Hispanic and Asian applicants at each step of the hiring process.

Four decades ago, the U.S. Justice Department filed civil rights suits against the Nassau and the Suffolk departments with the goal of integrating forces that each were more than 95% white. The counties settled through consent agreements that imposed changes to employment tests and prompted repeated commitments to diversify forces that today remain overwhelmingly white in counties with rising minority populations.

Approaching each round of hiring since then, elected officials and police commissioners asserted that stepped-up recruitment in minority communities would be key to diversifying the forces. The strategy failed.

Suffolk and Nassau County police recruitment images Credit: Newsday illustration

Most starkly, the number of Blacks who sat for Nassau exams fell by nearly half — from 2,055 to 1,213 — between tests in 2012 and 2018. Additionally, barriers uncovered by Newsday's investigation disproportionately blocked minority candidates after they had aced written tests.

Those obstacles included physical fitness testing that can disqualify even highly conditioned candidates if they have not learned to execute push-ups and sit-ups in precisely required forms, as well as psychological evaluations that eliminated Hispanic and Black and applicants at twice and almost three times the rates of white candidates.

"It's incredible to me that at every measure Blacks and Latinos are doing worse," McLaughlin said. "That's almost impossible. That's crazy talk. How can that possibly be? Something's afoot."

Justice Department spokeswoman Kristina Mastropasqua declined to comment on Newsday's findings or to make available attorneys responsible for enforcing the department's consent decrees with Nassau and Suffolk counties.

## Official Actions and Community Anger

Newsday interviewed Nassau Police Commissioner Patrick Ryder and former Suffolk Police Commissioner Geraldine Hart about key findings of the investigation, including the rejection of Black applicants at three times the rate of whites, and Hispanic candidates at twice the rate of whites.

Both said that increasing minority representation on the forces would lead to more effective policing and that they have worked to diversify their departments. Ryder said, for example, that he had enhanced the department's recruiting with a program that enables officers to guide minority job applicants through the hiring process. The Nassau Guardians, the department's fraternal group of Black officers, presented the idea to Ryder after Gov. Andrew M. Cuomo ordered localities to develop policing reform plans following the murder of George Floyd in Minneapolis.

Hart cited reforms developed after she assigned a seven-officer group to identify steps in the hiring process that had disproportionately winnowed out minority candidates.

"If we keep doing the same thing over and over, how do we expect a different result?" she said. "So, we really tried to change things up a little bit."

Both commissioners said that ending U.S. Justice Department oversight under four-decade-old federal consent decrees would give them greater flexibility to adopt measures aimed at increasing diversity.

Both called for granting the counties permission to stop administering their own police hiring civil service tests and instead use a state-run exam as the yardstick for selecting candidates.

During his interview, Ryder attributed the department's inability to attract more minority applicants to the presence of "broken homes" or to a lack of parental support in their communities.

He also said that, compared with white peers, relatively few minority career-seekers have family members who work as police officers and can serve as guides to getting hired.

Four Long Island civil rights leaders said that Ryder had expressed negative and inaccurate stereotypes about Black and Hispanic families as he tried to explain his department's hiring record.

**Civil rights leaders criticize Ryder's comments**
Nassau Police Commissioner Patrick Ryder faces criticism that he stereotyped Black and Hispanic families to explain why his department doesn't attract more minority hiring candidates. Credit: Newsday staff

Two of the leaders said that Ryder's comments revealed attitudes that merited termination as commissioner. NAACP Long Island Regional Director Tracey Edwards and Luis Mendez, former Nassau deputy director of minority affairs, urged County Executive Laura Curran to ask for Ryder's resignation.

"Clearly, based on his statements, he is unfit to serve the rich diversity of Nassau County," Edwards said.

Newsday provided Nassau County Executive Laura Curran with an audio recording of Ryder's Newsday interview and informed both her and Ryder about the responses to the commissioner's statements.

Ryder scheduled and then canceled an interview to be recorded regarding the criticism of his comments. In statements released by Curran's office, both officials expressed commitments to diversifying the police department.

