UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
JHISAIAH MYERS,
*on behalf of himself and all others similarly situated,*

                Plaintiff,                       **<u>MEMORANDUM AND ORDER</u>**

        -against-                       22-CV-07023 (OEM) (LGD)


COUNTY OF NASSAU, NASSAU COUNTY
CIVIL SERVICE COMMISSION, and NASSAU
COUNTY POLICE DEPARTMENT,

                Defendants.
---------------------------------------------------------------x

**ORELIA E. MERCHANT, United States District Judge:**

On November 17, 2022, Plaintiff Jhisaiah Myers ("Plaintiff" or "Myers") commenced this action against the County of Nassau (the "County"), the Nassau County Civil Service Commission (the "Commission"), and the Nassau County Police Department (the "NCPD," together with the County and the Commission "Defendants"). Plaintiff challenges the hiring practices of the Nassau Police Department during the phase of its hiring that takes place after an initial written examination, seeking to represent a "Class of all non-white applicants seeking to become Nassau County police officers who were disqualified for consideration by Defendants during the post-exam process in violation of § 1983 and the NYSHRL." Complaint ("Compl."), ECF 1 at 33. Plaintiff brings causes of action pursuant to 42 U.S.C. § 1983 ("§ 1983") for violation of the Equal Protection Clause and the New York State Human Rights Law (the "NYSHRL").

Before the Court is Defendants' motion to dismiss filed on November 27, 2023. Defendants' Motion to Dismiss, ECF 37. For the reasons that follow, Defendants' motion is granted in part and denied in part.

1

## BACKGROUND

Plaintiff is a 36-year-old Black man, who currently serves as a patrol officer for the New York Police Department.  Compl. at 7.  Plaintiff began the process for applying to the Nassau Police Department in late 2017, when he registered to take a written application that commences the hiring process for NCPD recruits.  *Id*. at 9.  In early 2018, Plaintiff took the written civil service exam and received a sufficiently high score to be added to a list of candidates eligible to continue with the hiring process.  *Id*. at 10.  In May 2019, the Commission informed Plaintiff that he had been selected to move on to the next stage of the process: a physical agility test, which Plaintiff took and passed.  *Id*.

In March 2020, the Nassau Police Department informed Plaintiff that he would move on to the subsequent stage of the hiring process: a background check.  *Id*.  As part of this process, Plaintiff filled out a mandatory questionnaire regarding his background and history, then met with a Nassau Police Department investigator and discussed the answers he had provided in the questionnaire.  *Id*.

In Plaintiff's completed background questionnaire, Plaintiff disclosed 14 infractions from between 2011 and 2012 that were listed in his motor vehicle record:

- 08/06/2012 N Bellmore, NY Covered Front Plant Dismissed
- 08/06/2012 N Bellmore, NY Covered Rear Plate Dismissed
- 08/06/2012 N Bellmore, NY Rear Side Windows Non Transparent Dismissed
- 08/06/2012 N Bellmore, NY Sidewings/Side Windows/Non Transparent Dismissed
- 08/06/2012 N. Bellmore, NY Covered/Tinted Stop Lamps Dismissed
- 07/12/2011 Levittown, NY Sidewings/Side Windows Non Transparent Dismissed
- 06/15/2012 East Meadow, NY Tints on windows and plate covers Guilty summons
- 05/02/2012 Bellmore, NY Tinted Black Right Brake Light Dismissed
- 05/02/2012 Bellmore, NY Covered Rear Plate Black Plastic Tinted Dismissed
- 05/02/2012 Bellmore, NY Tinted Black Left Brake Light Dismissed
- 05/02/2012 Bellmore, NY Front Side Windows Tinted 16% Light Dismissed

- 05/02/2012 Bellmore, NY Rear Side Windows Non Transparent 16% Light Dismissed
- 05/02/2012 Bellmore, NY No Distinctive Plate/Insecure/Dirty Dismissed
- 05/02/2012 Bellmore, NY Tinted Black Right Tail Light Dismissed

Declaration of Mark J. Lesko in Support of Defendants' Motion to Dismiss ("Lesko Declaration"), Exhibit A ("Application"), ECF 41, at 19.

