# EXHIBIT 9

1
2  **UNITED STATES DISTRICT COURT**
3  **EASTERN DISTRICT OF NEW YORK**
4  ------------------------------ X
   JHISAIAH MYERS, on behalf of
5  himself and all others
   similarly situated,
6
               Plaintiff,
7
         -against-            22-CV-07023
8                               (OEM)
   COUNTY OF NASSAU,
9
               Defendant.
10 ------------------------------ X
11
                     March 20, 2025
12                   10:09 a.m.
13
14
15       Deposition of MARTHA KRISEL,
16 held at the offices of Paul, Weiss,
17 Rifkind, Wharton & Garrison LLP, 1285
18 Avenue of the Americas, New York, New
19 York, pursuant to Notice, before Theresa
20 Tramondo, AOS, CLR, a Notary Public of the
21 State of New York.
22
23 Reported by:
24 THERESA TRAMONDO, AOS, CLR
25 JOB NO. NY7245493

## Page 46

1  Krisel
2  Q. Do you recall the year in which
3  Commissioner DeLuca became a commissioner?
4  A. I'm not sure.
5  Q. What about Markowitz?
6  A. It was the same time that
7  Commissioner DeLuca came in, but I'm not
8  sure of the exact year.
9  Q. Would that have been the same
10 year that Commissioner Foskey became the
11 chair?
12 A. Yes.
13 Q. Did you find working with the
14 commissioners challenging?
15    MS. COLE: Objection.
16    Go ahead.
17 A. Sometimes.
18 Q. How so?
19 A. The change in commissioners was
20 a challenge. Working with the commissioners
21 during the pandemic was a huge challenge.
22 Q. With regard to the pandemic, how
23 did the process that the Civil Service
24 Commission went through on voting on police
25 officers change?

## Page 47

1  Krisel
2    MS. COLE: Objection.
3  A. The process -- the voting didn't
4  change, but the ability to meet publicly
5  changed.
6  Q. How did the Commission conduct
7  its meetings if they were no longer public?
8  A. In compliance with the Open
9  Meetings Law, which had exceptions during
10 the pandemic.
11 Q. So how did they conduct their
12 meeting?
13 A. At different times, when
14 permitted in a room, with masks, and you
15 know, like spread out seating, and at other
16 times with votes individually taken when
17 applicants needed to be -- when applications
18 or when action items that would have
19 ordinarily been handled in the Commission
20 room needed to take place, when there
21 couldn't be a delay, when a position needed
22 to be filled.
23 Q. When you say that "with votes
24 individually taken," how would those votes
25 be taken?

## Page 48

1  Krisel
2  A. I would speak to the
3  Commissioner or I would designate staff to
4  speak to the commissioners, or I would
5  e-mail the commissioners, I would
6  communicate with them.
7  Q. Would there be any record of
8  those votes?
9  A. By e-mail there would be --
10 there could be a record. By phone probably
11 not.
12 Q. Are there closed meetings of the
13 Commission?
14 A. The Commission meets in
15 executive session. It meets in general
16 session and in executive session.
17 Q. With regard to police officer
18 applicants, were those votes taken in
19 executive sessions?
20 A. Yes.
21 Q. How did the executive sessions
22 change during the pandemic?
23    MS. COLE: Objection.
24    Go ahead.
25 A. The -- instead of the

## Page 49

1  Krisel
2  Commission -- the chair and the
3  commissioners being in a room, we had one
4  commissioner in the room and the other
5  commissioners participated in accordance
6  with the Pandemic Revised Open Meetings Law
7  by telephone.
8  Q. In the usual course of the CSC's
9  executive sessions, outside of the pandemic,
10 are those deliberations reflected in any
11 notes anywhere?
12 A. In the executive session
13 minutes.
14 Q. Did that change during the
15 pandemic?
16 A. No, the minutes did not change.
17 Q. Who prepares the minutes?
18 A. The minutes are prepared
19 by -- well, so the minutes reflect the
20 action items, and those are prepared by the
21 divisions, but then the minutes are put
22 together by my staff.
23 Q. In 2020 who was on your staff?
24 A. With regard to the minutes or in
25 general?

