UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JHISAIAH MYERS,
*on behalf of himself and all others similarly situated*

Plaintiff,

v.

COUNTY OF NASSAU,

Defendant.
-----------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
22-CV-7023-SJB-LGD

**BULSARA, United States District Judge:**

Plaintiff Jhisaiah Myers seeks to certify a class of Black and Hispanic individuals who applied to be Nassau County police officers and passed a written and physical examination, but were rejected at the final, background investigation stage of the process. They allege that these rejections violated the equal protection guarantees of the Fourteenth Amendment and the New York State Human Rights Law ("NYSHRL"). Alleging claims for both disparate impact and disparate treatment, Myers seeks to certify both an injunctive relief class and a damages class. Myers lacks standing to pursue injunctive relief, and neither class satisfies the requirement that the class resolve common issues of law or fact, and as a result, the motion is denied.[1]

---

[1] The motion for class certification was fully briefed on November 24, 2025. (*See* Pl.'s Mem. in Supp. of Mot. for Class Certification dated Aug. 15, 2025 ("Pl.'s Mot."), Dkt. No. 112-1; Def.'s Mem. in Opp'n to Pl.'s Mot. dated Oct. 15, 2025 ("Def.'s Opp'n"), Dkt. No. 112-48; Pl.'s Reply in Supp. of Pl.'s Mot. dated Nov. 24, 2025 ("Pl.'s Reply"), Dkt. No. 112-85).

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Nassau County has a multi-step process for hiring police officers.  (Dep. of Greg Sawina ("Sawina Dep."), attached to Pl.'s Mot. as Ex. 4, Dkt. No. 112-6 at 53:10–54:9; *see also* Decl. of Christopher V. Todd ("Todd Decl."), Dkt. No. 112-84 ¶¶ 3–5).  Individuals first submit an application and pass a written civil service exam, after which they are placed on an eligibility list.  (Sawina Dep. at 53:10-18; Todd Decl. ¶¶ 3–4).  Eligible applicants are invited to take a physical agility test, and those who pass progress to the background investigation phase—the only step of the process at issue in this case. (Sawina Dep. at 53:19-25; Todd Decl. ¶ 4).[2]  Applicants who pass the background investigation phase proceed to post-investigative steps, which entail further medical, psychological, and polygraph examinations.  (Sawina Dep. at 54:2-9; Todd Decl. ¶ 5). These steps comprise a hiring "cycle," which can last for years, and not all applicants proceed on the same timeline.  For example, the 2018 hiring cycle encompasses applicants who took the written civil service examination in January 2018 and received their test results around December 2018; then agility tests were conducted over the following five years, based on the County's hiring needs.  (Sawina Dep. at 90:16–92:22).

As part of the background investigation phase, applicants complete a questionnaire disclosing their employment, education, criminal, motor vehicle, and financial history.  (Todd Decl. ¶ 6).  Each applicant is assigned to an Applicant

---

[2] The Court previously found that Myers lacked standing to challenge the entire hiring process and allowed his claims to proceed only insofar as they challenged the background check phase of the process. *Myers v. County of Nassau*, No. 22-CV-7023, 2024 WL 3675815, at *5 (E.D.N.Y. Aug. 6, 2024).

Investigation Unit ("AIU") investigator who conducts the investigation and interviews the applicant. (*Id.* ¶ 7). That investigator prepares a General Review Report ("GRR") that includes the applicant's name,[3] criminal history (including drug use and arrest record), motor vehicle records (including traffic tickets, license suspensions, and accidents), delinquent debt, and education and employment history. (*Id.* ¶ 18). Some investigators take detailed interview notes and include them in the GRR; others do not. (Sawina Dep. at 89:16-24). That report is transmitted to a supervisor, who reviews it and can send it back to the investigator for correction or move it forward for decision. (Dep. of James Koenig ("Koenig Dep."), attached to Pl.'s Mot. as Ex. 5, Dkt. No. 112-7 at 29:19-25). The GRR is provided to the three Commissioners of the Civil Service Commission, who can vote to advance or disqualify an applicant with two votes. (Dep. of Carnell Foskey dated Jan. 7, 2025 ("Foskey Jan. 7 Dep."), attached to Pl.'s Mot. as Ex. 8, Dkt. No. 112-10 at 28:18–29:16, 31:11–33:8). The AIU investigator does not make any recommendation to the Commission about what decision should be made for an applicant. (*Id.* at 69:15-18).

Myers is a 39-year-old Black man who currently works as a patrol officer for the New York City Police Department. (Decl. of Jhisaiah Myers ("Myers Decl."), Dkt. No. 122-44 ¶ 4). He began the application process for a position with the Nassau County Police Department in early 2018. (*Id.* ¶ 10). He passed the written civil service exam and then a physical agility test. (*Id.*). He progressed to the background investigation

---

[3] As of January 2024, GRRs no longer include an applicant's name. (Todd Decl. ¶ 19).

phase, during which he was informed that he had been disqualified because he had "exhibited a disrespect for the process of the law as evidenced by [his] motor vehicle record." (*Id.* ¶ 13). Myers's background investigation had reflected 13 tickets in his motor vehicle record. (Dep. of Carnell Foskey dated June 6, 2025 ("Foskey June 6 Dep."), attached to Def.'s Opp'n as Ex. N, Dkt. No. 112-63 at 130:8-11). One of the Commissioners who voted to disqualify Myers testified that Myers had received "an excessive number of tickets" for the same violations (tinted windows) on two different occasions, from two different officers. (Dep. of Gary Ackerman ("Ackerman Dep."), attached to Pl.'s Mot. as Ex. 16, Dkt. No. 112-18 at 83:18–84:2; *see also id.* at 71:19–72:8). Myers submitted multiple appeals, which were rejected. (Myers Decl. ¶¶ 14–16). Myers "continue[s] to wish to be a police officer in . . . Nassau County." (*Id.* ¶ 19).

The Complaint brings a claim under the Equal Protection Clause of the Fourteenth Amendment, through 42 U.S.C. § 1983, (Compl. dated Nov. 17, 2022, Dkt. No. 1 ¶¶ 142–50), and two claims under NYSHRL § 296—one for disparate treatment, (*id.* ¶¶ 151–60), and one for disparate impact, (*id.* ¶¶ 161–66). Myers initially sought injunctive relief and damages on behalf of "all non-white applicants seeking to become Nassau County police officers who were disqualified for consideration by Defendants during the post-exam process." (*Id.* ¶¶ 132–33). The Court previously ruled that Myers lacked standing to challenge the constitutionality of the entire post-exam hiring process, since he had only suffered injury from the background investigation phase, and the separate phases raised different concerns and would hinge on different statistical analyses, so the Court confined this case to the background investigation challenge.

4

*Myers v. County of Nassau*, No. 22-CV-7023, 2024 WL 3675815, at *5, *11 (E.D.N.Y. Aug. 6, 2024) (otherwise denying the motion to dismiss, except as to the Nassau County Police Department and the Civil Service Commission).[4]

Myers's motion now seeks certification of two different classes, more narrowly defined than those in his Complaint. The first, which seeks injunctive relief in the form of changes to the County's practices, consists of "Black and Hispanic applicants for police officer positions in Nassau County disqualified during the background investigation phase . . . of the 2018 and subsequent hiring cycles." (Pl.'s Mot. at 1). The second, which seeks back pay, damages, and an order restoring class members' eligibility, consists of "Black and Hispanic applicants for police officer positions in Nassau County disqualified during the Background Investigation of the 2018 hiring cycle." (*Id.* at 1, 5).