Specifically addressing the criticisms, Ryder wrote: "My intention in my responses was not to be hurtful to anyone but to show how we are continuing to improve recruitment efforts to increase diversity through community outreach and supporting applicants throughout the process."

Curran wrote: "I do not believe lack of diversity in law enforcement is tied to family make-up."

MORE ON THIS TOPIC Curran creates panel on police hiring; Suffolk reviewing its process Ryder apologizes as more condemn his comments to Newsday on hiring diversity LI civil rights leaders criticize Ryder comments on lack of diversity Watch the full interview with Ryder

## Little Change After Four Decades of Federal Oversight

Under the Justice Department's supervision, the 40-year effort to increase minority representation helped change the Nassau and Suffolk forces from 95% white to roughly 85% white. Over the same period, population trends bolstered the minority presence in both counties and reduced the white share of the populations — to 68% in Suffolk and 60% in Nassau, according to Census estimates.

As a result, neither department mirrors the community it patrols.

"I hate to say it, not much has changed," said Suffolk Det. Earl Stroman, who was assigned as a police officer in the early 1990s to recruit minorities to join the Suffolk Department.

As of March this year, he was among the 2,400-member department's 61 Black officers – identical to the number on the force two decades ago. Over the same period, Nassau's roster of Black officers fell from 110 to 103.

After a 35-year law enforcement career, Stroman urges minorities to consider joining the force. In an interview, he expressed pride in police work and cited the possibility of earning $200,000-plus incomes as good cause for applying for jobs. He also recognized a gulf between the police at large and many minority community members while saying that he, too, had experienced being stopped by officers for no reason other than driving in a white neighborhood.

Stroman, who is the father of Mets pitcher Marcus Stroman, also recounted how he had taught his son to comply if pulled over while driving and detailed a 2017 incident in which police in Florida forced Marcus to lie face-down on the street during a routine traffic stop.

"I always say maybe Black officers have no home," Stroman said. "It's tough for us to take a side, it really is."

Earl Stroman, Suffolk County police detective and father of Mets pitcher Marcus Stroman, spoke about being a Black police officer on Long Island for 35 years. Credit: Newsday/Chris Ware

MORE ON THIS TOPIC Black and Hispanic officers tell of serving in Long Island forces Nassau and Suffolk's Hispanic representation grew by more than half since 2000, with Suffolk's increase aided by a mandate, approved by the Justice Department, that 10% of each academy class must be fluent in Spanish for communication purposes. Still, each department would need to roughly double its Hispanic ranks to bring them in line with the Hispanic share of the population.

Nassau and Suffolk have embarked on new hiring programs. In Nassau, the makeup of the first 281 recruits, hired in late 2019 and 2020, was 87% white, 6% Hispanic, 4% Black and 2% Asian.

In April, Suffolk swore in 104 officers, heralded by county officials as the most diverse rookie class in department history: 72% white, 23% Hispanic and 4% Black. The federally approved mandate that sets aside 10% of Suffolk's slots for Spanish-speakers helped increase the Hispanic presence in the class.

Those hiring efforts brought the total number of Black applicants to 6,539 and the total hired to 67.

**6,539 Blacks applied** to the Nassau and Suffolk forces in the nine years studied by Newsday.

**67 were hired** by the departments.

The U.S. Supreme Court ruled in 1971 that employment standards, such as civil service exams, that appear fair may still unlawfully discriminate if they have an "adverse impact" on minority applicants.

Courts and the U.S. Equal Employment Opportunity Commission have used a so-called four-fifths rule to judge whether hiring practices show such an adverse impact. If minorities meet requirements less than four-fifths of the times that whites make the grade, an employer can be found in violation of civil rights laws — unless the employer proves that its standards are reasonably related to job demands.

**Do job qualifications discriminate? The government uses arithmetic to find out.**
Its formula is called the four-fifths rule. Here's how it works. Credit: Newsday/Jeffrey Basinger and Jim Baumbach

From the written test through physical, psychological and medical screening, multiple steps in Long Island's police hiring showed adverse impacts on minorities — with the effect of supporting white representation on the forces.