Plaintiff alleges that he explained the circumstances for each of these infractions to the Nassau Police Department investigator and that his record was "otherwise pristine." Compl. at 11. On August 6, 2020, the Commission informed Plaintiff that "he had been disqualified, purportedly for 'disrespect for the process of law and order as evidenced by [his] motor vehicle record.'" *Id*. When Plaintiff brought an appeal of this decision it was "summarily rejected" by the Commission. *Id*. at 12.

Plaintiff alleges that white candidates were accepted despite much more troubling records, including evidence of past violence. *Id*. at 13. The Nassau Police Department hired a white male applicant in 2016 whose motor vehicle record reflected three accidents and faced sustained allegations of abuse of authority and discourtesy. *Id*. The same applicant also faced a lawsuit resulting from an incident in which he "allegedly threw a pregnant woman to the ground on her abdomen during a traffic stop" and called her a "fat bastard." *Id*. The NCPD also hired another while male applicant in 2020 who had been purportedly captured on surveillance video "standing by as his friend beat another man unconscious" after the applicant flashed his badge at the victim, telling him, "I'm with the NYPD. You're not going anywhere." *Id*. at 14.

Plaintiff alleges that the NCPD has a troubled history concerning racial disparities in hiring. In 1977, the Department of Justice filed an action against the County for hiring discrimination. *Id*. In 1982, that litigation was resolved by way of a consent decree (the "Consent Decree") in which the County represented that it "realizes that certain of its selection criteria for hire into and

promotion within the Nassau County Police Department […], certain of its personnel practices within the NCPD, and the existence of a substantial disproportion between the percentages of blacks, Hispanics and females in the NCPD as compared [their] percentages . . . within the relevant labor market, may give rise to an inference that discrimination has occurred." *Id*.  In the Consent Decree, the County agreed that it "hereafter shall fill Police Officer appointments in the NCPD by fair and nondiscriminatory selection from amongst qualified candidates." *Id*. at 17.

Nevertheless, Plaintiff contends that hiring disparities have only gotten worse at the NCPD following the entry of the Consent Decree.  Plaintiff contends that "[a]round the time of the DOJ's lawsuit, the NCPD was over 95% white, as compared to a population in the County that was approximately 91% white.  By contrast, according to recent Census data, non-Hispanic whites today make up approximately 57% of the County's population as compared to approximately 87% of the NCPD's officers.  Meanwhile, Blacks comprise approximately 13% of the County's population but only approximately 4% of the NCPD." *Id*. at 18-19.  Plaintiff alleges that "for the most recently completed hiring cycle, which concluded in 2019, Defendants hired 6.9% of white applicants, but merely 3.7% of Hispanic applicants, and just 1.8% of Black applicants." *Id*. at 3.

Plaintiff contends that these divergent results are due to the same subjective post-exam screening process that excluded Plaintiff from further hiring consideration.  Plaintiff alleges that "[a]pproximately 24.2% of white applicants who began the post-exam process were hired as Nassau County police officers, compared to a mere 15% of Hispanic and just 8.5% of Black applicants." *Id*. at 26.

Plaintiff alleges that after these troubling statistical disparities were outlined in an article in *Newsday*, NCPD Commissioner Patrick Ryder ("Commissioner Ryder") invoked racial stereotypes to defend the NCPD's hiring practices, attributing the statistical disparities to "broken

4

homes" and stating that "[t]hese kids struggle in these communities because they don't have both parents around." *Id*. at 30-31.  Plaintiff alleges that Commissioner Ryder has a history of making "more troublesome statements," including purportedly referring to a Black then-police officer as a "(expletive) N-word." *Id*. at 31.

## LEGAL STANDARDS

Defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### A. Federal Rule of Civil Procedure 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id*.  "In considering a motion to dismiss for lack of subject matter jurisdiction, we accept as true all material factual allegations in the complaint.  However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (cleaned up).

### B. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal on the basis of "failure to state a claim upon which relief can be granted."  Fed. R. Civ. Pro. 12(b)(6).  "To survive a motion to dismiss, Plaintiff's complaint must meet the *Iqbal-Twombly* pleading standard and 'must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In reviewing a motion to dismiss, this Court must "accept[] as true factual allegations

made in the complaint, […] drawing all reasonable inferences in favor of the plaintiffs." *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).