Page 50

1         Krisel
2   Q.  We can start with the minutes if
3 it's a smaller group.
4   A.  So the minutes were -- my staff
5 at that time was primarily a deputy
6 executive director -- although I want to
7 withdraw that because I don't know if that's
8 true in 2020, when she became -- when there
9 was a deputy, but my staff was Johanna
10 Rivera and Angela Grasso. That was like my
11 administrative staff that worked on the
12 minutes.
13   Q.  What was Johanna's title?
14   A.  At one point it was clerk typist
15 and then it was a bilingual administrative
16 assistant.
17   Q.  What about Angela's title?
18   A.  Angela was an administrative
19 assistant and then an administrative --
20 maybe like an Administrative Officer 1.
21   Q.  How many other staff members did
22 you have during 2020?
23   A.  Approximately 45.
24   Q.  Is it accurate to state that
25 during that period those 45 staff members

Page 51

1         Krisel
2 were all of the staff members of CSC?
3   A.  Approximately.
4   Q.  You mentioned earlier that the
5 change in commissioners could be
6 challenging. Is it accurate to state that
7 they're appointed for staggered six-year
8 terms?
9   A.  Theoretically, yes. It's -- a
10 commissioner's term is six years.
11   Q.  I take it by your answer that
12 there are sometimes exceptions to that term?
13   A.  Right. Somebody could resign.
14 Somebody could holdover. But the term
15 itself is a six-year term.
16   Q.  What is challenging about the
17 turnover in commissioners?
18   A.  There's an orientation process,
19 there's an education process, there's
20 different communications; some commissioners
21 like phone calls, some commissioners like
22 e-mail, some like none of the above. So
23 it's like working with any new client
24 really. It's -- there's a learning curve.
25   Q.  Are there any particular

Page 52

1         Krisel
2 qualifications that a commissioner has to
3 have to get that position?
4   A.  No.
5   Q.  You mentioned an orientation
6 process. What is the orientation process?
7   A.  So I would carve out time before
8 a meeting to, for example, introduce the
9 commissioners to staff. I would carve out a
10 little bit of time so that they could get to
11 know me, to get to know the materials that
12 would be provided to them, to get to know a
13 little bit about the voting structure.
14   Q.  You referenced materials that
15 would be provided to them. What materials
16 would be provided to the commissioners?
17   A.  So prior to meetings, the
18 commissioners received documents that were
19 prepared by staff that had to do with their
20 votes and their decisions.
21   Q.  So these were materials that
22 were specific to the votes that the
23 commissioners would be placing during an
24 upcoming meeting?
25       MS. COLE: Objection.

Page 53

1         Krisel
2   A.  Correct.
3   Q.  You also reference an
4 educational process for the commissioners.
5 What is involved in that process?
6   A.  Explaining the Civil Service
7 portfolio, which included all the County
8 agencies, all the towns, all the villages,
9 all the schools, all the libraries.
10   Q.  Who explains all of those things
11 to the commissioners?
12   A.  I did. Well, I did with
13 sometimes the assistance of a division head,
14 but generally I did the training.
15   Q.  Were there any documents that
16 you used in the course of providing that
17 training?
18   A.  I would give them a sample
19 application for a residency waiver so that
20 they could understand what -- that that was
21 a decision that they would make. I would
22 give them a sample general review so they
23 could understand that that was a document
24 that they'd be reading. I would give them a
25 sample report from an agency looking for a

## Page 54

1         Krisel
2 provisional hire.
3    Q. Did you ever provide them with a
4 copy of a statute?
5    A. Yes. Not frequently, but yes, I
6 did give them legal guidance in the form of
7 a statute.
8    Q. Was that on their request?
9    A. It could have been, or it could
10 have been where is it written that you have
11 to be a Nassau County resident, and I would
12 say, in this document; where is it written
13 that the meeting has to be public, and I
14 would give them the Opening Meetings Law;
15 where is it written that I have to -- you
16 know, where is it written that I have to --
17 that we have to provide this information,
18 and I would say in the Freedom of
19 Information Law, and sometimes they would
20 want to see the law, so I would send it to
21 them.
22    Q. Were there any statutes that as
23 a part of the orientation and education
24 process you would usually provide to them.
25    A. Not that I recall.