Myers does not detail the backgrounds of other putative class members (aside from including the GRR of one disqualified Hispanic applicant), but Nassau County submitted the GRRs of all Black and Hispanic applicants disqualified in the background investigation stage of the 2018 hiring cycle—individuals Myers ostensibly seeks to include as class members. These GRRs include applicants that, for example, pled guilty to harassment after leaving a message on their aunt's phone threatening "to snap her granddaughter's neck," (GRRs, attached to Def.'s Opp'n as Ex. W ("Def.'s GRRs"), Dkt. No. 112-72 at 9764); reportedly said to an arresting officer, "I'm going to shoot you," (*id.*

---

[4] The case was transferred from the Honorable Orelia E. Merchant to the undersigned on January 23, 2025.

at 9778); resigned while suspended from the New York Police Department after failing a drug test and made false statements in his application to Nassau County, (*id.* at 9699); and who used excessive force as a corrections officer, (*id.* at 10041). The County detailed 15 such instances of troubling background reports. (Def.'s Opp'n at 9–10).

Myers did submit the GRRs for seven white applicants who were offered employment despite a high number of traffic tickets or concerning arrest and past employment records. For example, a white applicant was hired despite 14 traffic tickets for tinted windows and speeding, (GRR, attached to Pl.'s Mot. as Ex. 21, Dkt. No. 112-23); and another was hired despite seven tickets, two prior license suspensions, and having been found at fault in three traffic accidents, (GRR, attached to Pl.'s Mot. as Ex. 23, Dkt. No. 112-25). Another was hired despite a prior conviction for aggravated driving while intoxicated, in addition to six prior license suspensions and ten traffic tickets. (GRR, attached to Pl.'s Mot. as Ex. 24, Dkt. No. 112-26). And yet another was hired despite having been terminated by two prior employers for performance deficiencies. (GRR, attached to Pl.'s Mot. as Ex. 28, Dkt. No. 112-30).

Myers contends that the Commissioners' review is a process without "sufficient guidance . . . to ensure consistent and unbiased decision-making," for example, with respect to when an applicant's traffic offenses demonstrate disrespect for the law and constitute grounds for disqualification. (Pl.'s Mot. at 9). He contends that the dearth of "formal documented criteria, standards, or guidance to use in making disqualification decisions," and the lack of training, particularly anti-bias training, results in "enormous discretion to make subjective decisions that are susceptible to racial bias," and that have

6

in fact led to racially disparate hiring results.  (*Id.* at 10–11).  Nassau County disputes that characterization, contending that the Commissioners' process is deliberative and individualized to each applicant.  (Def.'s Opp'n at 16).

With respect to training, neither investigators nor Commissioners receive specific anti-bias training.  (Def.'s Resp. to Req. for Admis. ("RFA"), attached to Pl.'s Mot. as Ex. 6, Dkt. No. 112-8 at 14–15).  Training for investigators is currently conducted by Officer James Koenig; before that, "a new investigator would just be assigned to shadow an experienced investigator" for "up to a year."  (Koenig Dep. at 25:6-25).  When Koenig joined the AIU, he shadowed an experienced officer, since "[t]here was no formal training officer."  (*Id.* at 27:2-6).  Koenig has not received any guidance or training on how to train new investigators.  (*Id.* at 30:4-7).  Now, new investigators shadow Koenig, typically for about six weeks.  (*Id.* at 31:3–32:14).  There are some written training materials for new investigators, consisting of confidentiality information, sample forms, and information on taking statements and conducting records checks for criminal and employment histories, including internet articles about interviewing techniques.  (*Id.* at 35:2–36:22; *see also* Command Procedure No. 2005-1, attached to Pl.'s Mot. as Ex 7, Dkt. No. 112-9).

The Executive Director of the Civil Service Commission testified that Commissioners generally do not receive formal training, but may be provided with an overview of civil service laws and related Nassau County statutory documents.  (Dep. of Martha Krisel ("Krisel Dep."), attached to Pl.'s Mot. as Ex. 9, Dkt. No. 112-11 at 57:16–59:3).  One Commissioner explained that the Executive Director and the Nassau County

Attorney's Office provided initial training and manuals, which included some information on what factors the Commissioners could consider and relevant state laws. (Dep. of Steven Markowitz ("Markowitz Dep."), attached to Pl.'s Mot. as Ex. 11, Dkt. No. 112-13 at 52:3-16, 54:3-16).

The Municipal Police Training Council ("MPTC") Guidelines and the Rule Book of the Nassau County Civil Service Commission apply to disqualification decisions. (Krisel Dep. at 206:10-13, 211:3-19; *see also* RFA at 7–8). The Rule Book provides in relevant part:

1. Good moral character and habits and a satisfactory reputation shall be requirements for appointment to any position subject to these rules. Any applicant who is found to lack such requirements shall be disqualified for examination or, after examination, for certification and appointment, or applicants may be disqualified pursuant to the provisions of Section 50 of the Civil Service Law.

2. A record of disrespect for the requirements and processes of law including repeated traffic offenses, or disregard of summonses for traffic offenses, may be grounds for disqualification for examination or, after examination, for certification and appointment.

3. The burden of establishing qualifications to the satisfaction of the Commission shall be upon the applicant.

(Rule Book, attached to Pl.'s Mot. as Ex. 13, Dkt. No. 112-15 at Rule XII).[5] The MPTC Guidelines were amended in 2021, pursuant to state law directing establishment of minimum hiring standards, to include further standards on "good moral character" of applicants. (MPTC Guidelines, attached to Pl.'s Mot. as Ex. 14, Dkt. No. 112-16 at 9130). The MPTC Guidelines now state that an applicant lacks "good moral character" if

---

[5] The Rule Book Myers submitted has a revision date of July 24, 2023. (Rule Book at 1).

within three years of the application date, the applicant engaged in certain criminal offenses, unlawfully used controlled substances, made false statements, or was dishonorably discharged from military service. (*Id.* at 9159–60). The MPTC Guidelines also lay out a variety of factors that "may be considered an indicator of a lack of good moral character," including criminal offense conduct more than three years old, a "[h]istorical pattern of conduct of moving traffic violations," and "[a]ny other conduct the agency determines is a reflection on the applicant's moral character." (*Id.* at 9160–61). The Commission did not change its review of applicants in response to the amendment to the MPTC Guidelines. (Foskey Jan. 7 Dep. at 52:23–53:3). It is also undisputed that Nassau County did not provide Commissioners with a written definition of "disrespect for the process of law" or "good moral character" for the 2018 hiring cycle. (RFA at 23–24).

Nassau County has operated under a consent decree since 1982, the product of an enforcement action by the U.S. Department of Justice alleging race and sex discrimination in Nassau County Police Department employment. (*See* Consent Decree, attached to Pl.'s Mot. as Ex. 3, Dkt. No. 112-5). Under its terms, Nassau County collects detailed demographic data of applicants and employees of its police department. (*Id.* ¶ 76). Nassau County produced a summary chart showing the hiring demographics from 2018 through 2023 as part of this litigation, which is reproduced below:

9

| 2018 Police Officer Exam Information current through 2023 | Process Started | Physical Fitness- Failed to appear | Physical Fitness- Passed | Physical Fitness- Failed | Investigation- Failed to appear | Investigation- Passed | Investigation- Failed-(cause) | Medical/Psychological- Passed | Medical- Failed | Psychological- Failed | Hired |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Asian or Pacific Islander | 153 | 75 | 47 | 13 | 3 | 24 | 7 | 23 | | | 22 |
| Black | 330 | 163 | 96 | 44 | 4 | 45 | 25 | 36 | | 1 | 34 |
| Hispanic | 855 | 422 | 266 | 101 | 14 | 149 | 46 | 125 | 1 | 3 | 119 |
| American Indian or Alska Native | 12 | 7 | 4 | | | 3 | 1 | 3 | | | 3 |
| Other | 66 | 38 | 20 | 8 | | 15 | 2 | 12 | | | 12 |
| Prefer Not to Answer | 160 | 77 | 54 | 18 | 1 | 35 | 9 | 32 | | | 28 |
| Unknown | 87 | 23 | 55 | 5 | | 38 | 4 | 37 | | | 35 |
| White | 3066 | 1383 | 1204 | 284 | 45 | 757 | 107 | 654 | | 5 | 621 |
| TOTAL | 4729 | 2188 | 1746 | 473 | 67 | 1066 | 201 | 922 | 1 | 9 | 874 |

(Summary Chart, attached to Pl.'s Mot. as Ex. 29, Dkt. No. 112-31).  The County was also the subject of news reports in 2021 detailing its racial disparities in hiring.  (See Newsday Article, attached to Pl.'s Mot. as Ex. 32, Dkt. No. 112-34 at 2 (reporting that only 36 out of 2,508 Black applicants were hired as police officers in Nassau County in the six years after the 2012 hiring exam)).