In the seven years studied by Newsday, for example, white applicants composed a total of 62% of the would-be officers — and they won a higher share (82%) of the jobs. Conversely, Blacks represented 9% of the applicants but secured a lower share (4%) of the jobs.

Awarding badges to Blacks at an equal proportion to whites would have increased Black representation by almost three times that number: 225 cops. Meeting the four-fifths rule would have translated to 180 Black hires.

"This is clear evidence that the counties have not taken upon themselves to change their process," said Rodney Coates, a professor of critical race and ethnic studies at Miami University in Oxford, Ohio, when informed of Newsday's findings. "And this is clear evidence that it is not the people, it is the process. It is the system that needs to change."

## Minorities Fell, Whites Rose from Test to Jobs

Winning a police officer's job on Long Island starts with written examinations offered every four to six years.

The tests are governed by civil service rules that are designed to ensure merit-based hiring. The Justice Department oversees how the tests are developed and scored. Candidates are not graded on whether they know subjects like criminal law and police procedures. Instead, the questions focus on skills that are necessary to serve well as an officer, such as reading comprehension.

Private companies design and score police hiring exams — and perform so-called validity studies to demonstrate that top test scores are good predictors of on-the-job success.

The Nassau and Suffolk civil service agencies have awarded no-bid contracts to testing firms whose exams scored whites and minorities at levels that exceeded the four-fifths standard and excluded minority test-takers at increasing rates compared with whites.

A round of hiring conducted by Suffolk's department from 2015 through 2019 provides a case study of how the multistep employment systems used by both counties have sifted white, Black, Hispanic and Asian applicants.

Hart instructed the department in 2018 to determine for the first time how often each step of the hiring process had eliminated candidates of different races or ethnicities. The review serves as the basis for the most comprehensive analysis to date of how the process played out on a Long Island force.

The Nassau department has never publicly tabulated similar data. At Newsday's request, the county's Civil Service Commission reviewed the county's hiring process. The commission provided information about the race or ethnicity of applicants who were eliminated since 2012 at each step for both the county police department and 18 smaller municipal forces. The commission was not able to limit the data to the county department. Even so, Nassau's information indicated that the outcome of Suffolk's 2015 hiring was broadly representative.

## A Diverse Field Took Suffolk's Hiring Test:

**11,325** White

**3,564** Hispanic

**1,419**Black

**385**Asians

**The test-takers were more diverse than Suffolk's overall population:** 66% white, 21% Hispanic, 8% Black and 2% Asian, compared with a population that was 70% white, 18% Hispanic, 7% Black and 4% Asian, according to U.S. Census estimates.

The test had a passing grade of 70. Those who fell below the mark were eliminated from consideration.

Matching the composition of the passing group against the starting field, whites passed more frequently than Black, Hispanic or Asian job seekers, with the difference crossing the four-fifths rule for Blacks.

MORE ON THIS TOPIC What's the right answer on the test? Experts disagreed.
White representation among the candidates still in the running climbed from 66% to 71% while the proportions of Hispanics and Blacks fell to 19% and 6%. Asians remained steady at 2%. The remainder was composed of members of other groups.

Amid fierce competition, the county advanced only candidates who scored a higher grade — 95.

## Top Scores Narrowed the Field to:

**2,735** White

**613** Hispanic

**216**Black

**61**Asian

With those results, white representation climbed again — to 74% — while the proportions of Blacks, Hispanics and Asians inched down. The outcomes broke the four-fifths standard.

White test-takers hit the mark that made them eligible for potential hiring 60% more frequently than Black test-takers and 41% more often than Hispanic applicants.

## White Test-takers Succeeded About 1.5X More Often than Minorities

"Minorities would have a case to charge discrimination," said Leaetta Hough, a Saint Paul, Minnesota-based psychologist who has developed, critiqued and testified about police exams over a 50-year career.

## After a Hiring Lottery, Candidates Still in the Running Were:

**1,624** White

**308** Hispanic

**131**Black

**41**Asians

The total number of top-scorers was far greater than the number of officers Suffolk expected to hire over the next four years. It used a lottery to select which applicants to call for additional screening. Each name was pulled at random from a bingo cage in a drawing that lasted hours.