## DISCUSSION

### A.  Standing

Defendants allege that because Plaintiff was only eliminated from hiring consideration at the post-exam background check phase of the hiring process, Plaintiff lacks standing to "challenge the constitutionality of the *entire* post-Exam hiring process irrespective of exam cycle" on behalf of a broad putative class.  Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defs. Memo"), ECF 38 at 8.

Class standing is judged by a two-part test.  "[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  *Ret. Bd. of Policemen's Annuity v. Bank of New York*, 775 F.3d 154, 160 (2d Cir. 2014).  As described in recent months by the Supreme Court, "Article III requires a plaintiff to first answer a basic question: 'What's it to you?'"  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024).  In order to establish standing under Article III, "the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute."  *Id*.

Defendants argue that Plaintiff improperly brings a challenge against the entire hiring process when he was personally only harmed by one step of it: the background investigation stage.  Defendants contend that when a plaintiff challenges a multi-step hiring process, that plaintiff can only bring suit against the specific element of that process that eliminated them.  Defs. Memo at 8.  Defendants ask the Court to follow the holding in *Davis v. State of Connecticut Dep't of*

*Correction*, 169 F. Supp. 3d 311 (D. Conn. 2016), wherein the plaintiff sought to challenge all aspects of a 4-step fitness test as part of a hiring process.  In *Davis*, the Court found the plaintiff only had standing to challenge the specific step that eliminated her.  *See id*. at 318 ("Here, Davis seeks to bring a class action on behalf of plaintiffs who were allegedly injured by not only DOC's use of the sit-up test, which she failed, but also by its use of the three other parts of the 2012 PFT. The fact that she and the purported class members were injured by 'similar' conduct does not suffice to give Davis standing, when the conduct complained of was not the same.").

Plaintiff argues that Defendants frame the Complaint in a misleading manner.  Plaintiff, he argues, was rejected as part of an overarching practice utilized at each stage of the post-exam process wherein "Defendants use their discretion to impose more stringent requirements for non-white applicants."  Plaintiff's Memorandum of Law In Opposition to Defendants' Motion to Dismiss ("Pl. Opp."), ECF 39 at 11.  "Plaintiff has alleged that the practice being challenged is not any particular step of the Post-Exam Process, but rather the discriminatory discretion exercised by Defendants in making decisions throughout the entire Post-Exam Process." *Id*. at 12.  Plaintiff suggests that the same mechanism causes harm to all class members, including Plaintiff: decisionmaker bias enabled by unconstrained discretion.

Plaintiff contends that *Davis* can be differentiated because "the court concluded that the other three parts of the exam did not raise the 'same set of concerns,'" whereas in this case the overarching concern of discriminatorily applied discretion applies to all stages of the process. *Id*. at 12.  To support his argument, Plaintiff refers the Court to *Richardson v. City of New York*, No. 17-CV-9447 (JPO), 2021 WL 1910689 (S.D.N.Y. May 12, 2021).  In *Richardson*, the court found that a plaintiff who was rejected for an Fire Department of New York ("FDNY")  job had standing to represent all Black applicants who were rejected for an FDNY job despite possessing all posted

requirements and passing the relevant tests. But, notably, unlike the multi-step NCPD hiring process, the hiring process in *Richardson* consisted solely of a test and an interview. The plaintiff in *Richardson*, and all other class members, were eliminated in the same interview stage.

Here, the Court finds that *Davis* is the closest factual analogue to this action and finds the holding in *Davis* to be persuasive. Despite Plaintiff's arguments to the contrary, the Court does not find that the concerns about each hiring step in *Davis* were any more different than those in this case. In *Davis*, the plaintiff argued that three of the four steps of the challenged physical exam suffered the same flaw: sex-by-age requirements that were more onerous for women than they were for men. Even though plaintiff alleged that these disparate elements of the four-step test in *Davis* suffered from the same discriminatory flaw, the *Davis* court found that the plaintiff only had standing to represent those eliminated by the same specific leg of the testing process as her.