## Page 55

1         Krisel
2    Q. What about any regulations that
3 you would usually provide to them?
4       MS. COLE: Objection.
5       Go ahead.
6    A. I don't know what you mean by a
7 regulation.
8    Q. So implementing regulation for a
9 statute.
10    A. So the Civil Service law is New
11 York State law, and there is also Nassau
12 County has as an administrative code, Nassau
13 County has a charter, and some -- some of
14 those provisions were relevant to the Civil
15 Service Commission.
16    Q. And were there any of those that
17 you would as a matter of course provide to
18 the commissioners?
19    A. No.
20    Q. Other than what you've already
21 discussed, was there any written
22 documentation that you would usually provide
23 to the commissioners?
24    A. Very rarely. Very rarely. I
25 mean, residency is a big issue, and I was

## Page 56

1         Krisel
2 frequently asked where it said you had to be
3 a Nassau County resident, so that's
4 something that I would provide. If there
5 was something that I needed to clarify as to
6 why something had to, for example, go to New
7 York State for its review, I would provide
8 the guidance that required that type of
9 referral to New York State. There was not a
10 big demand, but there was a demand for those
11 types of documents, explanatory documents as
12 to why we had to do something.
13    Q. With regard to police officer
14 applicants, while you were executive
15 director, did the commissioners have a lot
16 of discretion in terms of whether to
17 disqualify an applicant at the background
18 investigation phase?
19    A. Yes.
20    Q. Do you think that the level of
21 discretion that they had was appropriate?
22       MS. COLE: Objection.
23    A. Yes.
24    Q. Why was it appropriate for them
25 to have so much discretion?

## Page 57

1         Krisel
2    A. Because that's the way the law
3 is structured.
4    Q. When you reference "the law," is
5 there a particular statute that you're
6 thinking of?
7    A. The Civil Service law.
8    Q. Do you think that that
9 discretion could ever be problematic in any
10 way?
11       MS. COLE: Objection.
12    A. No.
13       THE WITNESS: Sorry.
14       MR. COLE: That's okay.
15    A. No.
16    Q. Do the commissioners ever
17 receive any training specific to evaluating
18 candidates for police officer positions?
19    A. Outside training.
20    Q. We can start with outside
21 training. Is there any outside training
22 that they receive?
23    A. No, there's not.
24    Q. What about training from within
25 the CSC?

Krisel

A. You know, I don't want to call it training, but I, as I stated, provided an overview of Civil Service law and the related Nassau County statutory documents to the commissioners.

Q. And you provided that at the time that they become commissioners or is it done sort of on an as-needed basis?

MS. COLE: Objection.
Go ahead.

A. You know, when they come in as new commissioners, they don't have questions yet because they don't know what a meeting is going to look like. So I would give them a few tools to understand how things were done. Certainly, when there's a new commissioner, and in that I only had the two new commissioners during my time, but they had different questions with regard to what we were doing, what they could -- what their choices were, what they could -- what they were going to be looking at, what a meeting would be like, how long is a meeting going to be, what if I can't come to a meeting;

Krisel

you know, just the logistics is really what I would say.

Q. You referenced the individuals, the new commissioners during your time?

A. Right.

Q. Would that be DeLuca and Markowitz?

A. Commissioner Michael DeLuca and Commissioner Steve Markowitz.

Q. Do you know whether the prior executive director for the CSC provided any sort of training for the commissioners that were on the CSC when you became executive director?

A. No, I don't know.

Q. Do you know whether the CSC has ever tracked demographic data regarding police officer hiring?

A. No.

Q. Do you know whether the CSC has ever tracked demographic data regarding disqualifications of police officer candidates?

A. Responsive to Freedom of

Krisel

Information requests, to that limited extent, yes.

Q. How many Freedom of Information requests concerning the demographic data of disqualifications are you aware of?

A. From Baumbach, from Newsday or in the universe?

Q. Really the universe.

A. I don't know.

Q. Is it a large number?

A. I don't know. Of freedom -- the number of Freedom, I don't know how many requests.

Q. How many are you aware from Baumbach?

A. I would say that I don't know the specific number.

Q. Do you know whether the data that was provided in response to any of those FOIL requests were ever shared with the commissioners?

THE REPORTER: You're saying FOIL, right?

THE WITNESS: FOIL, F-O-I-L.

Krisel

A. Can you repeat that question?

Q. Do you know whether the data that was provided in response to any of those FOIL requests was ever shared with the commissioners?

A. No.

Q. Has the Civil Service Commission, as far as you're aware, ever taken any actions to address potential racial disparities in hiring police officer candidates?