The racial disparities in Nassau County's police hiring and workforce are clear from Myers's Complaint.  E.g., Myers, 2024 WL 3675815, at *2, *7 ("[F]or the most recently completed hiring cycle, which concluded in 2019, Defendants hired 6.9% of white applicants, but merely 3.7% of Hispanic applicants, and just 1.8% of Black applicants," and "[a]pproximately 24.2% of white applicants who began the post-exam process were hired as Nassau County police officers, compared to a mere 15% of Hispanic and just 8.5% of Black applicants.").

The parties have since engaged various experts to support their positions.  In support of his motion, Myers attached the expert report of Dr. Charles A. Scherbaum, which opines on the degree to which the background investigation process represents a uniform procedure and complies with minimum professional standards, (Scherbaum Rep., attached to Pl.'s Mot. as Ex. 1, Dkt. No. 112-3 at 1), and the report of Professor Thomas A. DiPrete, who conducted statistical analyses of Nassau County's hiring data

10

and information contained in the GRRs of all applicants in the 2018 hiring cycle, (DiPrete Rep., attached to Pl.'s Mot. as Ex. 2, Dkt. No. 112-4 at 2–4). However, Myers advised that certification does not require reliance on the expert opinions, which are currently subject to *Daubert* briefing. (Pl.'s Letter dated May 11, 2026 ("Pl.'s May 11, 2026 Letter"), Dkt. No. 126 at 1–2). Accordingly, the Court does not rely on Myers's experts and, as discussed in detail below, there is no statistical evidence—beyond the general numbers Myers presents in the above summary chart or the statistics in the Complaint—analyzing, for example, whether applicants *with similar backgrounds*, as reflected in their GRRs, were treated differently or otherwise adversely impacted on the basis of race.

*          *          *

The Court provided the parties with an opportunity to explain whether the Court should delay class certification resolution until the *Daubert* motions are decided, so that it may appropriately consider (or decline to consider) the expert reports both sides rely upon. (Order dated May 4, 2026 ("The parties are directed to inform the Court by 5/11/2026, in separate letters no longer than 700 words, whether the forthcoming *Daubert* motions affect the pending motion for class certification [], and if so, how.")). Myers told the Court that it "may properly grant the motion . . . without reliance on any expert opinions, and the *Daubert* motions therefore do not affect the pending motion for class certification." (Pl.'s May 11, 2026 Letter at 3). In other words, if the Court were inclined to grant certification, it should not examine the expert analyses, but the semantic implication is that if the Court was inclined to deny

11

certification, it should expend the effort to save the motion by considering the expert opinions and resolve the *Daubert* issues. This "heads I win, tails Defendant loses," position is decidedly unhelpful: it assists the Court in no way in determining the priority or order in which to resolve the motions, or their interdependence, or lack thereof. Nor is it one that any Court would endorse because it gives Myers a one-sided strategic advantage, of only exposing his experts to scrutiny when it benefits him, but not if it might disadvantage him. Having failed to ask the Court to wait on deciding certification until it decided the *Daubert* motions—which he had plain opportunity to do—the Court cannot, and does not, examine any of the expert opinions in deciding whether certification is appropriate.

In any event, were the Court to consider the expert evidence as presented in this motion, it would not alter the outcome. That is largely because of Myers's failure to address Defendant's arguments about the improper methodology used in his expert reports. Myers argues in his motion that there is statistical evidence of disparate impact and disparate treatment, demonstrated by Professor DiPrete's expert report. (Pl.'s Mot. at 22). Nassau County attacks Professor DiPrete's methodology, including its "fail[ure] to define, analyze, or regress from a qualified pool," citing to its own expert, who concluded there was no statistically significant difference in the probability of disqualification on the basis of "disrespect for the process of law" on the basis of race. (Def.'s Opp'n at 13 n.12). Myers fails to address this methodological attack in any way, other than to cite a single case to argue that the credibility of statistical analysis is not to be addressed at certification. (Pl.'s Reply at 6 (citing *Lapin v. Goldman Sachs & Co.*, 254

12

F.R.D. 168, 186 (S.D.N.Y. 2008))).  This is decidedly not the law.[6]  The methodological

attack is therefore unrebutted, which leaves Myers with no expert evidence for the

Court to rely on.  Had Myers asked the Court to decide the methodological attacks now,

in the context of *Daubert*, there may have been a different outcome.  But instead, Myers

chose to plow ahead.  Myers well may have sacrificed certification at the risk-avoidance

altar of preserving his experts, but he informed the Court that the present motion may

be decided "without reliance on any expert opinions."  (Pl.'s May 11, 2026 Letter at 3).

---

[6] *Lapin* was a securities fraud class action.  The discussion Myers references concerns predominance—not commonality, which went uncontested in that case.  *See Lapin*, 254 F.R.D. at 176.  But the bigger problem with *Lapin*—and why it does not aid Myers—is that there, the expert report was pertinent "only to the merits of plaintiffs' claim . . . and not to whether plaintiffs have asserted common *questions* of law or fact." *Id.* at 186 (quoting *Hnot v. Willis Grp. Holdings Ltd.*, 241 F.R.D. 204, 210 (S.D.N.Y. 2007)). But since *Wal-Mart Stores, Inc. v. Dukes*, whether a plaintiff can show "significant proof" that a defendant "operated under a general policy of discrimination" is decidedly a certification issue.  564 U.S. 338, 353 (2011).  It is not an inquiry that can be waived off as a merits determination.  The post-*Dukes* examples of courts addressing employment discrimination classes, and scrutinizing plaintiffs' expert presentations, make Myers's dismissive response to the expert challenges all the more puzzling.  *E.g.*, *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 282–83 (S.D.N.Y. 2018) (finding statistical presentation inadequate to satisfy commonality); *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 75–76 (S.D.N.Y. 2018) (evaluating the factors and data used in plaintiffs' expert report to establish commonality for a disparate impact claim); *Richardson v. City of New York*, No. 17-CV-9447, 2021 WL 1910689, at *9–*12 (S.D.N.Y. May 12, 2021) (finding plaintiffs' statistical analyses flawed and denying certification).

Similar problems exist with the two cases Myers separately relies on to tell the Court it need not scrutinize his experts at this stage.  (*See* Pl.'s May 11, 2026 Letter at 2 (citing *Houser v. Pritzker*, 28 F. Supp. 3d 222, 243–44 (S.D.N.Y. 2014); *Lowell v. Lyft, Inc.*, No. 17-CV-6251, 2022 WL 17585670, at *3 (S.D.N.Y. July 5, 2022))).  True, *Houser* did not resolve dueling expert opinions on whether a statistically significant disparate impact was evident, but in *Houser*, the challenged practices were "uniform, non-discretionary hiring instruments."  28 F. Supp. 3d at 242–43.  And *Lowell* focused on merits issues of whether the plaintiffs had proposed a concrete and reasonable modification to defendant's policies under the Americans with Disabilities Act.  2022 WL 17585670, at *3.  Both are inapposite to this challenge to discretionary employment decisions.

13

For the reasons explained below, a robust statistical showing is indeed critical to certification in this case, and the lack thereof is fatal to Myers's attempt at certification.

DISCUSSION

Class certification is governed by Federal Rule of Civil Procedure 23.  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Plaintiffs seeking class certification under Rule 23 must satisfy each of the conditions in Rule 23(a).  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).  The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Dukes*, 564 U.S. at 348 (quotation omitted).  "The party seeking 'class certification must affirmatively demonstrate . . . compliance with the Rule,' and a district court may only certify a class if it 'is satisfied, after a rigorous analysis,' that the requirements of Rule 23 are met."  *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237–38 (2d Cir. 2012) (quoting *Dukes*, 564 U.S. at 350–51).  "Rigorous analysis" means that:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 41.