Guided by chance, the lottery reduced the ranks of applicants under consideration at roughly equal rates for all groups.

Although they were picked in the lottery, some applicants failed to appear when called for an orientation session.

Officials said they believe many of them had moved on to other careers because, following standard procedure, the department conducted hiring as its ranks thinned out. The intervals between taking a test and getting called were unpredictable and spanned as long as four years.

At orientation, the department gave applicants a 34-page questionnaire that delved into their backgrounds, including criminal history, driving record, credit record and the types and locations of tattoos. Some candidates never returned the questionnaire and were dropped from consideration.

More applicants later withdrew as the process continued. Suffolk did not track when in the hiring process any of these candidates dropped out.

Additionally, the department did not record how many applicants proceeded to take the physical fitness, psychological and medical tests. At those steps, it logged only candidates who were eliminated and not those who passed. Without knowing the number of candidates who advanced, it is impossible to calculate a pass-fail rate for each race or ethnicity at each step.

To understand the impact each obstacle had on the pool of police candidates, Newsday instead measured the number of candidates disqualified against the maximum possible number of applicants who were still in the running.

**Job-hunt Dropouts Cut Ranks to:**

**1,356** White

**234** Hispanic

**100**Black

**38**Asians

After returning the background packet, candidates next faced the precision-form physical fitness exam.

Under state regulations, Long Island's police forces subject applicants to a fitness test that is aimed at measuring whether they have the capacity to learn how to do push-ups and sit-ups by exact standards, as well as whether they show the ability to serve as an officer, according to the state Division of Criminal Justice Services.

## Fitness Examiners Failed Blacks 1.6X More than Members of Other Groups

To meet the standards — described by physical training experts as poorly designed – some candidates have hired coaches to teach them how to maintain form while doing the exercises.

James Pierre-Glaude, an assistant professor at the Stony Brook School of Health, Technology and Management who specializes in athletic training, said in an interview that the standards reward athletes who train specifically to meet them rather than determine physical fitness.

Pierre-Glaude said that he has coached 15 to 20 Long Island police hiring candidates in how to perform situps and pushups as required. These candidates — all but one was white — "knew to the T what was expected of them, as if it was drilled into them."

"You need some standards, absolutely, but to penalize a candidate that might have passed the test because they weren't sure of the technicalities is not good for the candidate and not good for the department," he said. "You end up picking people who know the standards, not all of the candidates who are physically fit."

How to pass fitness test – Suffolk video excerpt.

In addition to pushups and situps, candidates must complete a timed 1.5-mile run.

With the penalties for breaking form on the situps and pushups as stiff as disqualification, police academy staff failed the Black candidates 60% more often than white, Hispanic and Asian applicants.

Asked to explain why fitness tests resulted in adverse impacts on Blacks, Suffolk Deputy Police Commissioner Risco Mention-Lewis said that minority candidates are less likely to have family members who "have prior military or law enforcement experience."

"We didn't believe this was an agility issue, we believe it's a precision issue," Mention-Lewis said in an interview. "We believe it's more not understanding that you have to do exactly this way."

MORE ON THIS TOPIC Strict rules for physical fitness tests
Training experts said the regimen is ill-suited to discover whether candidates are fit for the special demands of policing.

"There's better, more accurate ways out there," that measure ability to perform the types of actions that officers can encounter at work, said Paul Davis, founder of the First Responder Institute, which develops fitness exams for law enforcement agencies. "How many officers have had to pull (their) cruiser over, jump out and do sit-ups?"

In contrast to sit-ups, push-ups and a run, the New York Police Department requires candidates to perform actions that simulate on-the-job challenges, such as climbing a 6-foot wall, withstanding the force of a physical restraint and dragging a 176-pound mannequin while wearing a 14-pound weight vest.

Nassau's department uses the same state-mandated protocols as Suffolk. There, examiners failed Black applicants at twice the rate of white candidates and disqualified Hispanic test-takers 40% more often than whites in a hiring process that started in 2012.