The Court also finds instructive the holding in *DiMuro v. Clinique Lab'ys, LLC*, 572 F. App'x 27 (2d Cir. 2014), which informed the holding in *Davis*. In *DiMuro*, the Second Circuit found that a plaintiff only had standing to bring claims related to the four products that plaintiff herself purchased and not an additional three products bearing similarly allegedly misleading labelling. The Second Circuit reasoned as follows:

> Here, by contrast, each of the seven different products have different ingredients, and Clinique made different advertising claims for each product. Entirely unique evidence will, therefore, be required to prove that the 35–some advertising statements for each of the seven different Repairwear products are false and misleading. As a result, we cannot say that "claims brought by a purchaser of" one product "would raise a 'set of concerns' nearly identical to that of a purchaser" of another Repairwear product.

*Id*. at 29.

Here, the different steps of the hiring process do not raise a nearly identical set of concerns. Unique statistical analyses are required for each step of the exam—entirely different bodies of

statistical evidence would be required to prove discrimination at the background check phase and the agility test phase.  Plaintiff only personally suffered actual injury as a result of the background check phase of the NCPDs's hiring process, and the Court finds that the other steps of that process—which Plaintiff either passed or did not experience at all— do not sufficiently implicate the "same set of concerns" to give Plaintiff class standing for those steps.  *Ret. Bd. of Policemen's Annuity*, 775 F.3d at 160.  Accordingly, Defendants' motion to dismiss is granted as to Plaintiff's purported challenge of the steps of the hiring process other than the background check phase.

## B.  Discriminatory Intent

Defendants contend that Plaintiff's equal protection challenge must be dismissed for failure to adequately allege that Defendants acted with discriminatory intent.  Pl. Memo at 10.

"To establish a prima facie case of employment discrimination under both Title VII and the New York State Executive Law, a plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for his employment position, (3) he suffered an adverse employment action, and (4) the defendant's discrimination on the basis of the plaintiff's membership in a protected class motivated the adverse employment action."  *Ganny v. FJC Sec. Servs., Inc.*, No. 15-CV-1965 (FB), 2016 WL 4939312, at *1 (E.D.N.Y. Sept. 14, 2016).

"The requirements for demonstrating these elements are 'relaxed' during the initial pleading stage of litigation. To prevail against a Rule 12(b)(6) motion, an employment discrimination plaintiff 'needs to present only minimal evidence supporting an inference of discrimination[,]' and 'detailed factual allegations are not required[.]' The plaintiff must only allege facts that 'give plausible support to a minimal inference of discriminatory motivation.'" *Id.*

### 1.   Knowledge of Plaintiff's Race

Defendants argue that Plaintiff fails to plead that the decisionmakers who disqualified him—the Civil Service Commissioners (the "CSC Commissioners")—were aware of his race or had access to that information.  "Plaintiff's allegations, steeped in speculation about how the post-Exam process *could* be administered in a discriminatory manner, are not a substitute for well-pleaded facts that Defendants intentionally discriminated against non-white applicants."  Pl. Memo at 11-12.  Without an allegation that the CSC Commissioners were aware of his race, Defendants contend that Plaintiff cannot prevail on his race discrimination claim.  *See Laurant v. City of N.Y.*, No. 01-CV-5740, 2019 WL 1364230, at *9 (S.D.N.Y. Mar. 26, 2019) (no inference of discrimination where complaint failed to allege defendants were aware of plaintiff's race).

Defendants also argue that Plaintiff's intent allegations are too general: they describe the post-exam process as "highly subjective," without specifying the particular mechanism of discrimination or particularized facts related to that mechanism.  Defs. Memo at 12.

Plaintiff responds that Defendants' argument that the CSC Commissioners were not aware of race ignores the allegations in the complaint that race was tracked in ways both explicit and implicit throughout the application process.  *See* Compl. ¶ 93 ("The background check reports provided to the Civil Service are highly subjective and slanted, with Black and Hispanic candidates' reports using coded critical language in disproportionate numbers as compared to reports for white candidates […] The background check reports contain information (e.g., a candidate's name and address) that can suggest a candidate's racial or ethnic background, allowing bias to enter the process.").  Furthermore, Plaintiff notes that "Plaintiff's application, which was reviewed by the CSC Commissioners, includes three photos of Plaintiff."  Pl.'s Opp. at 8; *see also* Application at 85, 87, 133.