A. The commissioners?

Q. The CSC.

A. Yes.

Q. And what were those actions?

A. In the application process in recruitment, which is the opportunity to attract the diverse candidates.

Q. What actions did they take with respect to recruitment?

A. Providing information to job fairs, providing information to Nassau County agencies that that had constituents interested in learning about a public sector

Krisel

but rather make it move more quickly, you know, keep people in play, because they understood, from what I told them, that many, many, many candidates have not lost interest because that would be unfair, but are no longer looking for a job because so much time has elapsed that they've gone to work for the MTA, that they've gone to law school, that they've gotten their Series 7 license. You know, we're dealing with a long period of time, and the inability to leave a position like that to start working at $34,000 a year, all while living in Nassau County. You know, it doesn't make it exactly a good plan for a lot of people.

Q. Were there any changes to the background investigation phase specifically that you recall the committee members discussing?

A. They wanted police officers who were more reflective of the different neighborhoods and different communities. They were aware that Nassau County's demographics were changing, and they wanted

Krisel

to see that type of change. They wanted to see, you know, what they considered to be more realistic recruitment strategies, where, you know, they would anecdotally say, well, nobody ever told me about police explorers, my guidance counselor never told me anything about jobs in law enforcement, I think that there should be postings in every guidance counselor office. I mean it was an aspirational discussion.

Q. But the question I'm asking you right now is a little bit more narrow. It's were there changes to the background investigation process that the members discussed?

A. Right. They wanted the background investigation to less focus on the past and more focus -- on an applicant's past and more focus on who would be a good police officer.

Q. Were there discussions about how that would be accomplished?

A. Not really.

Q. Just sort of aspirational?

Krisel

A. Yes.

Q. You referenced unblemished records as being something that's important to this process. What did you mean by that?

A. So you know that in a general review and in accordance with New York State Civil Service law, there are criteria that are followed, and you know that the applicants sign broad and narrow general releases for information that pertained to their -- the candidate's education, credit, driving, gang affiliation, et cetera, in accordance with New York State Civil Service law.

Q. Yes, I've had that understanding. And I'm wondering how do unblemished records play into the hiring process for police officers.

A. So it's very difficult to process applicants that have -- or to approve applicants, not that that's at the Civil Service stage, but to allow an applicant to continue processing if there's, for example, evidence that he asked a cousin

Krisel

to take his urine test or conversely that he took a urine test, gave a cousin urine, so that that cousin could pass the Civil Service test. It's very difficult to process candidates who give the impression that they would bend a law, that they would allow -- while working as a hostess at The Cheesecake Factory, they would allow a friend priority on the waiting list, that would sit -- that would use drugs after sitting for a police exam, that would have been dishonest about completing college or dishonest about a criminal record or a college incident, you know, the whole list of issues that would concern during the process.

Q. And the importance of these unblemished records is something that the committee discussed; is that right?

A. The commission, the commission. Oh, yes, yes. Well, they didn't sit around and say we're looking for an unblemished record, but they would review the general review and vote on whether in their opinion

Krisel

as a member of the Nassau County Civil Service Commission this candidate should be permitted to continue the process of taking the many steps toward becoming a police officer.

Q. I was actually asking about the Diversity Committee and whether they had discussed the --

A. Oh, whether they discussed.

Q. -- the role of unblemished records --

A. Oh --

Q. -- in this process?

A. Yeah.

MS. COLE: Hang on a second.

THE REPORTER: You're talking over each other.

Do you want to say that again?

MR. SMITH: Sure.

Q. I was asking about whether the Diversity Committee had discussed the importance of unblemished records.

A. Oh, because when you had said "committee," I had said the "commission," so

Krisel

I was thinking -- okay. The committee understood -- the Police Diversity Committee understood the importance of these factors and that nobody is perfect, but on the other hand, you know, they understood that it was the purview and they agreed with the purview of the commissioners to eliminate candidates that they thought were not demonstrating good moral character.

Q. Did any of the committee members express a concern that an emphasis on an unblemished record created problems with getting diverse candidates through the process?

A. They understood that the -- what you do in the years leading up to your background investigation was a problem regardless of who you were or what you were, it was a problem.

Q. And what I'm asking is whether any of the members ever expressed a concern about the impact of a focus on an unblemished record had on police officer diversity.

Krisel

A. They understood that no matter what your status is, if you have a bad driving record, a bad credit record, a record of lying, a record of having debt and not dealing with it that it would be -- you wouldn't be approved, and they agreed that the early education toward that end was pivotal and was the turning point.

Q. Did any of the members ever express a concern that there was a lack of standardized evaluation of the background of police officer applicants?

MS. COLE: Objection.

Q. Let me rephrase that.

Did any of the members ever express a concern about a lack of standardization in how the background check process operated?