> A plaintiff seeking class certification must demonstrate that:
>
> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Elisa W. v. City of New York*, 82 F.4th 115, 122 (2d Cir. 2023) (quoting Fed. R. Civ. P. 23(a)). These requirements are referred to as numerosity, commonality, typicality, and adequacy. In addition, Rule 23(a) has been found to contain an implicit requirement of "ascertainability." *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017) ("The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries.").

"In addition to satisfying these requirements, plaintiffs must also show that one of the three conditions of Rule 23(b) is met." *Elisa W.*, 82 F.4th at 122. As relevant here, Rule 23(b)(2) allows for class treatment if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). And Rule 23(b)(3) allows for class treatment when "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* R. 23(b)(3).

The Court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met," *In re Initial Pub.*

*Offerings Sec. Litig.*, 471 F.3d at 41, by a preponderance of the evidence, *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

Myers seeks certification under Rule 23(b)(2), an injunctive relief class, and Rule 23(b)(3), a damages class.  Each is addressed in turn below.

## I.      The Injunctive Relief Class

Myers seeks to certify a class of "Black and Hispanic applicants for police officer positions in Nassau County disqualified during the background investigation phase . . . of the 2018 and subsequent hiring cycles."  (Pl.'s Mot. at 1).  The class "seeks a declaration that Defendant's practices and policies are unlawful and unconstitutional; a permanent injunction prohibiting Defendant's unlawful practices and policies; an order requiring Defendant to develop and institute objective, validated hiring policies and procedures; and appointment of a monitor to ensure compliance."  (*Id.* at 5).

### A.      Standing

"Plaintiffs must establish for each claim that they have . . . constitutional, or Article III, standing (a constitutionally-cognizable injury arising from the defendant's breach of the statutorily imposed duty); and, because this is a putative class action, 'class standing' (standing to bring class claims on behalf of absent class members)." *Collins v. Ne. Grocery, Inc.*, 149 F.4th 163, 170 (2d Cir. 2025).

In class actions, "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite [future] injury."  *Hyland v. Navient Corp.*, 48 F.4th 110, 117–18 (2d Cir. 2022) (finding standing for a Rule 23(b)(2) class where named plaintiffs "were likely to suffer future harm").  There must be an indication of "a continuing violation or

the imminence of a future violation," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998), that is, a "real and immediate threat of repeated injury," *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013) (per curiam) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)).  "The prospective-orientation of the analysis is critical: to maintain an action for injunctive relief, a plaintiff 'cannot rely on past injury . . . but must show a likelihood that he . . . will be injured in the future.'"  *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 (2d Cir. 2020) (alterations in original) (quoting *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).  "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).

"Allegations of *possible* future injury do not satisfy the requirements of Article III. Rather, there must be a 'substantial risk' that harm will occur." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020) (quotation omitted; emphasis added); *see also Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021) ("[A]n allegation of future injury will be sufficient only if 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014))).

17

Myers lacks standing to pursue injunctive and declaratory relief.[7]  The reply brief cites Myers's declaration to say that he "continues to seek employment as a Nassau County police officer."  (Pl.'s Reply at 2).  But in his declaration Myers never actually says he plans or intends to reapply for a police officer position.  (*See* Myers Decl. ¶ 19 ("I continue to wish to be a police officer in my home county, Nassau County."); *see also* Compl. ¶ 73 ("Officer Myers nevertheless continues to desire employment as a police officer in his home County of Nassau[.]")).  Continued wishes and desires do not amount to a plausible allegation that he intends to reapply—and therefore will suffer the alleged discrimination he challenges; hope is not enough to show likely future injury.  *See Hyland*, 48 F.4th at 117–18; *e.g., Obie v. Commodity Futures Trading Comm'n*, No. 24-2436, 2025 WL 3640878, at *3 (2d Cir. Dec. 16, 2025) (affirming dismissal for lack of standing where plaintiff "retired from the CFTC, and his claim of a future injury rests on his assertion that he 'will consider a return' if the 'CFTC cleans up its act, ends its culture of retaliation, and stops trying to ban prayer'" which is "improperly conjectural or hypothetical speculation that is insufficient to sustain standing for prospective relief" (quotation omitted)).

---

[7] Declaratory relief is "prospective in nature," and, like injunctive relief, standing to seek a declaratory judgment "must be based on allegations of current [i.e. ongoing] or future harm."  *Brown v. S. Shore Univ. Hosp.*, 762 F. Supp. 3d 191, 204 (E.D.N.Y. 2025); *see Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (affirming dismissal of claims for injunctive and declaratory relief because plaintiff did not allege current or future injury); *Dorce*, 2 F.4th at 95 (requiring likelihood of future injury for injunctive *or* declaratory relief); *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 255 (E.D.N.Y. 2021) (collecting cases).

Because Myers has not demonstrated standing to obtain injunctive relief, that necessarily dooms his attempt to certify an injunctive relief class.  *See Liberian Cmty. Ass'n of Conn.*, 970 F.3d at 185 n.14 ("Because we conclude that none of the named plaintiffs has standing to pursue their claims for prospective relief, the class proposed by Appellants necessarily fails as well.").

However, because the issue of constitutional standing could potentially be cured by substitution of a similarly situated class member who does intend to reapply, *see Dorce*, 2 F.4th at 96, or an unequivocal statement from Myers himself that he intends to reapply, the Court proceeds to analyze class standing and the Rule 23 elements.

Plaintiffs can only assert claims on behalf of absent class members if they plausibly allege: "(1) that they personally have suffered some actual injury as a result of the purportedly illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  *Collins*, 149 F.4th at 174 (quotation omitted).  This test "was designed to ensure that a named plaintiff may properly assert claims on behalf of absent class members because his litigation incentives are sufficiently aligned with those of the absent class members."  *Id.* at 174–75 (quotation omitted).  "Alignment occurs when the proof that a named plaintiff develops for his individual claims tends to prove the class claims."  *Id.* at 175.

Nassau County contends Myers cannot represent a class that includes Hispanic applicants, since they are not similarly situated.  (Def.'s Opp'n at 18).  It bases its argument on the fact that Myers has not shown that "discrimination manifested itself

19

similarly as to Black and Hispanic applicants," since Hispanic applicants pass at a different, and higher, rate than Black applicants. (*Id.*). Myers contends that the practices challenged as discriminatory manifest in the same way, "resulting in disqualification rates for both groups that exceed those of White applicants," and that differences in the rates are irrelevant. (Pl.'s Reply at 2). Much of this dispute relies on both sides' experts and statistical analyses. (*See* Def.'s Opp'n at 19).

Myers—or a similarly situated class member who would qualify as a substitute—may represent a class of Black and Hispanic applicants. "[A] black lead plaintiff can represent a class containing Hispanic employees when [] general racial discrimination manifests itself in the same way against both black and Hispanic employees." *Fuller v. Instinet, Inc.*, 120 F. App'x 845, 846 (2d Cir. 2004). And Myers has made a sufficient showing that the proof underlying the class claims on behalf of both Black and Hispanic applicants is united: Myers's claims rely on disqualification rates based on the same underlying data, (*see* Pl.'s Reply at 2; Pl.'s Mem. at 2), and the challenged conduct—for example, reliance on vague criteria like "disrespect for the process of law and order" or "poor moral character"—is known to "impact Blacks and Hispanics disproportionately," (Pl.'s Mem. at 2). Myers's claims on behalf of Black applicants are sufficiently aligned with those of Hispanic applicants.

### B. Ascertainability

The ascertainability requirement is a "modest threshold requirement" that evaluates whether there is a "focused target for litigation." *In re Petrobras Sec.*, 862 F.3d at 269. Without such an objective, "the class itself cannot coalesce, rendering the class

action an inappropriate mechanism for adjudicating any potential underlying claims."