"It's a story I would hear over and over again," said retired Suffolk detective sergeant Ken Williams, recalling that young Black men in apparently good physical condition had spoken about failing the Nassau fitness test while they were students in criminal justice classes he taught at Suffolk Community College.

The fitness test cut black applicants by a third.

## After the Fitness Test, Candidates Still in the Running Were:

**1,120** White

**192** Hispanic

**72**Black

**33**Asians

A company that described itself as "experts in psychological risk management" has evaluated the mental and emotional fitness of candidates for police jobs in Suffolk County for two decades. Its clinicians disqualified Black candidates nearly three times more often than white applicants and Hispanic candidates at double the rate of whites.

Responding to Newsday's questions, Suffolk's Department of Human Resources, Personnel and Civil Service ordered Stone, McElroy & Associates to publicly report for the first time how frequently it found white, Black and Hispanic applicants suitable or unsuitable for hiring.

## Psychological Testers Failed Blacks Almost 3X as Often as Whites, Hispanics 2X as Often

The company responded with statistics that covered hiring by all police departments across Suffolk, including both the 2,400-member county force and the smaller municipal forces.

The Georgia-based firm disclosed that, during the 2015 exam's four-year hiring period, its clinicians recommended for employment 84% of white candidates who were screened, 67% of Hispanic applicants and 57% of the Black hopefuls.

Conversely, Stone, McElroy recommended against hiring 16% of white candidates, 33% of the Hispanic applicants and 43% of the Black job seekers.

"These numbers speak to something being wrong with the system," said Adwoa Akhu, a former president of the New York Association of Black Psychologists who teaches New York Police Department hostage negotiators about communication and de-escalation methods.

"These are supposed to be the cream of the crop candidates because they've made it through all of these other hurdles, so you'd expect the pass rates here to be similar, but they're not for the people of color. It shouldn't be such a huge disparity."

MORE ON THIS TOPIC Psychological tests cannot prevent 'catastrophic outcomes'
Acting on Stone, McElroy's recommendations, Suffolk disqualified police candidates far more frequently than Nassau has. All told, Suffolk declined to hire 193 applicants on mental or emotional grounds — four times the number of rejections issued by Nassau during a period when Nassau hired twice as many officers.

Stone, McElroy boasts a client list of several dozen law enforcement agencies. The civil service department has most recently paid it $985,000 under a contract signed in 2016. Managing partner Heather McElroy responded to Newsday questions in emails that she forwarded to county officials.

Asked about her company's figures showing that it had recommended against hiring Blacks at almost three times the rate of whites, and Hispanics at double the rate of whites, McElroy stated that the Suffolk police department had scheduled psychological evaluations before the department had finished background investigations.

She wrote that the process had the effect of "inflating the number of candidates who were not recommended." She did not explain why that would cause clinicians to recommend against hiring Blacks and Hispanics at greater rates than whites.

Suffolk police spokeswoman Dawn Schob said the department has since shifted to completing background investigations before scheduling psychological evaluations.

In its latest round of hiring, the department has called the first 362 candidates who scored at the top on a test given in 2019. Stone, McElroy recommended hiring 10 of the first 12 Black candidates, a pass rate of 83% compared with rates of 78% for white applicants and 68% for Hispanics, according to statistics the firm provided to the county.

McElroy said the changed process "appears to have increased the pass rate of Black candidates at the psychological evaluation." Again, she did not explain why.

She also wrote "whatever the impact of the test," on members of different races or ethnicities, "there is strong evidence that the evaluation is predictive of desirable outcomes for all involved, including the community."

## After Psychological Testing, Candidates Still in the Running Were:

**1,018** White

**167** Hispanic

**58** Black

**29** Asians

Medical examinations ran applicants through the equivalent of annual physical exams, from vision and hearing tests to blood pressure, heart and respiratory screenings.

The tests eliminated only 36 candidates — 26 white, five Black and five Hispanic. Although the numbers are small, they reflected different failure rates among the groups when compared with the applicant pool: 3.8% for Blacks, 1.6% for whites and Hispanics, 0% for Asians.

The Suffolk County Department of Health Services' Office of Employee Health conducted the physicals.