The Court finds that Plaintiff, in alleging that the CSC Commissioners reviewed photographs of Plaintiff in his application materials and reviewed background check reports that used "coded critical language" and contained information that "can suggest a candidate's racial or ethnic background," has adequately alleged that the CSC Commissioners had knowledge of Plaintiff's race and the race of Plaintiff's proposed comparators. *See* Compl. at ¶ 93.

### 2. Similarly Situated Comparators

Defendants also contend that Plaintiff has failed to allege he was treated differently than any similarly situated comparator because the two white comparators identified in the complaint were not similarly situated to Plaintiff.

"'[A] plaintiff can raise an inference of discrimination by demonstrating the disparate treatment of at least one similarly situated employee outside [his] protected group and sufficient facts from which it may reasonably be inferred that the plaintiff's and comparator's circumstances . . . bear a reasonably close resemblance.'" *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, No. 21-CV-0695, 2023 WL 2691622, at *18 (S.D.N.Y. Mar. 29, 2023)

Defendants contend that Plaintiff does not adequately allege that the comparators were similarly situated. Plaintiff retorts that the legal standard does not require an exact fit between comparators: "plaintiff can raise an inference of discrimination by demonstrating the disparate treatment of at least one similarly situated employee outside his protected group and sufficient facts from which it may reasonably be inferred that the plaintiff's and comparator's circumstances bear a reasonably close resemblance." *Sutter v. Dibello*, 2021 WL 930459, at *21 (E.D.N.Y. Mar. 10, 2021). Plaintiff argues that his proposed comparators were subject to reasonably close circumstances—the same background check that eliminated Plaintiff—and were nevertheless hired despite purportedly serious background issues in the form of violence both on and off duty.

11

Plaintiff draws a comparison with two white applicants who passed the exact same background check phase that eliminated Plaintiff from hiring consideration despite having background issues that appear considerably more concerning than the infractions reflected on Plaintiff's motor vehicle record.  The Court finds that the comparators put forward by Plaintiff bear a reasonably close resemblance to Plaintiff.  *See id*. at *21 (These are "sufficient facts from which it may reasonably be inferred that the plaintiff's and comparator's circumstances bear a reasonably close resemblance.").

### 3.  Statistical Evidence

#### a.  Reliance on Statistics

Defendants contend that Plaintiff's complaint improperly relies entirely on statistical evidence to demonstrate discriminatory intent.  Defendants argue that a statistics-only approach to demonstrating intent is barred by the Second Circuit, citing *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012) ("[E]qual protection claims under § 1983 cannot be based solely on the disparate impact of a facially neutral policy.") and *Martinez v. City of Stamford*, No. 22-0702-CV, 2023 WL 3162131, at *2 (2d Cir. May 1, 2023) (summary order) ("We previously have rejected the proposition that numbers alone serve as evidence of intentional discrimination . . . [w]e adhere to our precedent by rejecting the same proposition here.").

Plaintiff responds that while raw numbers alone are insufficient—as in *Martinez*, where Plaintiff introduced only raw numbers showing "the lack of Hispanic officers in leadership positions at the time he sought a promotion."  *Id*.  Plaintiff uses *statistics*, not just raw numbers, and "statistics alone may be sufficient to demonstrate discriminatory intent on a motion to dismiss."  *Brown v. City of New York*, No. 16-CV-1106 (NG) (RER), 2017 WL 1102677, at *4 (E.D.N.Y. Mar. 23, 2017).