A. They understood that the background process operated by the commissioners discussing what was in the general review. That's what they understood. Not right away, but that's what they came to understand.

Krisel

MR. SMITH: Tab 27.

Can we go off the record.

THE VIDEOGRAPHER: Off the record at 12:31. This is the end of media unit 2-A.

(Recess.)

THE VIDEOGRAPHER: On the record at 12:47. This is the start of media unit 2-B.

Q. All right, Ms. Krisel, you understand that you're still under oath?

A. Yes, I do.

Q. The court reporter is going to hand you a document that we have previously labeled as Plaintiff's Exhibit number 30.

A. Thank you.

Q. I'll direct you to a few particular places in this document where I have some questions.

Have you ever seen this document before?

A. Yes.

Q. When have you seen it?

A. When -- I think when Bishop's

Page 206

1           Krisel
2     A.   Oh, okay, hold on one second.
3  I'm not sure.  The numbering is MPTC
4  numbering, but I'm not sure.
5           THE REPORTER:  MPTC?
6           THE WITNESS:  MPTC numbering.
7     Q.   What does MPTC stand for?
8     A.   Municipal Police Training
9  Council.
10    Q.   Do the MPTC regulations govern
11 the work of the Civil Service Commission?
12    A.   In some regards it does -- they
13 do.
14    Q.   Do you know whether this Section
15 6000.10 would apply to the work of the Civil
16 Service Commission?
17    A.   I don't know.
18    Q.   Would the commissioners receive
19 any training regarding evaluation of an
20 applicant's motor vehicle record?
21         MS. COLE:  Objection.
22         Go ahead.
23    A.   No.  The commissioners -- you
24 mean training from New York State under the
25 MPTC or -- I don't even understand the

Page 207

1           Krisel
2  question.
3     Q.   I'm wondering how the
4  commissioners know how to evaluate an
5  applicant's motor vehicle record?
6     A.   The commissioners are appointed
7  to evaluate -- to do a number of things.
8  One of which is to evaluate the candidates,
9  and when the MPTC has standards, you know, I
10 would instruct them in those standards, but
11 in evaluating a driving record, it's in
12 accordance with New York State Civil Service
13 law, and the MPTC standards are -- have been
14 in effect.  There were some changes made to
15 them, but they have been in effect, and the
16 guidance is extracted from Civil Service
17 law.
18    Q.   Are you familiar with the
19 New York State Professional Policing Act of
20 2021?
21    A.   I'm familiar with the amendments
22 to the MPTC, the Municipal -- it's spelled
23 out.  I just saw it in this page, what it's
24 exactly called, but I haven't read through
25 the entirety of this, the Professional

Page 208

1           Krisel
2  Policing Act.
3     Q.   With regard to the subdivision
4  of that law that we were just reviewing --
5     A.   Right.
6     Q.   -- Section 6010 --
7     A.   Can you just give me the page
8  again?
9     Q.   Sure.  It's 9155.
10    A.   Yes.
11    Q.   With regard to evaluation of
12 motor vehicle records --
13    A.   Right.
14    Q.   -- are you aware of the
15 Commission changing how it reviewed motor
16 vehicle records in response to enactment of
17 6000.10?
18         MS. COLE:  Objection.
19         Go ahead.
20    A.   Are we on 9159?
21    Q.   Yes.
22    A.   I haven't reviewed this.  I have
23 reviewed components of the changes to the
24 6000s, but I'm not sure what you're
25 directing my attention to.  I thought you

Page 209

1           Krisel
2  said something about --
3          MR. COLE:  Let him, he'll either
4     clarify or ask a question or --
5          THE WITNESS:  Okay.
6     Q.   Sure.  So my question is
7  specific to evaluation of motor vehicle
8  records, and it's whether or not in response
9  to adoption of this Section 6000.10 the
10 Civil Service Commission changed how it
11 evaluates motor vehicle records.
12    A.   No.
13    Q.   Do you know whether tinted
14 windows would be considered a, quote,
15 "moving traffic violation"?
16         MS. COLE:  Objection.
17         If you know.
18    A.   I don't know.
19    Q.   Ms. Krisel, the court reporter
20 is going to give you a document that's
21 previously been labeled Exhibit Number 3.
22    A.   Yes.
23    Q.   Again, this is a lengthy
24 document, so I'll tell you that specifically
25 we're interested in discussing Rule XII,

53 (Pages 206 - 209)