*Id.* "[A] class should not be maintained without a clear sense of who is suing about

what." *Id.* A class is ascertainable if it is "defined using objective criteria that establish

a membership with definite boundaries." *Id.* The relevant inquiry "is whether

determinations as to class membership are objectively *possible*." *Fikes Wholesale, Inc. v.*

*HSBC Bank USA, N.A.*, 62 F.4th 704, 717 (2d Cir. 2023) (quotation omitted).

Nassau County contends the injunctive relief class is not ascertainable because it

includes applicants who "will be" disqualified from the background investigation of

future exam cycles and fails to propose any time limit. (Def.'s Opp'n at 26). This is not

a per se barrier to ascertainability—courts have certified injunctive relief classes that

include future members. *See Daniels v. Moores*, No. 24-0030, 2025 WL 883035, at *4 (2d

Cir. Mar. 21, 2025) (affirming certification of "all incarcerated individuals who are or

will be in the care and custody of the [DOCCS] who suffer or will suffer from chronic

pain and/or neuropathies who require individualized assessments of medical need for

treatment with MWAP medications"); *e.g.*, *Plaintiffs #1-21 v. County of Suffolk*, No. 15-

CV-2431, 2021 WL 1255011, at *9, *11 n.40, *16 (E.D.N.Y. Mar. 12, 2021) (recommending

certification of injunctive relief class of Latino persons who had been or will be subject

to a stop or detention in Suffolk County), *report and recommendation adopted*, 2021 WL

1254408, at *1 (Apr. 5, 2021); *Vogel v. City of New York*, No. 14-CV-9171, 2017 WL

4712791, at *5 (S.D.N.Y. Sep. 19, 2017) (certifying a class of persons who had been or will

be arrested without probable cause and charged with a particular crime). And Nassau

County fails to identify any other defect in the definition of class members that would

21

make it difficult or impossible to define which future applicants would be entitled to injunctive relief.

### C.      Numerosity

Rule 23(a)(1) requires that the prospective class be so numerous that joinder is "impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder."  *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002); *see also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).  In the Second Circuit, numerosity is generally presumed when the putative class has 40 or more members.  *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 n.20 (2d Cir. 2021).

The Court assumes numerosity is satisfied for the purpose of this motion.  Nassau County argues that, since it contends that Myers cannot represent Hispanic applicants or applicants for hiring cycles beyond 2018, there are only 23 Black applicants disqualified during the 2018 background investigation, and the class fails numerosity.  But, as explained above, the Court rejects those arguments in the context of class standing and ascertainability, and there is no dispute that more than 40 Black or Hispanic applicants were disqualified during the background investigation phase in the 2018 hiring cycle.  (*See* Def.'s Opp'n at 20).

### D.      Commonality

Commonality exists if plaintiffs' claims share a common question of law or fact.  Fed. R. Civ. P. 23(a)(2).  This requires the "plaintiff to demonstrate that the class members 'have suffered the same injury,'" *Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co.*

22

*of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)), not "merely that they have all suffered a violation of the same provision of law," *id.* at 349–50 (noting that the language of Rule 23(a)(2) is "easy to misread, since any competently crafted class complaint literally raises common questions" (quotation omitted)).  That is,

> [i]t asks not simply whether there are questions of law or fact common to the class, but whether a class action is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." . . . [T]here must be "a common contention . . . of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."

*Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 162 (S.D.N.Y. 2014) (alterations in original) (quoting *Dukes*, 564 U.S. at 350).  Ultimately, in deciding whether commonality exists, "the question becomes whether dissimilarities between the claims may impede a common resolution."  7A Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 1763.1 (4th ed. 2026).

In the context of employment discrimination class actions, "[c]onceptually, there is a wide gap between (a) an individual's claim that he has been denied [employment] on discriminatory grounds" and "(b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact."  *Dukes*, 564 U.S. at 352–53 (quoting *Falcon*, 457 U.S. at 157).  So, where plaintiffs bring claims for many "employment decisions at once," commonality requires the "examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."  *Id.* at 352.  There must be "some glue holding the alleged *reasons* for all those decisions together."  *Id.*

Myers claims that the background investigation process "allows for excessive subjectivity and discretion" because of the "minimal training and written guidance," provided to AIU investigators and Commissioners. (Pl.'s Mot. at 21). And these are "deficiencies that disparately impact all members of the Proposed Classes." (*Id.*). The common questions and common answers generated by these allegedly "centrally-administered and subjectively-applied employment practices" are: 1) "whether the Background Investigation process had an adverse impact on the Proposed Classes, whether information reviewed during the Background Investigation process was job-related and a business necessity, and whether there existed reasonable alternatives that would have reduced or eliminated the discriminatory impact," and 2) "whether the Background Investigation process had an adverse impact that was known to Defendant and whether it took any measures to alleviate the disparities." (*Id.* at 21–22).[8]

It is oft-repeated, including by Myers, that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). But that statement is immediately qualified: "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class

---

[8] Myers offers two other common questions, but they are just restatements of a legal claim or standard: "whether Defendant engaged in a pattern or practice of intentional discrimination," and "whether Defendant's conduct represents a deprivation of the Proposed Classes' rights and violated the law and Constitution." (Pl.'s Mot. at 22). As noted above, any class will "literally raise[] common questions," but commonality requires a demonstration that class members "suffered the same injury," not "merely that they have all suffered a violation of the same provision of law." *Supra* p. 23.

certification are satisfied." *Id.* Indeed, the Second Circuit has interpreted *Amgen* to mean that "the district court resolves factual issues related to class certification, making its findings based on the preponderance of the evidence, even if they overlap with the merits of the case. . . . But such findings do not bind the trier of fact." *Mazzei v. Money Store*, 829 F.3d 260, 268 (2d Cir. 2016). Thus, in resolving class certification motions, courts in this Circuit regularly analyze commonality for each claim at issue—not to decide whether plaintiffs can or will ultimately prevail on the merits of the claim, but to determine whether the claims are amenable to class-wide resolution. *E.g.*, *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 274 (S.D.N.Y. 2018) (disparate treatment and impact claims); *Richardson v. City of New York*, No. 17-CV-9447, 2021 WL 1910689, at *7 (S.D.N.Y. May 12, 2021) (same); *Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, No. 18-CV-4476, 2022 WL 17175798, at *8 (S.D.N.Y. Nov. 22, 2022) (same). That rigorous inquiry is particularly appropriate here, where plaintiffs seek class-wide relief for a disparate impact claim, which requires "glue" to hold the challenged employment decisions together, and a disparate treatment claim, using a pattern-or-practice method of proof that by definition does not entail a "common mode of exercising discretion." *Loc. 3621*, 2022 WL 17175798, at *8 (quotation omitted). Myers failed to disaggregate his commonality arguments by claim; the Court, however, must do so, because the inquiry is different when applied to disparate impact and treatment claims.

25

### i.   Disparate Impact Claim

In *Dukes*, a case challenging the effects of discretion in employment decisions, the Supreme Court required "significant proof" that the employer "operated under a general policy of discrimination."  564 U.S. at 353.[9]  Courts in this Circuit accordingly analyze disparate impact claims under a two-part framework: 1) whether there is a common mode of exercising discretion that pervades the employer; and 2) whether plaintiffs have proffered sufficient evidence of discrimination—significant proof—to satisfy commonality.  *E.g.*, *Ndugga v. Bloomberg L.P.*, No. 20-CV-7464, 2026 WL 1204483, at *14 (S.D.N.Y. Apr. 20, 2026) (report and recommendation); *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 73 (S.D.N.Y. 2018); *Loiseau v. Bozzuto's Inc.*, No. 22-CV-1485, 2025 WL 2267644, at *14 (D. Conn. Aug. 8, 2025).