## Medical Testers Failed Blacks More Often than Others

"The number of blacks who failed the medical exam, I'd want to look at why that is," said Hough, the psychologist who has developed and testified about police hiring tests for decades. She cautioned against drawing conclusions without detailed information from the examinations.

## After Medical Exams, Candidates Still in the Running Were:

**992** White

**162** Hispanic

**53** Black

**29** Asians

## Background Investigations and Hiring Decisions

Police officers delve into the past of their future colleagues by interviewing neighbors and employers, contacting schools that were attended and reviewing credit reports. Candidates must disclose everything from their driving records, bank account balances, tattoo locations, and gambling bets with bookmakers to whether they've ever reported a passport as lost.

In hiring based on the 2015 test, Suffolk officers both conducted those investigations and decided who passed and who failed. They also encouraged applicants to withdraw to avoid the lasting stigma of having failed background investigations.

As a result, the department does not have an accurate count of applicants whose records included allegedly disqualifying information. Its statistics lump those individuals among the candidates who withdrew for personal reasons, making it impossible to gauge the impact of background investigations by race or ethnicity.

Hart stripped officers of the powers to both investigate applicants and decide whether they should be disqualified. The investigators now refer their findings to civil service officials for determinations of who passes and who fails. Disqualifications are tallied by race and ethnicity.

In Nassau, a three-member Civil Service Commission reviews background investigations and rules on whether the police department may hire candidates. The three commissioners are former County Attorney Carnell Foskey, Nassau County Democratic Committee vice chairman Steven Markowitz and former Nassau University Medical Center executive Michael DeLuca.

The commissioners are appointed by the Nassau County executive and approved by the Legislature. Markowitz and DeLuca became commissioners in April, replacing Seaford attorney Alan Parente and former U.S. Rep. Gary Ackerman.

Candidates fail background investigations most frequently based on criminal records, evidence of recent drug use, or driving histories with numerous tickets or accidents, Parente said in an interview.

The police department provides the commissioners with a form that summarizes investigative findings without disclosing a candidate's race or ethnicity.

Cumulatively, Suffolk's drop-outs — including candidates told they were going to fail background investigations — eliminated nearly a third of the candidates called for processing.

## How Many Applied and How Many Were Hired

A chance to serve on the Suffolk County Police Department sparked high interest.

More than 30 applicants took the written exam for each job that eventually became available. The field started with 17,055 hopefuls, including 11,325 whites, 3,564 Hispanics, 1,419 Blacks and 385 Asians. They competed for what turned out to be 505 job openings.

The written test and the hiring lottery quickly reduced the number to 2,845 competitors who were eligible to continue through the physical, psychological, medical and background screening. They included 1,624 whites, 308 Hispanics, 131 Blacks and 41 Asians.

## From the Lottery to a Job

Over four years, Suffolk's department hired a total of 505 officers in eight police academy classes. A pool of applicants that started at 66% white when they took the test finished as a cadre of police recruits that was 87% white.

Conversely, the representation of Hispanics and Blacks fell by more than half — to 9% and 3% respectively, levels well below each group's population share.

To further grasp the impact of the process on minorities, consider that of those candidates who aced the test, were selected in the lottery and were lucky enough to get called for processing: 27% of whites won jobs, compared with 15% of Hispanics, 12% of Blacks and 12% of Asians.

**The Department Hired Whites Who Came Through Lottery at 2X Rate of Other Groups.**

**27%** of whites

**15%** of Hispanics

**12%** of Blacks

**12%** of Asians

"There appears to be some form of bias or something operating that skews the numbers to favor white applicants," said Ronnie Dunn, chief diversity officer and associate professor of urban studies at Cleveland State University. "I find it amazing they've been under a consent decree for 40 years and haven't made any substantive progress in addressing that."

## Case Study Shows Patterns

The evidence of adverse impacts uncovered by Newsday extended beyond Suffolk's police hiring in the four years after 2015. It appeared also in subsequent hiring by Suffolk as well as in two rounds conducted by Nassau County.