Here, the Court finds that the combination of statistics and specific factual allegations used in Plaintiff's complaint does not implicate the same set of concerns as *Reynolds* or *Martinez*. Plaintiff has put forward compelling statistical evidence, not just raw numbers, that compares the qualified applicant pool at the background exam stage—those who have passed the initial exam and the agility exam—to the pool of individuals that make it past that stage. Furthermore, Plaintiff's complaint is not solely supported by the use of statistics. Plaintiff combines his statistical analysis with specific factual allegations concerning statements made by Commissioner Ryder regarding the hiring of Black applicants at the Nassau Police Department. Though "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination," "when other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Plaintiff alleges that NCPD Commissioner Ryder publicly attributed the racial disparities in hiring to "broken homes" and invoked other racial stereotypes when defending his hiring practices, saying "[w]hat's the percentage of Asians that are in the doctor world? What is the percentage of lawyers that are Jewish?" Compl. ¶ 122. Plaintiff also alleges that sworn deposition testimony in another matter alleges that Ryder referred to a Black NCPD officer as a "(expletive) N-word." *Id*. ¶ 125. The combination of these remarks and the statistical indicia of discrimination alleged by Plaintiff suffices to plead discriminatory intent.

### b. Non-discriminatory explanation

Defendants also argue that Plaintiff's statistical evidence is insufficient to "be of a level that makes other plausible non-discriminatory explanations very unlikely" as required by the Second Circuit in *Burgis v. New York City Dept. of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015).

Defendants contend that they have put forward a plausible and not "very unlikely" non-discriminatory explanation for Plaintiff's non-selection: "that he thumbed his nose at the law by failing and refusing to remove the tint from his rear windows, brake lights, and license plate." MTD MOL at 14.

Plaintiff responds that Plaintiff's motor vehicle record is not a plausible explanation for his disqualification where similarly situated white applicants were accepted despite backgrounds of abuse of power and violence.

The Court finds that Plaintiff has adequately alleged statistical evidence "of a level that makes other plausible non-discriminatory explanations very unlikely." *Burgis*, 798 F.3d at 69. Plaintiff alleges that "[a]pproximately 24.2% of white applicants who began the post-exam process were hired as Nassau County police officers, compared to a mere 15% of Hispanic and just 8.5% of Black applicants." *Id*. at 26. This stark disparity rises to the level required in *Burgis*. Furthermore, the Court finds that Plaintiff's allegations that white comparators were not eliminated by significantly more troubling background issues casts sufficient doubt on Defendants' proffered non-discriminatory explanation for his elimination—Plaintiff's 14 motor vehicle infractions—to render dismissal inappropriate despite this purported non-discriminatory explanation.

### c.   Specific Employment Practice

Defendants argue that Plaintiff has not adequately identified a specific employment practice responsible for the statistical disparities. Defendants contend that though the Complaint faults "discretion" at multiple stages of the process for creating these disparities, broad allegations of a process being too discretionary are insufficient to support Plaintiff's complaint.

Defendants support this proposition with a citation to *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). In *Wal-Mart*, plaintiff challenged Wal-Mart's decision to leave promotional

decisions to the discretion of store managers, arguing that national and regional statistics demonstrated that this discretion was producing gender disparities. The Supreme Court found that "[o]ther than the bare existence of delegated discretion, respondents have identified no 'specific employment practice'—much less one that ties all their 1.5 million claims together. Merely showing that Wal–Mart's policy of discretion has produced an overall sex-based disparity does not suffice." *Id*. at 359. Defendants here also argue that Plaintiff's data derives from hundreds of discretionary decisions and therefore lacks a "common mode of exercising discretion that pervades the entire company." *Wal-Mart*, 564 U.S. at 356.

Plaintiff responds that determining whether a process is capable of separation for analysis turns on the factual details of the process, and an entire process can be characterized as one employment practice "[w]hen employment decisions are made based on variable, subjective criteria." *Schallop v. New York State Dep't of L.*, 20 F. Supp. 2d 384, 402 (N.D.N.Y. 1998). "Although the specific components of the hiring process may differ, the consistent opportunities for discretion allow bias to pervade the entire Post-Exam Process." Opp. at 29. Plaintiff argues that *Wal-Mart* lends support to this argument, given that the Supreme Court noted: "To be sure, we have recognized that, 'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since 'an employer's undisciplined system of subjective decision-making [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" *Wal-Mart*, 564 U.S. at 355.