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Krisel

1 which is on page 10096.C.
2 A. You're just looking at Rule XII?
3 Q. That's right. I'm going to ask
4 you some questions about this set of
5 regulations generally, but in terms of
6 anything specific, it will be Rule XII.
7 The first question is is this a
8 copy of the Nassau County Rule Book?
9 A. Yes, it is. I haven't looked at
10 all the pages, but the first page is from
11 the rule book, and I would have to go
12 through all of these to make sure that it's
13 the -- but it looks like the Nassau County
14 Rule Book.
15 Q. Sure. What is the Nassau County
16 Rule Book?
17 A. The Nassau County Rule Book is
18 guidance for the Nassau County -- specific
19 to the Nassau County Civil Service
20 Commission. Each Civil Service Commission
21 adopts its own rule book, and it's a
22 document that is amended by public hearing.
23 Q. Who has to vote on that
24 amendment?

Krisel

1 A. The commissioners.
2 Q. Are Civil Service commissioners
3 expected to be familiar with the rule book?
4 A. Yes, in the sense that when
5 they're given a submission to vote on, that
6 submission would cite the section of the
7 rule book.
8 Q. What do you mean by "a
9 submission to vote on"?
10 A. On a general calendar, if there
11 was an applicant who wanted to transfer, it
12 would be this application is pursuant to
13 rule whatever, you know, governing
14 transfers. So they're familiar with the
15 rule book in that sense. Do they refer to
16 the rule book, no. I mean, it's a legal
17 document. I would give them guidance on the
18 rule book.
19 Q. Looking at Rule XII --
20 A. Yes.
21 Q. -- are you familiar with this
22 rule?
23 A. Yes.
24 Q. Are you aware of this rule

Krisel

1 having been amended in any recent year?
2 A. It says on the rule book that it
3 was last updated July 24th, 2023. So I
4 don't know what that update was.
5 Q. Are you aware, though, of this
6 rule having changed at all in recent years?
7 A. I don't recall.
8 Q. Do you see the sentence under
9 number 2 that begins "A record for
10 disrespect for the requirements and
11 processes of law"?
12 A. Yes.
13 Q. It goes on to state, "including
14 repeat traffic offenses, or disregard of
15 summonses for traffic offenses" --
16 A. Right.
17 Q. -- "may be grounds for
18 disqualification for examination or, after
19 examination, for certification appointment"?
20 A. Yes.
21 Q. In your own words, what do you
22 consider to be, quote, "disrespect for
23 requirements and processes of law"?
24 A. It would depend. It could be

Krisel

1 any of the criteria set forth in Civil
2 Service law. It could have to do with
3 employment, credit, vehicular offenses,
4 accidents, having your -- having your
5 insurance lapse, not paying a ticket, any
6 kind of default provisions.
7 Q. Other than MPTC regulation
8 6000.10 which we just reviewed --
9 A. Right.
10 Q. -- are there any other
11 regulations that would be relevant to the
12 Civil Service Commission's evaluation of
13 whether an applicant had exhibited
14 disrespect for the requirements and
15 processes of law?
16 A. So the categories that Civil
17 Service law specifies are the categories
18 that general reviews address; as we've
19 discussed, employment, credit, driving,
20 convictions. All would be relevant to that
21 determination.
22 Q. And to make sure that we're
23 looking at all of the written regulations
24 that exist on that, is there anything out of

## Page 222

1  Krisel
2  what the Court held?
3  A. Yes.
4  Q. And what is that?
5  A. The Court disagreed with the
6  disqualification, finding that the grounds
7  were conclusory and without specific factual
8  findings.
9  Q. The disqualification decision
10 for this applicant as quoted in the Court's
11 decision stated "disrespect for the process
12 of law and order as evidenced by your motor
13 vehicle record and poor moral character"; is
14 that accurate?
15 A. Yes.
16 Q. And the Court found that that
17 disqualification decision was "conclusory
18 and failed to set forth any specific factual
19 findings"?
20 A. Yes.
21 Q. Is that language typical of a
22 disqualification decision?
23     MS. COLE: Objection.
24     Which number are you referring
25 to?