### a)   Common Mode of Exercising Discretion

The fact that the challenged conduct involves individualized discretionary decisions or an employer's failure to cabin discretion through a policy requiring uniform treatment is not a per se barrier to achieving commonality.  *E.g.*, *Elisa W.*, 82 F.4th at 124–25 (reversing the district court for categorically concluding that absence of non-discretionary policies precluded certification).  *Dukes* took issue with an attempt to

---

[9] *Dukes* acknowledged another method of bridging the "conceptual gap" between an individual claim and an allegation of a class-wide impact: use of "a biased testing procedure."  *Dukes*, 564 U.S. at 352–53.  Though Myers claims either method is applicable to this case, (Pl.'s Mot. at 21), he identifies no such testing procedure, as defined by *Dukes*, 564 U.S. at 353 ("The first manner of bridging the gap obviously has no application here; Wal–Mart has no testing procedure or other companywide evaluation method that can be charged with bias.  The whole point of permitting discretionary decisionmaking is to avoid evaluating employees under a common standard.").

26

certify a class based on a high-level corporate policy of permitting discretion at individual Walmart stores—despite the fact that the gender disparities, upon which the plaintiffs' commonality theory depended, could have been attributable to only a few stores, each with potentially significant different circumstances in terms of applicant pool and evaluation criteria.  564 U.S. at 355–57.  Myers's theory is different.

Here, Myers has identified "a common mode of exercising discretion that pervades the entire company."  *Id.* at 356.  The challenged discretion is concentrated within a single small team of decisionmakers, and all putative plaintiffs were subject to it: three Commissioners vote on whether to advance or disqualify every applicant, *e.g.*, *Chen-Oster*, 325 F.R.D. at 74–75 ("*Dukes* specifically anticipated a case where a discretion-based policy that 'pervades the entire company' would support a disparate impact claim.  Managerial discretion does not destroy Plaintiffs' claims." (quoting *Dukes*, 564 U.S. at 356)); *Loiseau*, 2025 WL 2267644, at *13 (collecting cases satisfying *Dukes* by showing existence of "common mode of exercising discretion").  He also cites specific practices as problematic components in the exercise of discretion: for example, the Commissioners do not receive sufficient guidance or training on the meaning of the "vague disqualification" criteria, and their decision-making process is "largely undocumented."  (Pl.'s Mot. at 21).  And he does present evidence of common policies that the Commissioners all must apply.  (*Id.* at 8–9 (explaining that the MPTC Guidelines and the Rule Book of the Nassau County Civil Service Commission govern disqualification decisions)).  These practices and the overarching policy of discretion are commonly and centrally administered by a small group of County employees, and

27

every putative class member was subject to them.  Thus, the putative class members were subject to a common method of exercising discretion.  *See Loiseau*, 2025 WL 2267644, at *16 ("Although managers have significant discretion under the Bid Policy, the court concludes that these limitations, as well as the procedure and structure laid out by the Bid Policy, amount to a 'common mode of exercising discretion' that applies to warehouse associates.").  Myers's theory satisfies the first step of the inquiry.

### b)      Significant Proof

But Myers must still put forward "significant proof" that Nassau County was operating "under a general policy of discrimination."  *Dukes*, 564 U.S. at 353.  That is, that the "uniformly applied, common practice is driving the unequal outcomes at issue."  *Richardson*, 2021 WL 1910689, at *9; *see also Loc. 3621*, 2022 WL 17175798, at *9. When evaluating whether significant proof exists, courts consider evidence of similarly situated comparators, *e.g.*, *Ndugga*, 2026 WL 1204483, at *15 (evaluating statistical evidence comparing similarly situated women and men in a Title VII sex discrimination case); *Kassman*, 416 F. Supp. 3d at 282 (same), and courts look for some basis to "draw [a] causal connection between [the] employment process and any disparities," *Loc. 3621*, 2022 WL 17175798, at *11.  Myers's evidence on both is inadequate.[10]

First, the evidence proffered by Myers makes no demonstration on a class-wide basis—or even of a sample of the larger class—that *similarly situated* applicants were hired or disqualified.  He purports to convey "numerous instances where Black and

---

[10] The experts' conclusions are not available to the Court as a form of "significant proof."  *See supra* pp. 11–13.

Hispanic applicants were disqualified when White applicants with worse or similar records were hired." (Pl.'s Mot. at 11). But Myers surfaces only two potential instances of discrimination evidenced by similarly situated comparators: against himself and one other Hispanic applicant. (*Id.* at 11–12). With respect to his own disqualification, Myers identified several white applicants as comparators with GRRs revealing a concerning number of traffic tickets, license suspensions, and at-fault accidents. (*Id.*). He also notes one Hispanic applicant disqualified on the basis of their employment record, compared to one white applicant offered employment despite a concerning history of employment terminations. (*Id.* at 12). But that is the extent of the proof he supplies. Myers offers no evidence from which the Court could find that the same disparity applies, beyond these two individuals, on a broader, class-wide basis—there is no analysis of any other disqualified applicants and identification of comparators for them. *See, e.g.*, *Kassman*, 416 F. Supp. 3d at 282 (finding that plaintiffs' evidence did not show a significant disparity between similarly situated comparators in hiring decisions); *Attenborough v. Const. & Gen. Bldg. Laborers' Loc. 79*, 238 F.R.D. 82, 96–97 (S.D.N.Y. 2006) (without a statistical showing or evidence of a causal connection between the allegedly discriminatory practice and the alleged effect, sworn testimony of single plaintiff was insufficient to show an aggrieved class). Because he has not put forward significant proof of discrimination via statistical or anecdotal evidence, Myers has not made a showing to bridge the "conceptual gap." *E.g.*, *Calvello v. Elec. Data Sys.*, 151 F. App'x 35, 37 (2d Cir. 2005) ("Appellant's anecdotal evidence and statistical evidence . . . did not

29

bridge the 'gap' between Calvello's claim that she was discriminated against and the existence of a class of EDS employees who suffered the same injury.").

Second, Myers makes no causal showing to connect the particular challenged practices to the discriminatory impact he alleges.  The specific practices Myers challenges are: 1) background investigations conducted by undertrained investigators; 2) use of vague criteria such as "disrespect for the process of law and order" and "poor moral character"; and 3) the failure to review the criteria for job-relatedness and consistency with business necessity.  (Pl.'s Mot. at 2 (referencing the process as "highly-subjective" and largely undocumented)).[11]  It is clear that Myers himself was impacted by one of these practices, since he was expressly informed that he was disqualified based on an alleged disrespect for the process of law and order.  (*See id.* at 4 (noting that Myers was disqualified based on his motor vehicle record)).  But Myers has not attempted to demonstrate a causal connection for any other disqualified applicant. Even the presentation of the one Hispanic applicant noted above, for whom Myers proffered similarly situated comparators, is completely untethered from the specific challenged practices.  There is no evidence of whether the lack of certain trainings, vague criteria, or some other manifestation of discrimination is to blame for that applicant's disqualification.  In summary, while Myers has presented evidence that he was disqualified based on a particular practice, he has not made that showing — that

---

[11] It does not appear that Myers is arguing that "unbridled discretion" is itself the challenged policy or practice.  (*See* Pl.'s Reply at 5 (contending that Defendant is confusing the excessively subjective *administration* of the uniform policies Myers challenges with the challenged practices themselves)).

their disqualification was based on the problematic practices—for a single other class member.  He may have an individual claim, but without significant proof that putative class members' results were tied to the same practices, class resolution is inappropriate. *E.g.*, *Loc. 3621*, 2022 WL 17175798, at \*10 (showing racial disparities without identifying which parts of the employment process account for the disparity).

Third, related to the failure to make any causal demonstration, there are further problems with Myers's motion that confirm that class certification is inappropriate here. Myers asks the Court to certify a sweepingly broad class, which does not make any attempt to exclude unqualified applicants or sub-class to account for vastly different individual applications.  (*See* Pl.'s Reply at 4 ("Plaintiff is not arguing that all putative class members are qualified.")).  This is not merely, as Myers argues, a merits issue of "[w]hether individual class members would have been hired" absent discrimination. (*Id.*).  Instead, it is a class certification issue because it is essentially a forgone conclusion that the "examination of all the class members' claims for relief" will *not* "produce a common answer to the crucial question *why was I disfavored*." *Dukes*, 564 U.S. at 352.