Suffolk is roughly at the halfway mark in a recruiting program begun in 2019. It provided Newsday data showing how many hopefuls applied to become officers and how many scored high enough on the written test to enter the hiring lottery. At the same time, the county declined to disclose how many candidates passed or failed at later steps, such as the physical fitness and psychological tests.

The data revealed that gaps in the performance of white and minority test-takers widened compared with how the groups fared on the previous exam. White candidates achieved top scores and entered the lottery.

- 65% more frequently than black candidates – up from 60% on the 2015 test

- 56% more often than Hispanic candidates – up from 40% on the 2015 test
- 52% more frequently than Asian candidates – about the same as on the 2015 test

The Nassau County Police Department completed one hiring effort and has partially finished a second during the period studied by Newsday.

Those who signed up for the 2012 police test appear to represent the most diverse applicant pool of the four tests studied by Newsday. Of the 20,352 candidates, partial statistics kept by the county show that 56% were white, 17% Hispanic, 12% Black and 6% other, while 10% did not provide their race or ethnicity.

White and minority applicants passed Nassau's written hiring exam at rates that appear to indicate the test has not adversely impacted minorities. This exam produced passing rates of 63% for whites, 55% for Hispanics and 51% for Blacks — margins within the four-fifths standard. The county did not break out how Asians performed that year.

But in practice, simply passing the test has nothing to do with getting a job.

Only candidates who have achieved peak possible scores — well above the passing grade – have chances of employment. That group was composed largely of white applicants, but its exact makeup is unknown because the civil service system has not tracked the race or ethnicity of test-takers at different scoring levels. They are called in rank order from the top for additional screening.

Among that group, the county's civil service department called whites 33% more frequently than Blacks and 12% more often than Hispanics.

> There is adverse impact here, clearly.
>
> *Patrick McKayprofessor at Temple University who has developed police exams*

"There is adverse impact here, clearly," said Patrick McKay, a Temple University industrial and organizational psychology professor who has developed police exams.

As in Suffolk, Nassau's physical fitness examiners eliminated minorities at greater rates than whites — cutting Black candidates twice as frequently as white applicants. Many of the examiners are retired physical education teachers. They failed at least half of the Blacks they reviewed, at least one-third of the Hispanic applicants and one-quarter of the white job seekers.

Background investigations conducted by police officers and reviewed by a three-member civil service board had a similar disparate impact on minorities. They knocked out at least half of the Black candidates who were scrutinized, compared with one-quarter of the Hispanic applicants and one-quarter of the whites whose records were examined.

"We don't know their racial breakdown, their religious preference, sexual orientation, nothing like that," said former board member Parente.

Medical checks in Nassau disqualified roughly 3% of the candidates of each race or ethnicity. Psychological evaluations eliminated Blacks at more than twice the rate of white and Hispanic candidates, but the numbers cut were small: 30 whites, six Blacks and four Hispanics.

Net outcome: The Nassau County Police Department hired 927 police officers who posted top test scores and made it through screening: 84% were white, 10% Hispanic and 4% Black.

The process transformed a cadre whose composition started roughly in line with the county's population into recruits whose white makeup was 26 percentage points higher than the white share of the population — while cutting Black and Hispanic representations to about half their county presences.

"That's a dramatic underrepresentation of the population, so that's a red flag for the administrators that says something's wrong here," said Wayne Cascio, a University of Colorado management professor who has developed police tests.

**Reporter:** Jim Baumbach

**Additional reporting:** Faith Jessie, Jeffrey Basinger

**Editors:** Arthur Browne, Keith Herbert

**Video editor:** Matt Golub

**Video reporters:** Jim Baumbach, Faith Jessie

**Videographers:** Jeffrey Basinger, Chris Ware, J. Conrad Williams Jr., Steve Pfost, James Carbone

**Producers:** Jeffrey Basinger, Artie Mochi, Robert Cassidy

**Research:** Caroline Curtin, Laura Mann

**Digital design/UX:** James Stewart, Matthew Cassella

**Digital producers:** Tara Conry, Heather Doyle

**Social media editor:** Gabriella Vukelić

**Print design:** Seth Mates

**QA:** Daryl Becker, Sumeet Kaur