The Court is not persuaded that *Wal-Mart*'s holding applies here. A key factor in *Wal-Mart* was that each store had its own unique hiring process, its own unique hiring pool, and its own unique set of circumstances, making a nation-wide challenge to "discretion" inappropriate. The same circumstances in *Wal-Mart* are not present here, where Plaintiff challenges discretion

applied by officers and officials in one county, one hiring process, and one specific step of that process, and does not as in *Wal-Mart* challenge discretion spread across the nation and thousands of stores with their own unique processes.

### 2. Relevant Comparison

Defendants argue that in hiring discrimination cases, the "relevant comparison" is between "the racial composition" of the at issue jobs and "the racial composition of the qualified population in the relevant labor market." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 210 (2d Cir. 2020), *reh'g denied*, 988 F.3d 664 (2d Cir. 2021). Defendants argue that Plaintiff fails to provide the racial composition of the qualified population and instead relies on the racial composition of the County as a whole.

Plaintiff responds that the comparison group for his statistical analysis is not the County as a whole but is instead those who were qualified at the start of each step of the hiring process. This, Plaintiff contends, precisely maps to "the qualified population" for each round.

Here, as narrowed by the Court's holding regarding standing, Plaintiff's complaint challenges the specific background check phase of the Nassau Police Department's hiring process. Plaintiff's statistics compare the pool of applicants qualified for that stage—those who have passed the initial exam and the agility exam—to the pool of individuals that are not eliminated at that stage. These statistics properly engage in the "relevant comparison" between "the racial composition" of the at issue jobs and "the racial composition of the qualified population in the relevant labor market." *Mandala*, 975 F.3d at 210.

### C. *Monell* Liability

Defendants contend that Plaintiff has failed to adequately plead municipal liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). In order to establish

municipal liability under *Monell*, Plaintiff must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007).

"A plaintiff can plead a 'policy' or 'custom' by alleging one of the following: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Buari v. City of New York*, 530 F. Supp. 3d 356, 397–98 (S.D.N.Y. 2021).

In order to properly plead a consistent and widespread practice giving rise to *Monell* liability a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.* at 398. Defendants allege that Plaintiff fails to plead a consistent and widespread practice because "he is the only person identified in the Complaint who was allegedly injured." Pl. Memo at 21. "While Plaintiff alleges more than 1,000 non-white applicants were disqualified […] he fails to identify a single instance of discrimination other than his own alleged experience." *Id*.

Plaintiff responds that he has demonstrated ample evidence of others who suffered discrimination: his statistical analysis demonstrated that numerous other non-white applicants were excluded from the process improperly. Plaintiff points to *Boyle v. City of Philadelphia*, where the plaintiff had adequately pleaded *Monell* liability through allegations "regarding the design and

scoring of the exam . . . when combined with the statistical data provided by plaintiffs." 2018 WL 994218 at *6 (E.D. Pa. Feb. 20, 2018).

Here, the Court is persuaded by and follows the holding in *Boyle*. Though Plaintiff has not identified other class members by name or by individualized description, Plaintiff alleges stark statistical disparities created by an allegedly widespread use of discretion to eliminate Black candidates, which was thoroughly reported on in the media and not changed by Defendants. Plaintiff's allegations suffice to plead "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware." *Buari*, 530 F. Supp. 3d at 397–98.

**D.   NYSHRL**

Defendants also make two arguments against Plaintiff's NYSHR claims: (1) that Plaintiff was not a "qualified" applicant in light of his driving record and therefore cannot adequately plead a disparate treatment claim, and (2) that Plaintiff's statistical evidence does not suffice to adequately plead a disparate impact claim.

**E.   Disparate Treatment**

In order to properly plead his disparate treatment claim, Plaintiff must allege "(1) he is a member of a protected class, (2) he was qualified, (3) he suffered an adverse employment action, and (4) he has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Toussaint v. City of New York*, No. 19-CV-1239 (AT), 2021 WL 4429316, at *6 (S.D.N.Y. Sept. 27, 2021).

Defendants contend that Plaintiff's NYSHRL disparate treatment claim should be dismissed because Plaintiff was not "qualified" in light of his driving record and cannot establish discriminatory intent (applying the same intent arguments as above).