## Page 223

1  Krisel
2     MR. SMITH: I'm sorry, Katy,
3  what did you say?
4     MR. COLE: Which language are
5  you referring to? You quoted two
6  section.
7     MR. SMITH: I'm referring to the
8  language that's quoted at the bottom
9  of page 12778 that begins, quote,
10 "disrespect for the process of law
11 and order as evidenced by your motor
12 vehicle record and poor moral
13 character," and I'm asking if that
14 disqualification language would be
15 typical.
16 A. Yes.
17 Q. Following this decision, did the
18 Civil Service commissioners change their
19 practice with regard to how they documented
20 disqualification decisions?
21 A. I don't know.
22 Q. Were you the executive director
23 when this decision was issued?
24 A. Yes.
25 Q. Ms. Krisel, the court reporter

## Page 224

1  Krisel
2  is going to hand you a document that will be
3  labeled Plaintiff's Exhibit 67. It's Bates
4  labeled NASSAU-322 -- I think that's
5  right -- through 23.
6     (Plaintiff's Exhibit 67, General
7     Review, Bates stamped
8     NASSAU-322 through 23, marked for
9     identification, as of this date.)
10 Q. Ms. Krisel, have you ever seen
11 this document before?
12 A. Yes.
13 Q. When did you see this document?
14 A. When did I see it?
15 Q. Yes.
16 A. When the lawsuit came in.
17 Q. Did you decide to review this on
18 your own?
19 A. When the lawsuit came in, I
20 asked for the file, sure.
21 Q. Do you know whether the Civil
22 Service commissioners reviewed this General
23 Review report before voting on Officer
24 Myers's application?
25 A. I don't know that they reviewed

## Page 225

1  Krisel
2  this one specifically, but they reviewed
3  every general review before them.
4  Q. Other than the executive session
5  minutes, would there be any documentation
6  regarding the Civil Service Commission's
7  deliberations regarding Officer Myers's
8  application?
9  A. No.
10 Q. Do you know whether all three
11 members of the Civil Service Commission
12 voted to disqualify Officer Myers?
13 A. I don't know.
14 Q. Is there any way that you could
15 find that information?
16 A. No.
17 Q. The court reporter is going to
18 hand you a document that will be labeled
19 Plaintiff's Exhibit 68. It's Bates number
20 NASSAU-3200 through 04.
21     (Plaintiff's Exhibit 68,
22     applicant investigation report, Bates
23     stamped NASSAU-3200 through 04,
24     marked for identification, as of this
25     date.)

1  Krisel
2  Q. Is Exhibit 68 an applicant
3  investigation report for Officer Myers?
4  A. Yes, it is.
5  Q. Would this document have been
6  provided to the Civil Service commissioners
7  prior to their vote on Officer Myers?
8  A. No.
9  Q. Could the commissioners have
10 asked to have review this applicant
11 investigation report?
12 A. They could have if they -- if
13 they knew what an applicant investigation
14 report was, but this was not part of
15 documentation given to them.
16 Q. Okay. Are you aware of them
17 ever having requested an applicant
18 investigation report?
19 A. I'm not.
20    MR. SMITH: Tab 21.
21    MR. COLE: Where are we?
22    THE REPORTER: Could we go off
23 record?
24 A. I would love a break.
25    MR. SMITH: That's fine.

1  Krisel
2    MR. COLE: I was asking out of
3    curiosity.
4    THE VIDEOGRAPHER: Off the
5    record at 1752. This is the end of
6    media unit number 4-A.
7    (Recess.)
8    THE VIDEOGRAPHER: On the record
9    at 1813. This is the start of media
10   unit 4-B.
11 Q. Ms. Krisel, the court reporter
12 is going to hand you a document that is
13 going to be labeled Plaintiff's number 69
14 and it's Bates number NASSAU-23589 through
15 90.
16    MR. COLE: I'm just going to ask
17    that she holds that for a moment. I
18    think the witness just wants to
19    clarify.
20 A. I just want to clarify an
21 earlier answer.
22 Q. Sure.
23 A. So I think what you asked me is
24 if I had -- was familiar with the New York
25 State Professional Policing Act of 2021,

1  Krisel
2  which I have never heard it called that. We
3  call it the MPTC standards. And in 2021
4  there were changes, but the changes were not
5  to how we viewed motor vehicle. The changes
6  were in the hiring of a totally different
7  component. So I have worked extensively
8  with what I call the MPTC, but I was not
9  familiar with that term. I mean, maybe it
10 was -- at the time I was familiar with it,
11 but as we sat here today, I was like what.
12 So I just wanted to clarify that.
13 Q. Thank you for that
14 clarification.
15    (Plaintiff's Exhibit 69, letter
16    to Mr. Myers dated August 6, 2020,
17    Bates stamped NASSAU-32589, marked
18    for identification, as of this date.)
19 Q. Ms. Krisel, this is a letter
20 from you to Officer Myers; is that correct?
21 A. Yes.
22 Q. Is this a letter informing him
23 that he has been disqualified from his
24 application to the Nassau County Police
25 Department?