A pre-*Dukes* example provides helpful context.  In the lengthy litigation by the federal government challenging race discrimination in hiring by the Fire Department of New York, a group of Black firefighter applicants intervened and sought class certification on disparate impact claims based on the use of particular written examinations. *United States v. City of New York*, 258 F.R.D. 47, 53–54 (E.D.N.Y. 2009).  In opposition to class certification, defendants argued that the intervenors' proposed class was "overbroad because its inclusion of *all* black applicants necessarily encompasses

31

applicants that are not qualified for the job of entry-level firefighter." *Id.* at 57. It would include, for example, applicants that could not pass the physical test, meet the age and medical requirements, and pass drug screening and background checks. *Id.* at 58. The intervenors responded by revising their class definition, limiting the class to "black applicants *harmed* by the allegedly discriminatory employment practices," so that applicants that would have been rejected for nondiscriminatory reasons would not be included in the class. *Id.*

In contrast, Myers took a different tack and doubled down on his inclusion of unqualified applicants. He seeks to include, as class members, applicants who:

- pled guilty to harassment and were subject to a protective order after leaving a message on their aunt's phone threatening "to snap her granddaughter's neck," (Def.'s GRRs at 9764);

- pled guilty to disorderly conduct and reportedly said to an arresting officer, "I'm going to shoot you," (*id.* at 9778);

- resigned while suspended from the New York Police Department after failing a drug test and made false statements in their application to Nassau County, (*id.* at 9699); and

- were suspended from a correctional officer position for excessive force by misuse of chemical spray and had their license suspended for failure to pay child support, (*id.* at 10041).

Nassau County detailed 15 such instances, among others, (Def.'s Opp'n at 9–10), and Myers does not offer any reason to demonstrate that these applicants *should* or even *could* have been hired. That is, Myers fails to demonstrate that these disqualification decisions are based on a discriminatory application of discretion. Because it appears that these decisions were based on appropriate exercises of discretion—that is, there were legitimate non-discriminatory reasons for their denials—they would not be

32

appropriate to include in the proposed class.  Said differently, Myers offers nothing from which this Court may "draw the causal connection between" vague definitions about respect for law and order or the absence of implicit bias training and the disparate hiring outcomes between Black and white applicants.  *Loc. 3621*, 2022 WL 17175798, at *10 (finding no "classwide answers" despite clear statistical disparities, because neither anecdotal nor statistical evidence helped identify which "specific employment practice or practices are discriminatory").[12]

There is no basis in the current record from which this Court can conclude that there is a causal connection between the disqualified Black and Hispanic applicants and the practices Myers challenges.  That deficiency is only heightened when Myers concedes, in arguing that his class deliberately includes unqualified applicants, that some class members were not at all impacted by the allegedly discriminatory practices.

On this record, Myers has not shown significant proof of a general policy of discrimination, *see Dukes*, 564 U.S. at 353, and so he has not made the required preponderance showing that there is commonality for his disparate impact claim.

### ii.      Disparate Treatment Claims

"Section 1983 allows plaintiffs to sue municipal entities . . . for deprivations of constitutional rights.  Through its application of the Equal Protection Clause of the

---

[12] Though courts may exercise their discretion to modify a class definition when the one plaintiffs present is overly broad, *e.g.*, *Loiseau*, 2025 WL 2267644, at *12, the Court declines to do so.  There is no obvious way to modify the class definition here. There are certainly many possibilities, such as limiting the class definition to qualified applicants, or introducing sub-classes based on particular practices, such as those excluded on the basis of traffic violations, marijuana use, or delinquent debts.

Fourteenth Amendment, it protects public employees from various forms of discrimination, including . . . disparate treatment on the basis of race." *Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 183–84 (2d Cir. 2025) (quotations omitted).

In a class context, plaintiffs may pursue such a claim through the pattern or practice method[13] of proving a disparate treatment claim. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977); *Tassy v. Buttigieg*, 51 F.4th 521, 530 (2d Cir. 2022) ("[A] pattern or practice case is not a separate and free-standing cause of action, but rather a method of proving a disparate treatment claim that is not available to nonclass, private plaintiffs[.]" (quotation omitted)).

The import for class certification is that Myers is not required to identify a specific practice responsible for the discrimination. He can instead show that the County engaged in "widespread acts of intentional discrimination against individuals," or that "intentional discrimination was [Nassau County's] standard operating procedure." *Reynolds v. Barrett*, 685 F.3d 193, 203 (2d Cir. 2012) (quotations omitted). Statistics alone may be sufficient to do so, but they must be statistically significant and "must also be of a level that makes other plausible non-discriminatory explanations very unlikely." *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015).

Ordinarily the Court would turn to Myers's statistical showing. *E.g., Richardson*, 2021 WL 1910689 at *9–*10; *Kassman*, 416 F. Supp. 3d at 282. But as noted above, the

---

[13] The pattern-or-practice method has generally only been discussed by the Second Circuit in the context of a disparate treatment claim. *E.g., Reynolds*, 685 F.3d at 203; *Chin v. Port Auth. of N.Y & N.J.*, 685 F.3d 135, 148–49 (2d Cir. 2012). The Court assumes Myers is seeking to proceed under this method.

Court has no statistical evidence before it—besides the table reproduced above. *Supra* pp. 11–13.  And Myers says the experts would add nothing new anyway.  (Pl.'s May 11, 2026 Letter at 1 ("Although the motion papers include references to expert reports, those references merely . . . add context in the commonality discussion.  No expert opinion is required to support a showing of . . . commonality."); *id.* at 2 ("Portions of expert reports are referenced in the commonality discussion to preview the common evidence, not to support the existence of common questions and answers.")).  So, Myers's showing relies entirely on the County's hiring records to attempt to demonstrate that white applicants with similar records were hired while Black and Hispanic applicants were disqualified.  (Pl.'s Mot. at 11–13).  (As for the table, it does not establish a pattern or practice of discrimination, for the reasons explained above.)

The anecdotal evidence is insufficient to carry Myers's burden to establish commonality.[14]  Myers argues that four white applicants with similar histories of traffic tickets were hired, while Myers was disqualified on that factor.  (Pl.'s Mot. at 11–12).  He also says he has never been arrested, but two white applicants were offered employment despite concerning arrest records.  (*Id.* at 12).  The only other direct

---

[14] *Kassman* also considered the defendant's failure to remedy known disparities in assessing whether the plaintiffs showed a pattern or practice.  *See* 416 F. Supp. 3d at 283–84.  To that end, as for Myers's argument that a 2021 news article put Nassau on notice of its racial disparities in hiring, (Pl.'s Mot. at 15–16), Myers applied in 2018, well before the article was issued, and his denial took place in 2020, (Myers Decl. ¶¶ 10, 13).  Myers's separate argument that Nassau County was aware of disparities and failed to eradicate them, as evidenced by the governing consent decree, also does not satisfy his commonality burden on a disparate treatment claim.  *See Kassman*, 416 F. Supp. 3d at 284 ("At most, Plaintiffs have shown that KPMG was aware of a pay and promotions gap, and that the firm's efforts have not completely eradicated the gap."); *Ndugga*, 2026 WL 1204483, at *17 (stating the same).

comparison Myers offers is that one Hispanic applicant was disqualified for their employment record, which consisted of termination from one job, while a white applicant was hired who had been terminated from two jobs.  (*Id.*).  While the evidence of discrimination against those two individuals is compelling as to their disqualifications, it is insufficient to establish a wider pattern or practice to support class certification.  *Compare Dukes*, 564 U.S. at 358 ("In [*Teamsters*], in addition to substantial statistical evidence of companywide discrimination, the [plaintiff] produced about 40 specific accounts of racial discrimination from particular individuals."), *with Richardson*, 2021 WL 1910689, at *11 ("These anecdotes may support individual claims, but they cannot carry a class action in the absence of strong statistical evidence." (citation omitted)); *Loc. 3621*, 2022 WL 17175798, at *13 n.9 (same); *Kassman*, 416 F. Supp. 3d at 284–85 (explaining that even where the record reflected 150 internal complaints of sex discrimination and 20 declarations from putative class members—numbers largely reflective of limitations imposed by the Court—such anecdotal evidence could not compensate for the lack of a strong statistical showing).