18

Here, because the Equal Protection Clause carries a more stringent pleading standard than the NYSHRL, the Court finds that Plaintiff has adequately alleged his qualification for the same reasons that it found dismissal of Plaintiff's Equal Protection claim was not merited in light of Defendants' proffered non-discriminatory explanation: because Plaintiff has identified specific non-Black comparators who were found qualified despite allegedly having significantly more troubling background issues. *See Miranda v. S. Country Cent. Sch. Dist.*, 461 F. Supp. 3d 17, 30 (E.D.N.Y. 2020); *see supra* at 11-12, 14.

**F. Disparate Impact**

Defendants contend that their arguments detailed *supra* concerning Plaintiff's statistical evidence also require the dismissal of Plaintiff's NYSHRL disparate impact claim. For the same reasons that the Court found Plaintiff's statistical evidence sufficient in regard to his Equal Protection claim, *see supra* at 12-16, the Court finds that Plaintiff has adequately pled a disparate impact claim pursuant to the NYSHRL.

**G. Class Certification**

Defendants further argue that Plaintiff cannot demonstrate that he has commonality or typicality with his proposed class, which is "all non-white applicants seeking to become Nassau County police officers who were disqualified for consideration by Defendants during the post-exam process" in 2012 and 2018 hiring cycles.

Commonality under Rule 23(a) "requires the plaintiff to demonstrate that the class members have suffered the same injury" and to demonstrate that "their claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 350. "Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim

arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Barrows v. Becerra*, 24 F.4th 116, 131–32 (2d Cir. 2022).

Defendants argue that Plaintiff's proposed class would have been disqualified by different steps of the process (*e.g.*, the physical exam vs. the psychological exam), many of which Plaintiff either passed or did not experience.  Defendants also argue that Plaintiff's circumstances (of having a number of traffic citations) are sufficiently unique to defeat typicality and commonality even among other applicants disqualified at the background investigation phase.  Defendants contend that the hiring process is an inherently unique one: "[t]he reason Plaintiff was disqualified is as unique as the class he seeks to represent, and there is no single person whose application process was common or typical of a wide swath of the others."  Pl. Memo at 31.

Defendants also contend that Plaintiff's class allegation must be stricken because Plaintiff "fail[ed] to identify a single member of the purported class other than [him]self" or allege that an investigation was conducted "to determine if there are other class members before filing this action."  *PFT of Am., Inc. v. Tradewell, Inc.*, No. 98-CV-6413, 1999 WL 179358, at *1 (S.D.N.Y. Mar. 31, 1999).  Plaintiff responds that Defendants' cited cases involve cases where there was no evidence that other members of the purported class existed—which is not the case here, given Plaintiff's compelling statistics.

Here, the Court declines to strike Plaintiff's class allegations as narrowed by the Court's holding regarding standing *supra*.  Motions to strike are "disfavored because they require a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint and before the plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."  *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 166 (S.D.N.Y. 2019).  Given the early phase of

discovery in this action, which weighs against striking class action allegations, and the Court's significant narrowing of the purported class, the Court finds that striking Plaintiff's class allegations at this stage would be premature. *See Calibuso v. Bank of America Corp.*, 893 F. Supp. 2d 374, 390 (E.D.N.Y. 2012).

## H.  NCPD and CSC

Lastly, Defendants are correct that the NCPD and the Commission are agencies of municipalities and therefore are not suitable entities.  "[A]gencies of a municipality are not suable entities because '[u]nder New York law, departments that are merely administrative arms of a municipality have no separate legal identity apart from the municipality and therefore cannot be sued.'" *Chodkowski v. Cty. of Nassau*, No. CV 16-5770, 2017 WL 10637956, at *5 (E.D.N.Y. Nov. 30, 2017).  Accordingly, the NCPD and the Commission are hereby dismissed from this action.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted as to Plaintiff's purported challenge of the steps of the hiring process other than the background check phase, granted as to the NCPD and the Commission, and denied as to Plaintiff's remaining claims alleged against the County in complaint.

**SO ORDERED.**

_____/s/_____
ORELIA E. MERCHANT
United States District Judge

Dated: Brooklyn, New York
        August 6, 2024