1  Krisel
2  A. Yes, it is.
3  Q. Was that disqualification on the
4  basis of disrespect for the process of law
5  and order as evidenced by his motor vehicle
6  record?
7  A. That's correct.
8  Q. Do you have any recollection of
9  the commissioners' deliberations as to
10 Officer Myers' application?
11 A. I don't.
12 Q. The court reporter is going to
13 hand you a document that is going to be
14 labeled Plaintiff's Exhibit number 70, and
15 it's Bates stamped NASSAU-5077.
16    (Plaintiff's Exhibit 70, letter
17    dated October 29, 2020, Bates stamped
18    NASSAU-5077, marked for
19    identification, as of this date.)
20 Q. Ms. Krisel, is this a letter
21 from you to Officer Myers's attorney
22 informing him that Officer Myers's appeal
23 had not been granted by the Civil Service
24 Commission?
25 A. Yes.

Page 230

1  Krisel
2  Q. Do you have any recollection of
3  the commissioners' deliberations regarding
4  Officer Myers's appeal?
5  A. No.
6  Q. The court reporter is going to
7  hand you a document that is going to be
8  labeled Plaintiff's Exhibit 71.
9      (Plaintiff's Exhibit 71,
10     five-page e-mail chain, unBates
11     stamped, marked for identification,
12     as of this date.)
13     MR. COLE: Could I just note for
14     the record, it doesn't bear a Bates
15     stamp. Was this produced in
16     discovery?
17     MR. SMITH: I am not certain
18     whether or not this was produced
19     during discovery.
20  Q. Ms. Krisel, are these e-mails in
21 this document messages between you and Jim
22 Baumbach?
23  A. Yes.
24  Q. Do these pertain to a request
25 from Mr. Baumbach for information relating

Page 231

1  Krisel
2  to the racial breakdowns of police officer
3  applicants for the Nassau County police
4  officer positions?
5  A. Yes.
6  Q. Could you turn to the last page
7  of this document?
8  A. The chart?
9  Q. Yes, the chart. Did you create
10 this document?
11  A. No.
12  Q. Do you know who created this
13 document?
14  A. Yes.
15  Q. Who was it?
16  A. The recruitment division.
17  Q. Did they create that at your
18 request?
19  A. Yes, yes, responsive to the
20 FOIL.
21  Q. What does this chart represent?
22  A. So the chart represents the
23 stages that a candidate must travel through
24 after he or she passes an exam, the written
25 exam.

Page 232

1  Krisel
2  Q. Looking at the part of the chart
3  that's titled "2024 Police Officer Eligible
4  List," do you see that?
5  A. Yes. Wait, I have 2014 -- 2014
6  and 2019.
7  Q. Would the 2014 Police Officer
8  Eligible List reflect candidates that had
9  sat for the 2012 exam?
10     MR. COLE: I'm just going to
11     object, noting that it's outside the
12     scope of the magistrate's order about
13     the time period, but go ahead.
14  A. And this predates me. I don't
15 know.
16  Q. Looking above there to the 2019
17 Police Officer Eligible List --
18  A. Right.
19  Q. -- would that information
20 reflect individuals that had sat for the
21 exam in 2018?
22  A. I believe so.
23  Q. What do the numbers in each of
24 these columns represent?
25  A. The number of people -- do you

Page 233

1  Krisel
2  mean -- are we looking at one specific line?
3  Like what are we --
4  Q. For example, under the second
5  column Physical Fitness Failed to Appear --
6  A. Correct.
7  Q. -- the first number is 22?
8  A. Right.
9  Q. What does that number represent?
10  A. The number of people that failed
11 to appear that had been given -- that had
12 passed the exam, but had been given a date
13 for physical fitness, but didn't show up.
14  Q. If you continue over on the
15 page, there's a column labeled Investigation
16 Failed, do you see that?
17  A. Yes.
18  Q. What do the numbers under that
19 column represent?
20  A. No -- are we looking at
21 Investigation Failed or Failed to Appear?
22  Q. Let's start with the first
23 one --
24  A. Failed to Appear --
25  Q. -- Investigation Failed to

59 (Pages 230 - 233)

Veritext Legal Solutions

212-267-6868   www.veritext.com   516-608-2400