Indeed, these two samples stand in stark contrast to the evidence submitted by the County.  The County submitted the GRRs for the 23 Black and 43 Hispanic applicants disqualified during the background investigation phase of the 2018 hiring cycle, which goes largely unrebutted by Myers.  (*See* Def.'s GRRs; Def.'s Opp'n at 9–10 (noting disqualified applicants included those with significant criminal records or other serious misconduct)).  The County highlighted over a dozen applicants, none of whom can be credited as anecdotal evidence of disparate treatment on the basis of race: the

County points to legitimate, race-neutral, disqualifying reasons for each of them, and Myers does not argue otherwise, nor does he present the GRRs of similarly situated white applicants who were offered employment. *See supra* p. 32 (discussing applicants that threatened to snap the neck of a child or shoot an arresting officer, failed drug tests and lied in their applications, or had prior excessive force discipline).

In summary, Myers has not met his burden to show a pattern or practice of discriminatory treatment by a preponderance of the evidence. *E.g.*, *Kassman*, 416 F. Supp. 3d at 282; *Richardson*, 2021 WL 1910689, at *12; *Loc. 3621*, 2022 WL 17175798, at *14.

Because of the failure to show commonality for both the disparate impact and disparate treatment claims, the motion for certification must be denied. *See Loc. 3621*, 2022 WL 17175798, at *14 ("Plaintiffs therefore have not met Rule 23(a)'s commonality requirement, and their proposed classes cannot be certified."); *Richardson*, 2021 WL 1910689, at *12 (same).

## II.    The Damages Class

The second class Myers seeks to certify consists of "Black and Hispanic applicants for police officer positions in Nassau County disqualified during the Background Investigation of the 2018 hiring cycle." (Pl.'s Mot. at 1).  The damages class "seeks back pay and damages sustained as a result of Defendant's conduct and an order restoring Plaintiff and members of the class to the eligibility list for the current application cycle." (*Id.* at 5).  Because Myers cannot satisfy the commonality requirement of Rule 23(a), his "motion would be doomed by Rule 23(b)(3)'s

predominance inquiry, which is 'far more demanding' than the commonality inquiry and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Allen v. City of New York*, No. 19-CV-3786, 2022 WL 4133132, at *2 (S.D.N.Y. Sep. 12, 2022) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). Thus, Myers's motion to certify a damages class must also be denied.

## III.    Rule 23(c)(4) Issue Class Certification

In the alternative, Myers seeks issue class certification as to liability under Rule 23(c)(4) for his proposed Rule 23(b)(3) class. Because he has not satisfied commonality, the Court declines to certify any issue class. *E.g.*, *Kassman*, 416 F. Supp. 3d at 285. As discussed throughout this opinion, individual issues regarding each applicant's qualifications, exacerbated by the failure to delineate sub-classes or identify similarly situated comparators on a representative basis, would defeat the potential judicial economy to be gained by class litigation, even confined to the issue of liability. *See Dungan v. Acad. at Ivy Ridge*, 344 F. App'x 645, 648 (2d Cir. 2009) (affirming denial of issue class where district court determined that "the significance of individualized issues of reliance, causation, and damages in this case meant that issue certification would not meaningfully reduce the range of issues in dispute and promote judicial economy").

## IV.    Motion to Seal

The parties jointly request to seal certain documents filed with their class certification briefs. Specifically, the parties seek to redact personally identifiable information ("PII") of applicants whose GRRs they filed, Myers's application materials,

and cell phone numbers of counsel and a witness.  (Mem. in Supp. of Joint Mot. to Seal dated Nov. 21, 2025 ("Mot. to Seal"), Dkt. No. 111 at 1).  Nassau County also asks to redact names of personnel listed on an affirmative action report, and details of individuals' sealed criminal records or personal health and family information of non-parties.  (*Id.* at 1–2).

> In deciding whether to seal or unseal filed materials, a court properly conducts a three-step inquiry: First, the court determines whether the record at issue is a judicial document—a document to which the presumption of public access attaches.  Second, if the record sought is determined to be a judicial document, the court proceeds to determine the weight of the presumption of access to that document.  Third, the court must identify all of the factors that legitimately counsel against disclosure of the judicial document and balance those factors against the weight properly accorded the presumption of access.

*Giuffre v. Maxwell*, 146 F.4th 165, 175 (2d Cir. 2025) (quoting *Stafford v. Int'l Bus. Machines Corp.*, 78 F.4th 62, 69 (2d Cir. 2023)).

The materials at issue are judicial documents, since they were "filed on a federal court's docket in the ordinary course of litigation."  *Id.* at 176.  "Filings related to *Daubert* motions and class certification motions are subject to a strong presumption of access under the common law and the First Amendment."  *Ndugga*, 2025 WL 2302089, at *1.  In light of the strong presumption of access, sealing "'may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim.'"  *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006)).

39

The Court agrees that the redactions the parties have applied, focused on narrow redactions of PII of nonparties—names, dates of birth, social security numbers, and in some instances, business ownership where it would be identifying—as well as sealed criminal histories of non-party declarants and phone numbers of counsel, satisfies *Lugosch*. *See Thor Equities, LLC v. Factory Mut. Ins. Co.*, No. 20-CV-3380, 2023 WL 6382684, at *1–*2 (S.D.N.Y. Sep. 29, 2023) (allowing plaintiff to file sealed exhibits that relate to "personal, confidential, [and] sensitive medical information" and that have "minimal relevance to the Court's decision" on pending motions).

The parties seek to seal the entirety of Myers's GRR and application materials—beyond sensitive personal information like his social security number and date of birth—because his identity would be readily apparent (unlike those whose names could merely be redacted). (Mot. to Seal at 5–6). The parties do not seek to redact their briefs discussing Myers's GRR, (*see, e.g.*, Pl.'s Mot. at 11 (discussing the proffered reason for Myers's disqualification and the traffic infractions listed on his GRR)), but they justify sealing the exhibits themselves because they say his employment history is not relevant to class certification, nor is it referenced or relied upon by the parties. (Mot. to Seal at 5). The Court sees no basis to wholesale seal materials that the parties publicly discuss in their motion papers—portions of which directly bear on the class certification request, since Myers makes arguments about similarly situated comparators on the basis of the motor vehicle information contained within his GRR. (Pl.'s Mot. at 11). Wholesale sealing of such a document is not "narrowly tailored" under *Lugosch*. *E.g.*, *Susquehanna Int'l Grp. Ltd. v. Hibernia Express (Ireland) Ltd.*, No. 21-CV-0207, 2021 WL

40

3540221, at \*4 (S.D.N.Y. Aug. 11, 2021) (denying motion to seal for lack of narrow tailoring); *Park v. Parker*, No. 25-CV-0789, 2025 WL 3493793, at \*3 (S.D.N.Y. Dec. 5, 2025) (denying motion to seal where information was already separately publicly available).

Accordingly, the motion to seal is granted as to the parties' proposed redactions. However, the parties are directed to confer and file a public version of Myers's application materials with tailored redactions and a renewed application to seal any portions of that document sought to be maintained under seal, beyond the PII the Court has already deemed permissible to redact.

CONCLUSION

For the reasons above, Myers's motion for class certification is denied. The parties' motion to seal is granted in part and denied in part. The parties are directed to file a renewed sealing application with narrowly tailored redactions as to Myers's application materials that were filed entirely under seal, and do so by **July 17, 2026**.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date: July 9, 2026
Central Islip, New York

41